United States Bankruptcy Court
Southern District of Texas

**ENTERED**

February 15, 2022

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Case No. 21-33989 |
| | § | |
| SMOKINKWR LLC, | § | Chapter 11 |
| | § | |
| Debtor-in-Possession. | § | |
| | § | |

**FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364,
AND 507, BANKRUPTCY RULES 2002, 4001, 6004, AND 9014, AND LOCAL
RULE 4001-2 (I) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL
AND OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND
PROVIDING SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS,
(III) GRANTING ADEQUATE PROTECTION, AND (IV) GRANTING
<u>RELATED RELIEF</u>**

Upon the motion (the "<u>Motion</u>") of the debtor and debtor-in-possession (collectively, the "<u>Debtor</u>") in the above-captioned chapter 11 case (the "<u>Chapter 11 Case</u>"), pursuant to sections 105(a), 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(d)(1), 364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>"), and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), seeking, among other things, entry of this final order (the "<u>Final DIP Order</u>"):

i.       Authorizing the Debtor to obtain a postpetition financing facility (the "<u>DIP Facility</u>"), consisting of senior secured, superpriority, revolving loan(s) (the "<u>DIP Loan(s)</u>," and together with all other obligations under the DIP Loan Documents (as defined below), the "<u>DIP Obligations</u>") to be advanced and made available to the Debtor in the aggregate maximum principal amount of $260,000.00 (such amount, the "<u>Committed Amount</u>") consistent with the terms and conditions of that certain *Senior Secured Debtor-in-Possession Credit and Security Agreement*, dated as of January 28, 2022, the form of which is attached hereto as **<u>Exhibit A</u>** (as

*ACTIVE 62994883v2*

amended, supplemented, or otherwise modified from time to time in accordance with the terms and conditions set forth in the Final DIP Order, the "DIP Credit Agreement") , among the Debtor, as borrower, and Dickey's Barbecue Restaurants, Inc., as lender ("Dickey's" or the "DIP Lender"), and the Approved Budget[1] (as defined below and together with the DIP Credit Agreement and any other document or instrument executed and/or delivered in connection with the DIP Facility, the "DIP Loan Documents");

ii.      Authorizing the Debtor to execute and enter into the DIP Loan Documents and to perform all such other and further acts as may be required in connection with the DIP Loan Documents, including the DIP Obligations, and all instruments, security agreements, assignments, pledges, mortgages, reaffirmations and other documents referred to therein or requested by the DIP Lender to give effect to the terms thereof;

iii.      Authorizing the Debtor to use proceeds of the DIP Facility as permitted in the DIP Loan Documents and in accordance with this Final DIP Order;

iv.      Authorizing the Debtor to grant, and granting superpriority administrative expense claims pursuant to Bankruptcy Code § 364(c)(1) in respect of the DIP Obligations to the DIP Lender;

v.      Authorizing the Debtor to grant, and granting liens on and security interests in  the DIP Collateral (as defined herein) in respect of the DIP Obligations to the DIP Lender as follows: pursuant to Bankruptcy Code § 364(c)(2) and (d), valid, perfected, enforceable, non-avoidable, first priority, priming liens on and security interests in all now owned or hereafter acquired assets and property of the Debtor on the terms set forth in the DIP Loan Documents;

---

[1] The initial Approved Budget is attached as Exhibit C to the DIP Credit Agreement.

*ACTIVE 62994883v2*

vi.      Vacating and modifying the automatic stay pursuant to Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Final DIP Order and the DIP Loan Documents;

vii.      Granting the Debtor such other and further relief as is just and equitable; and

viii.      The Court having held hearings on January 28 and February 14, 2022, and after due deliberation and consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND CONCLUDED THAT:**[2]

A.      On December 14, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code. The Debtor is continuing to operate and maintain its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.      This Court has jurisdiction over this chapter 11 case and the Motion pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this case and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The Court has authority to enter this Final DIP Order consistent with Article III of the United States Constitution.

C.      Sufficient and adequate notice of the Motion and entry of this Final DIP Order has been given pursuant to Bankruptcy Code §§ 102(1) and 364(c) and (d) and Bankruptcy Rules 2002 and 4001(c) to all entities entitled thereto such that no other or further notice of the Motion or of the entry of this Final DIP Order need be provided to any entity.

---

[2]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. Pursuant to Bankruptcy Rule 7052, to the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. Statements made by the Court from the bench during the Final Hearing shall constitute additional conclusions of law and findings of fact, as appropriate.

*ACTIVE 62994883v2*

D.  An immediate and ongoing need exists for the Debtor to use Cash Collateral and obtain the DIP Facility in order for the Debtor to pursue a chapter 11 plan of reorganization (the "Plan"), and maximize the value of its business and assets as debtor in possession under chapter 11 of the Bankruptcy Code through, among other things: the orderly continuation of the operation of its businesses; maintenance of business relationships with vendors, suppliers and customers; paying payroll obligations; and satisfaction of other working capital and operational needs. The Debtor does not have sufficient available resources of working capital to operate its business in this chapter 11 case in the ordinary course without the use of Cash Collateral and the proceeds of the DIP Facility. The Debtor's ability to maintain business relationships with vendors, to pay employees, and otherwise to fund operations is essential to the Debtor's viability and preservation of the going-concern value of their businesses and successful reorganization.

E.  The Debtor is unable to obtain unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense, and the Debtor is unable to obtain the postpetition financing that it needs on terms more favorable than those provided by the DIP Facility. Without limiting the foregoing, postpetition financing is not available to the Debtor without the Debtor granting to the DIP Lender, the DIP Liens (as defined herein) and the DIP Super-Priority Claims (as defined herein) provided under the DIP Loan Documents and this Final DIP Order.

F.  The DIP Facility has been negotiated in good faith and at arms' length between the Debtor and the DIP Lender. Any credit extended and loans made to the Debtor pursuant to the DIP Loan Documents and this Final DIP Order shall be deemed to have been extended, issued, or made, as the case may be, in good faith, as required by, and within the meaning of Bankruptcy Code § 364(e), and the DIP Lender is entitled to the protections of Bankruptcy Code § 364(e).

*ACTIVE 62994883v2*

G.      The extension of credit under the DIP Facility is fair and reasonable and reflects the Debtor's exercise of prudent business judgment consistent with their fiduciary duties. The DIP Lender has provided fair, adequate, and sufficient consideration that constitutes reasonably equivalent value for the DIP Liens (as defined herein) conveyed to, and the rights, protections, and benefits obtained by, the DIP Lender under this Final DIP Order and under the DIP Loan Documents.

H.      Entry of this Final DIP Order is in the best interests of the Debtor's estate and creditors because its implementation, among other things, will allow for the availability to the Debtor of working capital and will enhance the Debtor's prospects for a successful reorganization.

I.      The DIP Lender is willing to provide the DIP Facility to the Debtor, but only upon the terms and conditions set forth in the DIP Loan Documents and this Final DIP Order. Absent entry of this Final DIP Order, the DIP Lender would not provide the DIP Facility.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein and the DIP Facility is approved on a final basis.

2.      Any objections to the Motion or to entry of this Final DIP Order that have not been withdrawn or otherwise resolved are hereby **OVERRULED**.

3.      The DIP Liens granted herein are superior in priority to the liens of US Foods, Inc. ("USF"), including those liens granted to USF under the First and Second Interim Orders for Use of Cash Collateral (ECF # 43 and 73, respectively) and any amendments or final orders entered in connection with the same (collectively, the "Cash Collateral Orders"); (b) the Approved Budget supersedes the budget attached to the Second Cash Collateral Order (ECF #**73** ) as if set forth and incorporated therein; (c) on or before February 2, 2022 and on each consecutive Wednesday

5

thereafter until termination of this order and the Cash Collateral Orders, the Debtor shall provide the DIP Lender, USF and the Subchapter V Trustee with a comparison of the Debtor's budgeted to actual performance for the immediately preceding week; (d) to the extent a provision of this Order directly conflicts with a provision of the Cash Collateral Orders, this Order shall prevail and (e) all other provisions of the Cash Collateral Orders, including those provisions providing for adequate protection payments, remain in full force and effect.

4.      The execution and delivery of the DIP Credit Agreement and other DIP Loan Documents by the Debtor is authorized and approved on a final basis. Further, the Debtor is expressly authorized to (a) execute and deliver to the DIP Lender any other document of any kind required to be executed and delivered in connection with the DIP Credit Agreement and the other DIP Loan Documents; (b) take any action to carry out the intent and purpose of the DIP Credit Agreement and other DIP Loan Documents, including all such actions to create, protect, and perfect the DIP Liens (as defined herein) in favor of the DIP Lender, and (c) comply with and perform all of the terms and conditions contained in the DIP Credit Agreement and other DIP Loan Documents. The DIP Loan Documents constitute valid and binding obligations of the Debtor, enforceable against the Debtor and its estate and any successor trustee, in accordance with the terms thereof. No obligation, payment, transfer, or grant of security under the DIP Loan Documents as approved under this Final DIP Order shall be stayed, restrained, voided, voidable, or recoverable under the Bankruptcy Code or applicable nonbankruptcy law, except to the extent this Order expressly provides otherwise.

5.      The Debtor is expressly authorized to borrow the DIP Loan(s) from the DIP Lender in the maximum principal amount not to exceed $260,000, on the terms and conditions set forth in the DIP Loan Documents and this Final DIP Order.

6.      The Debtor shall repay Dickey's for prior extensions of credit in the amount of $161,351.37, which amounts represent financing that was extended to the Debtor after the Petition Date but prior to the entry of the Interim DIP Order approving the DIP Facility.

7.      The DIP Obligations are subject to the payment of the DIP Lender's attorneys' fees in this Chapter 11 Case, and include those amounts. Principal will be payable on a weekly basis. The fees and expenses relating to the DIP Facility, including the DIP Lender's attorneys' fees, are authorized and approved for payment without further order of Court.

8.      The Debtor is hereby authorized to use the Cash Collateral of any Prepetition Secured Parties and proceeds of the DIP Loan(s) in accordance with the budget approved by US Foods, Inc. ("USF") and the DIP Lender (the "Approved Budget"). The Approved Budget is attached as Exhibit B hereto (the "Approved Budget"). The Approved Budget may be updated, modified, or supplemented (with the consent of the DIP Lender) from time to time, and each such updated, modified or supplemented budget shall be approved by, and in form and substance satisfactory to, the DIP Lender and USF, and no such updated, modified, or supplemented budget shall be effective until so approved and once so approved shall be deemed an Approved Budget. Prior to 5:00 p.m. (prevailing Central time) on the fourth business day during the fifth (5th) week of the Approved Budget (and the fourth business day during the final week of each successive Approved Budget thereafter), the Debtor shall submit a budget for the next successive nine (9) week period to the DIP Lender and USF, which budget shall be in form and substance acceptable to the DIP Lender, and USF and approved by the DIP Lender and USF.

9.      Without further order of the Court, upon an Event of Default (as defined in the DIP Credit Agreement) and written notice to USF, the DIP Lender may direct the Debtor to (or the DIP Lender may directly) instruct all account debtors of existing and future accounts receivable

7

included in the DIP Collateral to make payments directly into accounts satisfactory to the DIP Lender, in which event all such cash proceeds shall be applied in accordance with the DIP Loan Documents. Further, upon written notice to USF, the DIP Lender may foreclose or otherwise realize upon its Collateral without the need for relief from the automatic stay.

10. The DIP Lender is authorized to collect upon, convert to Cash Proceeds, and enforce checks, drafts, instruments and other forms of payment now or hereafter coming into its possession or under their control which constitute DIP Collateral or proceeds of DIP Collateral, subject to the provisions hereof.

11. As security for the DIP Obligations, and as provided in the DIP Loan Documents and this Final DIP Order, the DIP Lender shall have (effective and continuing, without the necessity of the execution, filing, and/or recordation of mortgages, security agreements, control agreements, patent security agreements, trademarks security agreements, pledge agreements, financing statements, or otherwise) (a) pursuant to Bankruptcy Code §§ 364(c)(2) and (d), valid, perfected, enforceable, non-avoidable, first priority, priming liens on and security interests in all now owned or hereafter acquired assets and property of the Debtor, including, but not limited to, any and all rents, issues, products, offspring, proceeds and profits generated by any item of such collateral, without the necessity of any further action of any kind or nature by the DIP Lender in order to claim or perfect such rents, issues, products, offspring, proceeds and/or profits (collectively, the "DIP Collateral"); and (b) pursuant to Bankruptcy Code § 364(c)(3), valid, perfected, enforceable, non-avoidable, first priority or other junior liens on and security interests in all now owned or hereafter acquired assets and property of the Debtor, and any and all rents, issues, products, offspring, proceeds and profits generated by any item of such collateral, without the necessity of any further action of any kind or nature by the DIP Lender in order to claim or

8

perfect such rents, issues, products, offspring, proceeds and/or profits, in each case on the terms set forth in the DIP Loan Documents ((a) and (b) collectively, the "DIP Liens," and the assets subject to the DIP Liens, the "DIP Collateral"); for the avoidance of doubt, the DIP Liens shall attach to any chapter 5 causes of action (collectively, "Avoidance Actions") or the proceeds thereof. The DIP Liens are senior and superior in priority to all other secured and unsecured creditors of the Debtor's estate.

12.     Notwithstanding any other provisions included in this Final DIP Order, or any agreements approved hereby, any statutory liens (collectively, the "Tax Liens"), of the Texas Taxing Authorities[3] shall not be primed by nor made subordinate to any liens granted to any party hereby to the extent such Tax Liens are valid, senior, perfected, and unavoidable, and all parties' rights to object to the priority, validity, amount, and extent of the claims and liens asserted by the Texas Taxing Authorities are fully preserved.

13.     This Final DIP Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the DIP Liens granted herein, effective as of the Petition Date, without any further action by Debtor or DIP Lender and without the execution, filing or recordation of any financing statements, security agreements, mortgages, certificates or other agreements, documents or instruments. Notwithstanding the foregoing, the Debtor shall execute and deliver to the DIP Lender such financing statements, mortgages, instruments, certificates, agreements and other documents as the DIP Lender may reasonably request from time to time to provide further evidence

---

[3] The Texas Taxing Authorities consist of Brazoria County Tax Office, Brazoria County MUD #26, Harris County MUD #102, Dickinson Independent School District, Klein Independent School District, Kleinwood MUD, City of Burleson, Burleson Independent School District, Johnson County, Arlington Independent School District, Frisco Independent School District,  Bell County Tax Appraisal District, Midland Central Appraisal District, City of Waco, Texas, The County of Hardin, Texas, The County of Henderson, Texas, Harris County, Texas, Harris County Municipal Utility District No. 102, Cypress-Fairbanks Independent School District, Galveston County, Texas, and Montgomery County, Texas.

9

of the perfection of the DIP Liens, and any such documents filed by the DIP Lender shall be deemed filed as of the Petition Date.

14.     In accordance with Bankruptcy Code § 364(c)(1), to the extent the DIP Liens do not satisfy the DIP Obligations, the DIP Obligations shall constitute claims with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), or 726 (to the extent permitted by law), and/or 364(c)(1), and any other provision of the Bankruptcy Code (other than section 506(c) of the Bankruptcy Code), and shall at all times be senior to the rights of the Debtor, any chapter 11 trustee, any chapter 7 trustee or any other creditor in this chapter 11 case (the "DIP Super-Priority Claims"); _provided_, _however_, that the DIP Super-Priority Claims shall be subject to the Carve-Out.

15.     While any portion of the DIP Obligations remains unpaid or any of the DIP Loan Documents remains in effect, the Debtor shall not seek entry of any order approving or authorizing (under Bankruptcy Code §§ 105 or 364, or otherwise) (a) the granting of any lien or security interest in any of the DIP Collateral in favor of any party other than the DIP Lender or (b) the obtaining of credit or the incurring of indebtedness that is entitled to superpriority administrative status, in either case _pari passu_ with or superior to that granted to the DIP Lender pursuant to this Final DIP Order, unless, in connection with any transaction cited in clause (a) or (b) of this Paragraph, such request by the Debtor seeks to authorize and direct that the full amount of the DIP Obligations shall first be paid indefeasibly and in full.

16.     The DIP Liens in the DIP Collateral, the DIP Super-Priority Claim, the Adequate Protection Liens, and the Adequate Protection Super-Priority Claim, shall, in each instance, be

subject only to the Permitted Existing Liens and the right to payment of the following (the "Carve-Out"):

> (i)      Statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6); and

> (ii)     Fees payable to the Clerk of this Court.

17.     Except for the Carve-Out, no costs or expenses of administration shall be imposed against Lender or any of its Collateral under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise.

18.     None of the DIP Loans, proceeds thereof, or DIP Collateral may be used to fund, directly or indirectly, any effort to: (a) object to or contest in any manner, or raise any defenses to the validity, perfection, priority, or enforceability of the DIP Obligations owing to the DIP Lender or the DIP Liens in favor of the DIP Lender securing such DIP Obligations; or (b) assert any claims or causes of action of any type against the DIP Lender, including, without limitation, any Avoidance Actions, or any claim or cause of action under the DIP Facility against the DIP Lender.

19.     The DIP Lender, at its election, is authorized to apply all Cash Proceeds (to the extent any payment is due and owing with respect to any DIP Obligations under the DIP Loan Documents) now or hereafter coming into the DIP Lender's possession or control to payment of the DIP Obligations in accordance with the terms of the DIP Credit Agreement. All such applications shall be final and not subject to challenge by any person, including any trustee.

20.     The DIP Facility shall terminate and the DIP Loans and all other DIP Obligations shall mature and be due and owing, upon the DIP Lender's election, at the earliest of the maturity dates set forth in the DIP Credit Agreement.

*ACTIVE 62994883v2*

21.     The Debtor shall indemnify and hold harmless the DIP Lender, and each of their respective partners, members, officers, directors, employees, affiliates, successors, assigns, agents, counsel and other advisors (collectively, the "Indemnified Parties") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party.

22.     The automatic stay imposed by Bankruptcy Code § 362(a) is hereby modified, to the extent necessary, to implement and effectuate the terms and conditions of this Final DIP Order.

23.     The Debtor is authorized to perform all acts and execute and comply with the terms of such other documents, instruments, and agreements in addition to the DIP Loan Documents, as the DIP Lender may reasonably require, as evidence of and for the protection of the DIP Obligations, or which otherwise may be deemed reasonably necessary by the DIP Lender to effectuate the terms and conditions of this Final DIP Order and the DIP Loan Documents. The Debtor and the DIP Lender are hereby authorized to implement, in accordance with the terms of the DIP Loan Documents, any non-material modifications of the DIP Loan Documents without further order of this Court.

24.     Upon the indefeasible payment in full in cash, and the termination of, the DIP Facility, the Debtor shall execute and deliver in favor of the DIP Lender a valid and binding termination and release agreement, in form and substance reasonably acceptable to the DIP Lender.

25.     By executing the DIP Loan Documents or taking any actions pursuant to this Final DIP Order or the Final DIP Order, the DIP Lender shall not: (1) be deemed to be in control of the operations or liquidation of the Debtor; or (2) be deemed to be acting as a "responsible person" with respect to the operation, management, or liquidation of the Debtor.

12

26.     The DIP Lender shall not be required to file any proof of claim in the chapter 11 case for any claim under the DIP Loan Documents, or for any claim allowed herein.

27.     Unless the DIP Lender consents thereto, no order shall be entered confirming a plan in these chapter 11 cases unless such order provides for the indefeasible and final payment of the DIP Obligations in full in cash on the earlier of: (1) the effective date thereof; and (2) the Maturity Date.

28.     The DIP Lender's failure, at any time or times hereafter, to require strict performance by the Debtor (or by any trustee) of any provision of this Final DIP Order or the DIP Loan Documents shall not waive, affect, or diminish any right of the DIP Lender thereafter to demand strict compliance and performance therewith. No delay on the part of the DIP Lender in the exercise of any right or remedy under this Final DIP Order, the DIP Loan Documents, the Bankruptcy Code, or applicable nonbankruptcy law shall preclude any other or further exercise of any right or remedy. The DIP Lender shall not be deemed to have suspended or waived any of its rights or remedies under this Final DIP Order, the DIP Loan Documents, the Bankruptcy Code, or applicable nonbankruptcy law unless such suspension or waiver is in writing, signed by a duly authorized officer of such party, and directed to the Debtor.

29.     Any stay, modification, reversal, or vacation of this Final DIP Order shall not affect the validity and enforceability of any DIP Obligations of the Debtor to the DIP Lender incurred pursuant to this Final DIP Order or the validity, priority, or enforceability of any of the DIP Liens and DIP Super-Priority Claims granted to the DIP Lender under this Final DIP Order. Notwithstanding any such stay, modification, reversal, or vacation, all DIP Liens and Super-Priority Claims granted under this Final DIP Order, the DIP Loans made pursuant to this Final DIP Order in respect of the DIP Credit Agreement, and all DIP Obligations incurred by the Debtor

13

pursuant hereto and pursuant to the terms of the DIP Loan Documents prior to the effective date of any such stay, modification, reversal, or vacation shall be governed in all respects by the original provisions of this Final DIP Order, and the DIP Lender shall be entitled to all the rights, privileges, and benefits, including, without limitation, the DIP Liens, and priorities granted herein with respect to all such DIP Obligations.

30.     The provisions of this Final DIP Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any plan of reorganization in this chapter 11 case (and, to the extent not satisfied in full, the DIP Obligations shall not be discharged by the entry of any such order, notwithstanding Bankruptcy Code § 1141(d)); (b) converting this chapter 11 case to a chapter 7 case; (c) appointing a chapter 11 trustee, or (d) dismissing this chapter 11 case. The terms and provisions of this Final DIP Order as well as the DIP Super-Priority Claims and DIP Liens granted pursuant to this Final DIP Order and the DIP Loan Documents shall continue in full force and effect notwithstanding the entry of such order, and such DIP Super-Priority Claims and DIP Liens shall maintain their priority as provided by this Final DIP Order until all of the DIP Obligations are paid indefeasibly and in full.

31.     The provisions of this Final DIP Order shall be binding upon and inure to the benefit of the DIP Lender, the Debtor, and their respective successors and assigns, including any trustee appointed or elected in these chapter 11 cases, whether under chapter 11 or chapter 7.

32.     Notwithstanding anything contained in this Order or the attachments hereto, or the Interim DIP Order, the (a) DIP Lender is not granted a lien on any assets that are not property of Debtor's bankruptcy estate, and (b) the Court makes no findings or conclusions whether or not the LaMarque Lease is or is not property of the bankruptcy estate, and all parties rights are reserved relating thereto.

*ACTIVE 62994883v2*

33.     Notwithstanding anything contained in this Order or the attachments hereto, or the Interim DIP Order, the DIP Lender is not granted a lien superior to the landlord's lien held under the Commercial Lease of Carolina Real Estate Holdings, LLC (the "Carolina Lease"); and the Court makes no findings as to the rights of the parties to the Carolina Lease, which are reserved by all parties.

34.     For the avoidance of doubt and notwithstanding anything to the contrary contained herein or in the DIP Loan Documents, any liens granted pursuant to this Final DIP Order shall attach solely to the proceeds of the Debtor's real property leasehold resulting from its leases with Brixmor Operating Partnership ("Brixmor") and KRG Kingwood LLC ("KRG") and shall not attach to the leasehold interests resulting from its leases with Brixmor and KRG.  Further, notwithstanding anything to the contrary contained herein or in the DIP Loan Documents, following the occurrence of an Event of Default, the DIP Lender may enter upon the leased real property resulting from its leases with Brixmor and KRG after providing five (5) business days' written notice to Brixmor and KRG, as applicable.

35.     If there is any inconsistency between the terms of the DIP Loan Documents and the provisions of this Final DIP Order, the provisions of this Final DIP Order shall control to the extent of such inconsistency.

36.     Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final DIP Order shall be valid, take full effect, and be enforceable immediately upon entry hereof; there shall be no stay of execution or effectiveness of this Final DIP Order; and any stay of the effectiveness of this Final DIP Order that might otherwise apply is hereby waived for cause shown.

37.     The Court has and will retain jurisdiction to enforce this Final DIP Order according to its terms.

Signed:  February 15, 2022

Christopher Lopez
United States Bankruptcy Judge

*ACTIVE 62994883v2*

**EXHIBIT A**

**DIP Credit Agreement**

## <u>SENIOR SECURED DEBTOR IN POSSESSION</u>
## <u>LOAN AND SECURITY AGREEMENT</u>

THIS SENIOR SECURED DEBTOR IN POSSESSION LOAN AND SECURITY AGREEMENT ("<u>Agreement</u>") is entered into this 28th day of January, 2022, between **Dickey's Barbecue Restaurants, Inc.,** a Texas corporation ("<u>Lender</u>"), and **Smokinkwr LLC**, a Texas limited liability company ("<u>Borrower</u>"). All schedules, riders and exhibits annexed hereto are incorporated herein and made a part hereof.

WHEREAS, on December 14, 2021 (the "<u>Petition Date</u>"), Borrower commenced Chapter 11 Case No. 21-33989 (the "<u>Chapter 11 Case</u>") by filing a voluntary petition under Chapter 11 of the Bankruptcy Code (as defined below) with the United States Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>");

WHEREAS, Borrower continues to operate its business and manage its properties as a debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Lender is willing to extend credit to Borrower to fund Borrower's operations upon the terms and conditions set forth herein; and

WHEREAS, Borrower has agreed to secure all of the obligations under this Agreement by granting to Lender a security interest in and lien upon all or substantially all of its existing and after-acquired assets.

NOW, THEREFORE, for good and valuable consideration, the parties hereto, intending to be bound hereby, agree as follows:

## SECTION 1. DEFINITIONS

1.1 **<u>Defined Terms</u>**. When used in this Agreement or in any schedule or rider hereto, the following terms shall have the following meanings (terms defined in the singular to have the same meaning when used in the plural and vice versa).

"<u>Addison Distribution</u>" means the monthly distribution of Revolving Loan proceeds described in <u>Section 2.1(e)</u> of this Agreement.

"<u>Addison Landlord</u>" means **[TX-0087 Addison's Landlord]**.

"<u>Addison Lease</u>" means that certain lease agreement, dated as of **[date of lease]**, among Borrower and Addison Landlord.

"<u>Approved Budget</u>" has the meaning set forth in the Interim Order.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Bankruptcy Default</u>" means the occurrence of any of the following in connection with the Chapter 11 Case:

(a) the entry of an order in the Chapter 11 Case confirming a plan of reorganization or liquidation that does not contain a provision for the full payment of all obligations under this Agreement;

(b) the entry of an order amending, supplementing, staying, vacating or otherwise modifying this Agreement without the written consent of Lender;

(c) the Final Order, in form and substance acceptable to Lender, is not entered promptly following the expiration of the Interim Order;

(d) the Final Order, in form and substance acceptable to Lender, is not entered on or before the date that is seventy-five (75) days after the entry of the Interim Order;

(e) the appointment of a trustee in the Chapter 11 Case or the appointment of an examiner in the Chapter 11 Case (or Borrower applies for, consents to, or acquiesces in, any such relief);

(f) the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code (or Borrower applies for, consents to, or acquiesces in, any such relief);

(g) the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (i) to allow any creditor to execute upon or enforce a Lien on any Collateral, or (ii) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case is with respect to any portion of the Collateral having a value, individually or in the aggregate, in excess of $25,000 or which would otherwise have a Material Adverse Effect;

(h) the commencement of a suit or action against Lender by or on behalf of Borrower or its bankruptcy estate;

(i) the breach of and/or failure of Borrower to perform any of its obligations under this Agreement; and

(j) the Bankruptcy Court or any other court of competent jurisdiction enters an order or judgment, or Borrower applies for, consents to, or acquiesces in, the entry of such order or judgment, in the Chapter 11 Case modifying, limiting, subordinating or avoiding (i) the priority of any obligations owing to Lender under this Agreement, or (ii) the perfection, priority or validity of any Lien securing such obligations.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Case.

"<u>Borrower's Bank Account</u>" means the Deposit Account of Borrower identified on <u>Exhibit A</u> to this Agreement (or such other Deposit Account of Borrower that has been designated as such, in writing, by Borrower to Lender).

"<u>Borrower's Books</u>" means all of Borrower's books and records relating to its existence, governance, assets, liabilities or financial condition or any of the Collateral, including minute books; ledgers and records indicating, summarizing or evidencing Borrower's assets or liabilities; all information relating to Borrower's business operations; and all computer records, programs, discs or tape files, printouts, runs, and other information prepared or stored electronically, including the equipment or any website or third party storage provider containing or hosting such information.

"<u>Borrower's Locations</u>" means Borrower's franchises located at **[insert franchise locations]**.

"<u>Carve-Out</u>" has the meaning provided in the DIP Order.

"<u>Carve-Out Amount</u>" has the meaning provided in the DIP Order.

"<u>Chapter 11 Case</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Closing Date</u>" means the date on which the initial Revolving Loan is funded hereunder, which shall be no later than the first Monday after the Bankruptcy Court's approval of this Agreement.

"<u>Collateral</u>" means all of the property and interests in property described in this Agreement, all property described in any of the Security Documents as security for the payment or performance of any of the Obligations, and all other property and interests in property that now or hereafter secure (or are intended to secure) the payment or performance of any of the Obligations.

"<u>Default</u>" means an event or condition the occurrence of which would, with the lapse of time or the giving of notice, or both, become an Event of Default.

"<u>Deposit Account</u>" means any deposit account (as that term is defined in the UCC).

"<u>DIP Order</u>" means the Interim Order or the Final Order, whichever is in effect as of the relevant date in question.

"<u>Dollars</u>" and the sign "$" means lawful money of the United States of America.

"<u>Event of Default</u>" means the occurrence of any one of the events set forth in <u>Section 8</u> of this Agreement.

"<u>Environmental Law</u>" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on

Borrower or its subsidiaries, relating to the environment, the effect of the environment on employee health, or Hazardous Materials, in each case as amended from time to time.

"Fees" means all fees payable to Lender pursuant to this Agreement.

"Final Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to Lender, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless Lender waives such requirement), together with all extensions, modifications and amendments thereto, in form and substance satisfactory to Lender, which, among other matters but not by way of limitation, authorizes Borrower to obtain credit, incur (or guaranty) indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super priority of Lender's claims.

"Frisco Distribution" means the monthly distribution of Revolving Loan proceeds described in Section 2.1(b) of this Agreement.

"Frisco Landlord" means **[TX-0426 Frisco's Landlord]**.

"Frisco Lease" means that certain lease agreement, dated as of **[date of lease]**, among Borrower and Frisco Landlord.

"Full Payment" means the full, final and indefeasible payment in full of all of the Obligations.

"GAAP" means generally accepted accounting principles in the United States of America in effect from time to time.

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Intellectual Property" means all intellectual and similar property of a Person, including inventions, designs, patents, copyrights, trademarks, service marks, trade names, trade secrets, confidential or proprietary information, customer lists, know-how, software and databases; all embodiments or fixations thereof and all related documentation, applications, registrations and franchises; all licenses or other rights to use any of the foregoing; and all books and records relating to the foregoing.

"Interim Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extension, modifications, and amendments thereto, in form and substance satisfactory to Lender which, among other matters but not by way of limitation, authorizes, on an interim basis, Borrower to execute and perform under the terms of this Agreement and the other Loan Documents, substantially in the form of Exhibit B.

"Kingwood Distribution" means the monthly distribution of Revolving Loan proceeds described in Section 2.1(d) of this Agreement.

"Kingwood Landlord" means **[TX-0774 Kingwood's Landlord]**.

"Kingwood Lease" means that certain lease agreement, dated as of **[date of lease]**, among Borrower and Kingwood Landlord.

"LaMarque Distribution" means the monthly distribution of Revolving Loan proceeds described in Section 2.1(c) of this Agreement.

"LaMarque Landlord" means **[TX-1750 LaMarque's Landlord]**.

"LaMarque Lease" means that certain lease agreement, dated as of **[date of lease]**, among Borrower and LaMarque Landlord.

"Lien" means any interest in property securing an obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based on common law, statute or contract. The term "Lien" shall also include reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases and other title exceptions and encumbrances affecting property. For the purpose hereof, Borrower shall be deemed to be the owner of any property which it has acquired or held subject to a conditional sale agreement or other arrangement pursuant to which title to the property has been retained by or vested in some other Person for security purposes.

"Loan" means an advance of money made by Lender to Borrower pursuant to the terms of this Agreement.

"Loan Documents" means, collectively, this Agreement (including any rider hereto), the DIP Order, and any other documents and agreements entered into between Lender and Borrower in connection with this Agreement or to evidence or govern the terms of any of the Obligations.

"Local Bankruptcy Rules" means the local bankruptcy rules of the Bankruptcy Court as the same may from time to time be in effect and applicable to the Chapter 11 Case.

"Material Adverse Effect" means a material adverse effect on any of (a) the condition (financial or otherwise), business, performance, operations or property of Borrower and its subsidiaries taken as a whole; (b) the ability of Borrower to perform its obligations under any Loan Document; (c) the validity or enforceability of any Loan Document or the material rights and remedies of Lender under any Loan Document; or (d) a material impairment of the

enforceability or priority of Lender's Liens with respect to all or a material portion of the Collateral.

"Material Agreement" means any agreement, instrument or arrangement to which Borrower is a party for which default in the performance, observance or fulfillment of any of the material obligations, covenants or conditions contained therein could reasonably be expected to have a Material Adverse Effect.

"Obligations" means all debts, liabilities, obligations, covenants, and duties at any time or times owing by Borrower to Lender of any kind and description, whether incurred pursuant to or evidenced by any of the Loan Documents or pursuant to any other agreement between Lender and Borrower or otherwise, and whether direct or indirect, absolute or contingent, due or to become due, or joint or several, including the principal of and interest on any Loan. Without limiting the generality of the foregoing, the term "Obligations" shall include all debts, liabilities and obligations incurred by Borrower to Lender in the Bankruptcy Case and any interest, fees or other charges accrued in the Bankruptcy Case, whether or not any such interest, fees or other charges are recoverable from Borrower or its estate under 11 U.S.C. §506.

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Petition Date" has the meaning set forth in the recitals to this Agreement.

"Postpetition" means the time period beginning immediately upon the filing of the Chapter 11 Case.

"Prepetition" means the time period ending immediately prior to the filing of the Chapter 11 Case.

"Revolving Loan" means each loan to be made by Lender to Borrower pursuant to Section 2.1 of this Agreement.

"Security Documents" means each instrument or agreement now or at any time hereafter securing or assuring payment of the whole or any part of the Obligations, including this Agreement.

"Taxes" means any taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein, and all interest, penalties or similar liabilities with respect thereto.

"UCC" means the Uniform Commercial Code (or any successor statute) as adopted and in force in the State of Texas from time to time or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code (or any successor statute) of such state.

"US Foods Distribution" means the weekly distribution of Revolving Loan proceeds described in Section 2.1(a) of this Agreement.

1.2    **UCC Terms**. All other capitalized terms contained in this Agreement and not otherwise defined herein shall have, when the context so indicates, the meanings provided for by the UCC to the extent the same are used or defined therein.

1.3    **Super Priority Nature of Obligations**.

(a)    The priority of Lender's claims against, and Liens on and in the Collateral of, Borrower shall be as set forth in the DIP Order.

(b)    All Obligations shall constitute administrative expenses of Borrower in the Chapter 11 Case, with administrative priority and senior secured status under Sections 364(c) and 364(d) of the Bankruptcy Code. Subject to the Carve-Out, such administrative claim shall have priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of Borrower, Borrower's estate, and any successor trustee or estate representative in the Chapter 11 Case or any subsequent proceedings or cases under the Bankruptcy Code. The Liens granted to Lender on and in the Collateral of Borrower, and the priorities accorded to the Obligations, shall have the priority and senior secured status afforded by Sections 364(c) and 364(d)(l) of the Bankruptcy Code (all as more fully set forth in the DIP Order) senior to all claims and interests other than the Carve-Out.

(c)    Lender's Liens on and in the Collateral of Borrower and Lender's administrative claims under Sections 364(c)(l) and 364(d) of the Bankruptcy Code afforded the Obligations shall also have priority over any claims arising under Section 506(c) of the Bankruptcy Code subject and subordinate only to the Carve-Out. Except as set forth herein or in the DIP Order, no other claim having a priority superior or *pari passu* to that granted to Lender by the DIP Order shall be granted or approved while any Obligations under this Agreement remain outstanding. Except for the Carve-Out, no costs or expenses of administration shall be imposed against Lender or any of its Collateral under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, and Borrower hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under sections 105, 506(c) or 552, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against Lender.

1.4    **Payment of the Obligations**. Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, Lender shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

1.5    **No Discharge; Survival of Claims**. Borrower agrees that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization in the Chapter 11 Case (and Borrower pursuant to Section 1141(d)(4) of the Bankruptcy Code,

hereby waives any such discharge) and (ii) the superpriority administrative claim granted to Lender pursuant to the DIP Order and described in this Agreement and the Liens granted to Lender pursuant to the Interim Order and Final Order and described in this Agreement shall not be affected in any manner by the entry of an order confirming a plan of reorganization in the Chapter 11 Case.

1.6    **Waiver of Priming Rights**. Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligations shall be outstanding, without limiting any terms or conditions of the DIP Order, Borrower hereby irrevocably waives any right, (a) to grant or impose, or request that the Bankruptcy Court grant or impose, under section 364 of the Bankruptcy Code or otherwise, Liens on or security interests in any of the Collateral securing the Obligations, which are *pari passu* with, equal to or superior to the Liens and security interests held by Lender, (b) to grant or impose, or request that the Bankruptcy Court grant or impose, under section 364 of the Bankruptcy Code or otherwise, claims or expenses against Borrower, which are *pari passu* with, equal to or superior to the Obligations, and (c) to use, or to request that the Bankruptcy Court authorize the use of, Cash Collateral (as defined in the DIP Order) or proceeds of Loans, except for such consensual uses expressly provided under the DIP Order.

## SECTION 2.  LOAN AND TERMS OF REPAYMENT

2.1    **Revolving Loans**. Upon the Bankruptcy Court's approval of this Agreement, on the Closing Date and every subsequent month thereafter until this Agreement is terminated [or the Obligations arising under all Revolving Loans mature, Lender shall advance a monthly Revolving Loan to Borrower in the total principal amount not to exceed **[$260,000.00]**, with such Revolving Loan proceeds to be distributed by Lender as follows:

(a)  Lender shall pay US Foods, Inc. each week (such weekly payment date to be determined in Lender's reasonable discretion), on behalf of Borrower, an amount that Lender reasonably determines is appropriate to supply Borrower's Locations for such week (approximately $48,000 per week);

(b)  Lender shall pay Frisco Landlord **[$10,172.52 (need exact monthly rent amount)]** each month (such monthly payment date to be determined in accordance with the terms of the Frisco Lease) on behalf of Borrower's obligations under the Frisco Lease;

(c)  Lender shall pay LaMarque Landlord **[$8,000.00 (need exact monthly rent amount)]** each month (such monthly payment date to be determined in accordance with the terms of the LaMarque Lease) on behalf of Borrower's obligations under the LaMarque Lease;

(d)  Lender shall pay Kingwood Landlord **[$7,472.00 (need exact monthly rent amount)]** each month (such monthly payment date to be determined in accordance with the terms of the Kingwood Lease) on behalf of Borrower's obligations under the Kingwood Lease; and

(e)  Lender shall pay Addison Landlord **[$12,679.96 (need exact monthly rent amount)]** each month (such monthly payment date to be determined in accordance with the

terms of the Addison Lease) on behalf of Borrower's obligations under the Addison Lease.

2.2    **Payments**. All payments with respect to the Obligations shall be made as follows:

(a) As payment for the amounts advanced under the US Foods Distribution, Lender shall debit Borrower's Bank Account for the exact amount of each US Foods Distribution 7 days after such US Foods Distribution occurs;

(b) As payment for the amounts advanced under the Frisco Distribution, Lender shall debit Borrower's Bank Account $2,543.13 on Monday of every week after the Closing Date;

(c) As payment for the amounts advanced under the LaMarque Distribution, Lender shall debit Borrower's Bank Account $2,000.00 on Monday of every week after the Closing Date;

(d) As payment for the amounts advanced under the Kingwood Distribution, Lender shall debit Borrower's Bank Account $1,868.00 on Monday of every week after the Closing Date;

(e) As payment for the amounts advanced under the Addison Distribution, Lender shall debit Borrower's Bank Account $3,169.99 on Monday of every week after the Closing Date; and

(f) For any of the Obligations not arising under any Revolving Loan, Borrower shall make payments to Lender for the amount owed under such Obligations on the date when due, in immediately available funds, without any offset or counterclaim.

2.3    **Fees and Reimbursement of Expenses**. Borrower shall be obligated to pay all of Lender's reasonable fees and expenses, including attorneys' fees and costs, incurred in connection with this Agreement and any Revolving Loan.

2.4    **No Prepayment Penalty**. Borrower shall have the right to prepay the Obligations under this Agreement in full at any time without the imposition of any prepayment fee or penalty.

2.5    **No Promissory Note**. No promissory note shall evidence the Obligations under any Revolving Loan; provided, however, that Borrower will provide a promissory note to Lender, in form and substance acceptable to Lender, upon written request.

## SECTION 3.  TERM AND TERMINATION

3.1    **Term**. The Obligations under all Revolving Loans shall mature and be payable in full at the earlier of: (1) the first business day that is three months after the entry of the Interim Order; (2) confirmation of a chapter 11 plan in the Chapter 11 Case; (3) conversion of the Chapter 11 Case to chapter 7; (4) dismissal of the Chapter 11 Case; or (5) appointment of a chapter 11 trustee in the Chapter 11 Case.

3.2 **Termination**. At any time that an Event of Default exists, Lender may terminate this Agreement upon 5 days' notice to Borrower.

## SECTION 4.  CREATION OF SECURITY INTEREST

4.1 **Grant of Security Interest**. Without limitation of any of the provisions of the DIP Order, to secure the prompt payment and performance of all of the Obligations, Borrower hereby grants to Lender a continuing security interest in and Lien upon all personal and real property of Borrower, including all of the following property and interests in property of Borrower, whether now owned or existing or hereafter created, acquired or arising and wheresoever located: (i)  all cash and cash equivalents; (ii) all funds in any deposit account, securities account or other account of Borrower and all cash and other property deposited therein or credited thereto from time to time; (iii) all accounts and other receivables (including for the avoidance of doubt all intercompany receivables owed to Borrower); (iv) all contract rights; (v) all instruments, documents and chattel paper; (vi) all securities (whether or not marketable); (vii) all goods, equipment, inventory and fixtures; (viii) all real property interests; (ix) all interests in leaseholds, (x) all franchise rights; (xi) all patents, trade names, trademarks (other than intent-to-use trademarks), copyrights and all other intellectual property; (xii) all general intangibles; (xiii) all equity interests or capital stock, limited liability company interests, partnership interests and financial assets; (xiv) all investment property; (xv) all supporting obligations; (xvi) all letters of credit and letter of credit rights; (xvii) all commercial tort claims; (xviii) unearned premiums, refunds, and proceeds related to any insurance policies; (xix) all other claims and causes of action, including proceeds thereof (including, but not limited to, subject to entry of the Final Order, all claims and causes of action arising under Chapter 5 of the Bankruptcy Code and the proceeds thereof); (xx) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records); (xxi) to the extent not covered by the foregoing, all other assets or properties of Borrower, whether tangible, intangible, real, personal or mixed; and (xxii) all products, offspring, profits and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Borrower from time to time with respect to any of the foregoing.

4.2 **Perfection of Security Interest**. Without limitation of any of the provisions of the DIP Order relating to the automatic perfection of Lender's Liens, promptly after Lender's request therefor, Borrower shall execute or cause to be executed and delivered to Lender such instruments, assignments, title certificates or other documents as are necessary under the UCC or other applicable law (including any motor vehicle certificate of title act) to perfect (or continue the perfection of) Lender's Liens upon the Collateral and shall take such other action as may be requested by Lender to give effect to or carry out the intent and purposes of this Agreement. Unless prohibited by applicable law, Borrower hereby irrevocably authorizes Lender to execute and file in any jurisdiction any financing statement or amendment thereto on Borrower's behalf, including financing statements that indicate the Collateral (i) as all assets or all personal property of Borrower or words to similar effect or (ii) as being of equal or lesser scope, or with greater or lesser detail, than as set forth in this Agreement. Borrower also hereby ratifies its authorization for Lender to have filed in any jurisdiction any like financing statement or amendment thereto if filed prior to the date hereof.

**SECTION 5.  CONDITIONS PRECEDENT**

5.1  **Initial Conditions Precedent**. Lender shall not be obligated to fund each Revolving Loan unless each of the following conditions has been satisfied:

(a) Borrower has executed and delivered each such Loan Document, all in form and substance satisfactory to Lender.

(b) The DIP Order shall be in full force and effect and shall not have been reversed, modified, amended, subject to a pending appeal, stayed or vacated (other than, as to the Interim Order, by the Final Order) absent the prior written consent of Lender.

**SECTION 6.  BORROWER'S REPRESENTATIONS AND WARRANTIES**

6.1  **Administrative Priority; Lien Priority; DIP Order**.

(a) The Obligations constitute an allowed administrative expense in the Chapter 11 Case, having priority in payment over all other administrative expenses and claims against Borrower now existing or hereafter arising, of any kind or nature whatsoever, including without limitation all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code.

(b) Pursuant to Section 364(c)(2) of the Bankruptcy Code and the DIP Order, all Obligations are secured by a perfected Lien on the Collateral, subject to no other Lien (except as provided in the DIP Order) in any of the Collateral which is not encumbered by a Prior Lien (as defined in the DIP Order).

(c) Pursuant to Section 364(d)(1) of the Bankruptcy Code and the DIP Order, all of the Obligations are secured by (1) a perfected Lien on the Collateral which came into existence or was acquired by Borrower on or after the Petition Date, subject to no other Lien except as provided in the DIP Order, and (2) a perfected Lien on the Collateral which came into existence or was acquired by Borrower prior to the Petition Date, subject to no other Lien except as provided in the DIP Order.

(d) On the Closing Date, the Interim Order is, and from and after the entry of the Final Order, the Final Order will be, in full force and effect, and neither the Interim Order nor the Final Order has been reversed, vacated, modified, amended or stayed, except for modifications and amendments that are reasonably acceptable to Lender and are not stayed in any respect.

6.2  **Approved Budget**.   Borrower has furnished the Approved Budget to Lender. The Approved Budget is reasonable and was prepared on a reasonable basis and in good faith by Borrower and is based on reasonable assumptions based on the best information available to Borrower, and Borrower is not aware of any facts or information that would lead it to believe that the Approved Budget is incorrect or misleading in any material respect.  The Borrower shall comply with the Approved Budget in all respects.

6.3    **Appointment of Trustee or Examiner; Liquidation**. No order has been entered or is pending in the Chapter 11 Case (a) for the appointment of a Chapter 11 trustee, (b) for the appointment of an examiner with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Sections 1104(d) and 1106(b) of the Bankruptcy Code or (c) to convert the Chapter 11 Case to a Chapter 7 case or to dismiss the Chapter 11 Case.

6.4    **Chapter 11 Case**. The Chapter 11 Case was commenced by the filing of a voluntary petition on the Petition Date. The Chapter 11 Case has not been dismissed. The motion for approval of this Agreement was proper and sufficient pursuant to the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules of the Bankruptcy Court.

## SECTION 7. AFFIRMATIVE COVENANTS

At all times that this Agreement remains in effect, Borrower covenants that it shall:

7.1    **Notices**. Notify Lender, promptly after Borrower obtains knowledge thereof, of (i) any Default or Event of Default; (ii) the commencement of any action, suit or other proceeding against, or any demand for arbitration with respect to, Borrower; (iii) the occurrence or existence of any default (or claimed default) by Borrower relating to this Agreement or any Loan; or (iv) any other event or transaction which has or could reasonably be expected to have a Material Adverse Effect.

7.2    **Rights and Facilities**. Maintain and preserve all rights (including all rights related to Intellectual Property), franchises and other authority adequate for the conduct of its business; maintain its properties, equipment and facilities in good order and repair; conduct its business in an orderly manner without voluntary interruption; and maintain and preserve its existence.

7.3    **Insurance**. In addition to the insurance required by the Loan Documents with respect to the Collateral, maintain with its current insurers or with other financially sound and reputable insurers having a rating of at least A- or better by Best's Ratings, a publication of A.M. Best Company, (i) insurance with respect to its properties and business against such casualties and contingencies of such type (including product liability, workers' compensation, larceny, embezzlement or other criminal misappropriation insurance) and in such amounts and with such coverages, limits and deductibles as is customary in the business of Borrower (ii) marine cargo coverage, in such amounts and with such coverages, limits and deductibles as is customary in the business of Borrower, and (iii) business interruption insurance, in an amount approved by Lender.

7.4    **Visits and Inspections**. Permit representatives of Lender from time to time, as often as may be reasonably requested, but only during normal business hours and (except when a Default or Event of Default exists) upon reasonable prior notice to Borrower to: visit and inspect properties of Borrower; inspect, audit and make extracts from Borrower's books and records; and discuss with its officers, employees and independent accountants Borrower's financial conditions, business prospects and results of operations.

7.5    **Taxes; Other Charges**. Pay and discharge all Taxes (and other charges the non-payment of which could result in a Lien on Borrower's assets) in accordance with the

requirements of the Bankruptcy Code to the extent permitted under the DIP Order, and, if requested by Lender, shall provide proof of payment or, in the case of withholding or other employee taxes, deposit of payments required by applicable law. Borrower shall deliver to Lender copies of all Tax returns (and amendments thereto) promptly after the filing thereof.

7.6    **Financial Statements and Other Information**. Keep adequate records and books of account with respect to its business activities in which proper entries are made in accordance with GAAP reflecting all its financial transactions.

7.7    **Compliance with Laws**. Comply with all laws relating to Borrower, the conduct of its business and the ownership and use of its assets, including ERISA, all Environmental Laws, OSHA, the Fair Labor Standards Act and all other laws regarding the collection, payment and deposit of the Taxes, and shall obtain and keep in full force and effect any and all governmental and regulatory approvals necessary to the ownership of its properties or the conduct of its business and shall promptly report any non-compliance to Lender.

7.8    **Reimbursement for Lender Expenses**. Upon the demand of Lender, promptly reimburse Lender for all Lender's reasonable fees and expenses, including attorneys' fees and costs, incurred in connection with this Agreement and any Revolving Loan, and Borrower hereby authorizes and approves all Loans by Lender in payment of items constituting such fees and expenses.

## SECTION 8.  EVENTS OF DEFAULTS

8.1    **Events of Default**. The occurrence or existence of any one or more of the following events or conditions shall constitute an Event of Default:

(a)   Borrower shall fail to pay any of the Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration or otherwise);

(b)   Borrower fails or neglects to perform, keep or observe any term, provision, condition, covenant or agreement, in this Agreement (including, without limitation, compliance with the Approved Budget), in any of the other Loan Documents, or in any other present or future agreement between Borrower and Lender;

(c)   Borrower is enjoined, restrained or in any way prevented by court order from continuing to conduct all or any material part of its business affairs; or

(d)   A Bankruptcy Default shall occur.

8.2    **Cumulative Rights; No Waiver**. All covenants, conditions, warranties, guaranties, indemnities and other undertakings of Borrower in the DIP Order, this Agreement or any of the other Loan Documents shall be deemed cumulative, and Lender shall have all other rights and remedies not inconsistent herewith as provided under the UCC or other applicable law. No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Default or Event of Default on one occasion shall be deemed to be a continuing waiver or applicable to any other occasion. No waiver or course of dealing shall be established by the failure or delay of Lender to require strict performance by Borrower with any term of the

Loan Documents, or to exercise any rights or remedies with respect to the Collateral or otherwise.

## SECTION 9.  GENERAL PROVISIONS

9.1      **Effectiveness, Successors and Assigns**. This Agreement shall be binding and deemed effective when executed by Borrower and accepted by Lender, and when so accepted, shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided that Borrower may not assign this Agreement or any rights hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely void. No consent to an assignment by Lender shall release Borrower from its Obligations to Lender. Lender may assign this Agreement and its rights and duties hereunder. Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in, Lender's rights and benefits hereunder.

9.2      **Section Headings; Interpretation**. Section headings and section numbers have been set forth herein for convenience only. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or Borrower, whether under any rule of construction or otherwise. This Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of the parties hereto.

9.3      **Indulgences Not Waivers**. Lender's failure at any time or times to require strict performance by Borrower of any provision of this Agreement or any of the other Loan Documents shall not waive, affect or otherwise diminish any right of Lender thereafter to demand strict compliance and to performance with such provision.

9.4      **Severability; Survival**. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

9.5      **Modification; Entire Agreement**. This Agreement cannot be changed or terminated orally. This Agreement and the other Loan Documents represent the entire understanding of the parties with respect to the subject matter hereof and thereof and supersede all prior agreements, understandings, negotiations and inducements regarding the same subject matter.

9.6      **Counterparts; Facsimile Signatures**. This Agreement and any amendments hereto may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. Counterparts of each of the Loan Documents may be delivered by facsimile or electronic mail and the effectiveness of each such Loan Document and signatures thereon shall, subject to applicable law, have the same force and effect as manually signed originals and shall be binding on all parties thereto.

9.7     **Governing Law**. This Agreement shall be deemed to have been made in the State of Texas and shall be governed by and construed in accordance with the internal laws (without regard to conflict of law provisions) of the State of Texas.

9.8     **Consent to Forum**. Borrower and Lender consent to the exclusive jurisdiction of the Bankruptcy Court in any action, suit or other proceeding arising out of or relating to this Agreement or any of the other Loan Documents. Subject to the terms of the DIP Order, nothing herein shall limit the right of Lender to bring proceedings against Borrower in the courts of any other jurisdiction where Collateral may be located. Nothing in this Agreement shall be deemed or operate to affect the right of Lender to serve legal process in any other manner permitted by law or to preclude the enforcement by Lender of any judgment or order obtained in such forum or the taking of any action under this Agreement to enforce same in any other appropriate forum or jurisdiction.

9.9     **Waiver and Release of Certain Claims and Rights**. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BORROWER HEREBY KNOWINGLY, INTENTIONALLY AND INTELLIGENTLY WAIVES (WITH THE BENEFIT OF ADVICE OF LEGAL COUNSEL OF ITS OWN CHOOSING): (I) THE RIGHT TO TRIAL BY JURY (WHICH LENDER HEREBY ALSO WAIVES) IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM OF ANY KIND ARISING OUT OF, RELATED TO OR BASED IN ANY WAY UPON ANY OF THE LOAN DOCUMENTS, THE OBLIGATIONS OR THE COLLATERAL; (II) SUBJECT TO THE TERMS OF THE DIP ORDER, PRESENTMENT, PROTEST, DEFAULT, NON-PAYMENT, MATURITY, RELEASE, COMPROMISE, SETTLEMENT, EXTENSION OR RENEWAL OF ANY OR ALL COMMERCIAL PAPER, ACCOUNTS, CONTRACT RIGHTS, DOCUMENTS, INSTRUMENTS, CHATTEL PAPER AND GUARANTIES AT ANY TIME HELD BY LENDER ON WHICH BORROWER MAY IN ANY WAY BE LIABLE AND HEREBY RATIFIES AND CONFIRMS WHATEVER LENDER MAY DO IN THIS REGARD; (III) SUBJECT TO THE TERMS OF THE DIP ORDER, NOTICE PRIOR TO TAKING POSSESSION OR CONTROL OF ANY OF THE COLLATERAL AND THE REQUIREMENT TO DEPOSIT OR POST ANY BOND OR OTHER SECURITY WHICH MIGHT OTHERWISE BE REQUIRED BY ANY COURT OR APPLICABLE LAW PRIOR TO ALLOWING LENDER TO EXERCISE ANY OF LENDER'S SELF-HELP OR JUDICIAL REMEDIES TO OBTAIN POSSESSION OF ANY OF THE COLLATERAL; (IV) THE BENEFIT OF ALL VALUATION, APPRAISEMENT AND EXEMPTION LAW; (V) ANY CLAIM AGAINST LENDER ON ANY THEORY OF LIABILITY, FOR DIRECT, ACTUAL, SPECIAL, INDIRECT, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, (A) ANY PREPETITION ACTS, CONDUCT, OR TRANSACTIONS AND (B) ANY OF THE LOAN DOCUMENTS, ANY TRANSACTION THEREUNDER, THE ENFORCEMENT OF ANY REMEDIES BY LENDER OR THE USE OF ANY PROCEEDS OF ANY LOANS; (VI) NOTICE OF ACCEPTANCE OF THIS AGREEMENT BY LENDER; AND (VII) THE RIGHT TO ASSERT ANY CONFIDENTIAL RELATIONSHIP THAT IT MAY HAVE UNDER APPLICABLE LAW WITH ANY ACCOUNTING FIRM AND/OR SERVICE BUREAU IN CONNECTION WITH ANY INFORMATION REQUESTED BY LENDER PURSUANT TO OR IN ACCORDANCE WITH THIS AGREEMENT (AND

**BORROWER AGREES THAT LENDER MAY CONTACT DIRECTLY ANY SUCH ACCOUNTING FIRM AND/OR SERVICE BUREAU IN ORDER TO OBTAIN ANY SUCH INFORMATION).**

9.10    **Additional Provisions**. Time is of the essence of this Agreement and the other Loan Documents. No provision of this Agreement or any of the other Loan Documents shall be construed against or interpreted to the disadvantage of any party hereto by any governmental authority by reason of such party having or being deemed to have structured, drafted or dictated such provision.

9.11    **Lender as Party-in-Interest**. Borrower hereby stipulates and agrees that Lender is and shall remain a party in interest in the Chapter 11 Case and shall have the right to participate, object and be heard in any motion or proceeding in connection therewith. Nothing in this Agreement or any other Loan Document shall be deemed to be a waiver of any of Lender's rights or remedies under applicable law or documentation. Without limitation of the foregoing, Lender shall have the right to make any motion or raise any objection it deems to be in its interest.

9.12.    **Credit Bids**. Lender has the right to credit bid its claims under this Agreement or the DIP Order, as applicable, pursuant to Section 363(k) of the Bankruptcy Code, and Borrower agrees that it shall not object to Lender's right to credit bid.

9.13.    **Conflict of Terms**. If any provision in this Agreement or any other Loan Document conflicts with any provision in the DIP Order, the provision in the DIP Order shall govern and control.

[*Signatures on following page*]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, to be effective on the date first set forth above.

BORROWER:

**SMOKINKWR LLC**

By: _[signature]_
Name: Brian M. Hubbard
Title: Sole Member and Managing Member


LENDER:

**DICKEY'S BARBECUE RESTAURANTS, INC.**

By: _____
Name:
Title:

## <u>EXHIBIT A</u>

### <u>BORROWER'S BANK ACCOUNT</u>

Bank Name:       JPMorgan Chase Bank, N.A.
Bank Address:    712 Main St
                 Houston, TX 77002
ABA Number:      ███████
Account Number:  ███████
Reference:       DBRI DIP
Address:         2124 ROPE MAKER RD
                 CONROE, TX 77384

**<u>EXHIBIT B</u>**

**<u>INTERIM ORDER</u>**

(See attached.)

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

January 29, 2022

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Case No. 21-33989 |
| | § | |
| SMOKINKWR LLC, | § | Chapter 11 |
| | § | |
| Debtor-in-Possession. | § | |
| | § | |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507, BANKRUPTCY RULES 2002, 4001, 6004, AND 9014, AND LOCAL RULE 4001-2 (I) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL AND OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of the debtor and debtor-in-possession (collectively, the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"), pursuant to sections 105(a), 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(d)(1), 364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking, among other things, entry of this interim order (the "Interim DIP Order"):

i.      Authorizing the Debtor to obtain a postpetition financing facility (the "DIP Facility"), consisting of senior secured, superpriority, revolving loan(s) (the "DIP Loan(s)," and together with all other obligations under the DIP Loan Documents (as defined below), the "DIP Obligations") to be advanced and made available to the Debtor in the aggregate maximum principal amount of $260,000.00 (such amount, the "Committed Amount") consistent with the terms and conditions of that certain *Senior Secured Debtor-in-Possession Credit and Security Agreement*, dated as of January [21], 2022, the form of which is attached hereto as **Exhibit A** (as

amended, supplemented, or otherwise modified from time to time in accordance with the terms and conditions set forth in the Interim Order, the "DIP Credit Agreement"), among the Debtor, as borrower, and Dickey's Barbecue Restaurants, Inc., as lender ("Dickey's" or the "DIP Lender"), and the Approved Budget[1] (as defined below and together with the DIP Credit Agreement and any other document or instrument executed and/or delivered in connection with the DIP Facility, the "DIP Loan Documents");

ii.      Authorizing the Debtor to execute and enter into the DIP Loan Documents and to perform all such other and further acts as may be required in connection with the DIP Loan Documents, including the DIP Obligations, and all instruments, security agreements, assignments, pledges, mortgages, reaffirmations and other documents referred to therein or requested by the DIP Lender to give effect to the terms thereof;

iii.      Authorizing the Debtor to use proceeds of the DIP Facility as permitted in the DIP Loan Documents and in accordance with this Interim DIP Order;

iv.      Authorizing the Debtor to grant, and granting superpriority administrative expense claims pursuant to Bankruptcy Code § 364(c)(1) in respect of the DIP Obligations to the DIP Lender;

v.      Authorizing the Debtor to grant, and granting liens on and security interests in the DIP Collateral (as defined herein) in respect of the DIP Obligations to the DIP Lender as follows: pursuant to Bankruptcy Code §§ 364(c)(2) and (d), valid, perfected, enforceable, non-avoidable, first priority, priming liens on and security interests in all now owned or hereafter acquired assets and property of the Debtor on the terms set forth in the DIP Loan Documents;

---

[1] The initial Approved Budget is attached as Exhibit C to the DIP Credit Agreement.

2

vi.     Vacating and modifying the automatic stay pursuant to Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim DIP Order and the DIP Loan Documents;

vii.    Scheduling a final hearing to consider entry of a final order authorizing, among other things, the Debtor to obtain financing under the DIP Loan Documents and continue using cash collateral; and

viii.   Granting the Debtor such other and further relief as is just and equitable.

ix.     The Court having held a hearing on January 28, 2022, and after due deliberation and consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND CONCLUDED THAT:**[2]

A.      On December 14, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code. The Debtor is continuing to operate and maintain its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.      This Court has jurisdiction over the Chapter 11 Case and the Motion pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this case and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The Court has authority to enter this Interim DIP Order consistent with Article III of the United States Constitution.

---

[2]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. Pursuant to Bankruptcy Rule 7052, to the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. Statements made by the Court from the bench during the Final Hearing shall constitute additional conclusions of law and findings of fact, as appropriate.

3

C.      Sufficient and adequate notice of the Motion and entry of this Interim DIP Order has been given pursuant to Bankruptcy Code §§ 102(1) and 364(c) and (d) and Bankruptcy Rules 2002 and 4001(c) to all entities entitled thereto such that no other or further notice of the Motion or of the entry of this Interim DIP Order need be provided to any entity.

D.      An immediate and ongoing need exists for the Debtor to use Cash Collateral and obtain the DIP Facility in order for the Debtor to pursue a chapter 11 plan of reorganization (the "Plan"), and maximize the value of its business and assets as debtor in possession under chapter 11 of the Bankruptcy Code through, among other things: the orderly continuation of the operation of their businesses; maintenance of business relationships with vendors, suppliers and customers; paying payroll obligations; and satisfaction of other working capital and operational needs. The Debtor does not have sufficient available resources of working capital to operate its business in this chapter 11 case in the ordinary course without the use of Cash Collateral and the proceeds of the DIP Facility. The Debtor's ability to maintain business relationships with vendors, to pay employees, and otherwise to fund operations is essential to the Debtor's viability and preservation of the going-concern value of their businesses and successful reorganization.

E.      The Debtor is unable to obtain unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense, and the Debtor is unable to obtain the postpetition financing that it needs on terms more favorable than those provided by the DIP Facility. Without limiting the foregoing, postpetition financing is not available to the Debtor without the Debtor granting to the DIP Lender, the DIP Liens (as defined herein) and the DIP Super-Priority Claims (as defined herein) provided under the DIP Loan Documents and this Interim DIP Order.

F.      The DIP Facility has been negotiated in good faith and at arms' length between the Debtor and the DIP Lender. Any credit extended and loans made to the Debtor pursuant to the DIP

4

Loan Documents and this Interim DIP Order shall be deemed to have been extended, issued, or made, as the case may be, in good faith, as required by, and within the meaning of Bankruptcy Code § 364(e), and the DIP Lender is entitled to the protections of Bankruptcy Code § 364(e).

G. The extension of credit under the DIP Facility is fair and reasonable and reflects the Debtor's exercise of prudent business judgment consistent with their fiduciary duties. The DIP Lender has provided fair, adequate, and sufficient consideration that constitutes reasonably equivalent value for the DIP Liens (as defined herein) conveyed to, and the rights, protections, and benefits obtained by, the DIP Lender under this Interim DIP Order and under the DIP Loan Documents.

H. Entry of this Interim DIP Order is in the best interests of the Debtor's estate and creditors because its implementation, among other things, will allow for the availability to the Debtor of working capital and will enhance the Debtor's prospects for a successful reorganization.

I. The DIP Lender is willing to provide the DIP Facility to the Debtor, but only upon the terms and conditions set forth in the DIP Loan Documents and this Interim DIP Order. Absent entry of this Interim DIP Order, the DIP Lender would not provide the DIP Facility.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT**:

1. The Motion is **GRANTED** as set forth herein.

2. Any objections to the Motion or to entry of this Interim DIP Order that have not been withdrawn or otherwise resolved are hereby **OVERRULED**.

3. The DIP Liens granted herein are superior in priority to the liens of US Foods, Inc. ("USF"), including those liens granted to USF under the First and Second Interim Orders for Use of Cash Collateral (ECF # 43 and **73**, respectively) and any amendments or final orders entered in connection with the same (collectively, the "Cash Collateral Orders") ; (b) the Approved Budget

5

set forth herein supersedes the budget attached to the Second Cash Collateral Order (ECF #**73** ) as if set forth and incorporated therein; (c) on or before February 2, 2022 and on each consecutive Wednesday thereafter until termination of this order and the Cash Collateral Orders, the Debtor shall provide Lender, USF and the Subchapter V Trustee with a comparison of the Debtor's budgeted to actual performance for the immediately preceding week; (d) to the extent a provision of this Order directly conflicts with a provision of the Cash Collateral Order, this Order shall prevail and (e) all other provisions of the Cash Collateral Orders, including those provisions providing for adequate protection payments, remain in full force and effect.

4.      The execution and delivery of the DIP Credit Agreement and other DIP Loan Documents by the Debtor is authorized and approved. Further, the Debtor is expressly authorized to (a) execute and deliver to the DIP Lender any other document of any kind required to be executed and delivered in connection with the DIP Credit Agreement and the other DIP Loan Documents; (b) take any action to carry out the intent and purpose of the DIP Credit Agreement and other DIP Loan Documents, including all such actions to create, protect, and perfect the DIP Liens (as defined herein) in favor of the DIP Lender, and (c) comply with and perform all of the terms and conditions contained in the DIP Credit Agreement and other DIP Loan Documents. Upon execution and delivery of the DIP Loan Documents and entry of this Interim DIP Order, the DIP Loan Documents shall constitute valid and binding obligations of the Debtor, enforceable against the Debtor and its estate and any successor trustee, in accordance with the terms thereof. No obligation, payment, transfer, or grant of security under the DIP Loan Documents as approved under this Interim DIP Order shall be stayed, restrained, voided, voidable, or recoverable under the Bankruptcy Code or applicable nonbankruptcy law, except to the extent this Order expressly provides otherwise.

*ACTIVE 62523530v3*

5.      The Debtor is expressly authorized to borrow the DIP Loan(s) from the DIP Lender in the maximum principal amount not to exceed $260,000, on the terms and conditions set forth in the DIP Loan Documents and this Interim DIP Order.

6.      The Debtor shall repay Dickey's for prior extensions of credit in the amount of $161,351.37, which amounts represent financing that was extended to the Debtor after the Petition Date.

7.      The DIP Obligations are subject to the payment of the DIP Lender's attorneys' fees in this Chapter 11 Case, and include those amounts. Principal and accrued, unpaid Interest will be payable on a weekly basis. The fees and expenses relating to the DIP Facility, including the DIP Lender's attorneys' fees, are authorized and approved for payment without further order of Court.

8.      The Debtor is hereby authorized to use the Cash Collateral of any Prepetition Secured Parties and proceeds of the DIP Loan(s) in accordance with the budget approved by US Foods, Inc. ("USF") and the DIP Lender (the "Approved Budget"). The initial Approved Budget is attached as Exhibit B hereto (the "Initial Approved Budget"). The Approved Budget may be updated, modified, or supplemented (with the consent of the DIP Lender) from time to time, and each such updated, modified or supplemented budget shall be approved by, and in form and substance satisfactory to, the DIP Lender and USF, and no such updated, modified, or supplemented budget shall be effective until so approved and once so approved shall be deemed an Approved Budget. Prior to 5:00 p.m. (prevailing Central time) on the fourth business day during the fifth (5th) week of the Initial Approved Budget (and the fourth business day during the final week of each successive Approved Budget thereafter), the Debtor shall submit a budget for the next successive nine (9) week period to the DIP Lender and USF, which budget shall be in

7

form and substance acceptable to the DIP Lender, and USF and approved by the DIP Lender and USF.

9.     Without further order of the Court, upon an Event of Default (as defined in the DIP Credit Agreement) and written notice to USF, the DIP Lender may direct the Debtor to (or the DIP Lender may directly) instruct all account debtors of existing and future accounts receivable included in the DIP Collateral to make payments directly into accounts satisfactory to the DIP Lender, in which event all such cash proceeds shall be applied in accordance with the DIP Loan Documents.  Further, upon written notice to USF, the DIP Lender may foreclose or otherwise realize upon its Collateral without the need for relief from the automatic stay.

10.     The DIP Lender is authorized to collect upon, convert to Cash Proceeds, and enforce checks, drafts, instruments and other forms of payment now or hereafter coming into its possession or under their control which constitute DIP Collateral or proceeds of DIP Collateral, subject to the provisions hereof.

11.     As security for the DIP Obligations, and as provided in the DIP Loan Documents and this Interim DIP Order, the DIP Lender shall have (effective and continuing, without the necessity of the execution, filing, and/or recordation of mortgages, security agreements, control agreements, patent security agreements, trademarks security agreements, pledge agreements, financing statements, or otherwise) (a) pursuant to Bankruptcy Code §§ 364(c)(2) and (d), valid, perfected, enforceable, non-avoidable, first priority, priming liens on and security interests in all now owned or hereafter acquired assets and property of the Debtor, including, but not limited to, any and all rents, issues, products, offspring, proceeds and profits generated by any item of such collateral, without the necessity of any further action of any kind or nature by the DIP Lender in order to claim or perfect such rents, issues, products, offspring, proceeds and/or profits

8

(collectively, the "<u>DIP Collateral</u>"); and (b) pursuant to Bankruptcy Code § 364(c)(3), valid, perfected, enforceable, non-avoidable, first priority or other junior liens on and security interests in all now owned or hereafter acquired assets and property of the Debtor, and any and all rents, issues, products, offspring, proceeds and profits generated by any item of such collateral, without the necessity of any further action of any kind or nature by the DIP Lender in order to claim or perfect such rents, issues, products, offspring, proceeds and/or profits, in each case on the terms set forth in the DIP Loan Documents ((a) and (b) collectively, the "<u>DIP Liens</u>," and the assets subject to the DIP Liens, the "<u>DIP Collateral</u>"); for the avoidance of doubt, the DIP Liens shall attach to any chapter 5 causes of action (collectively, "<u>Avoidance Actions</u>") or the proceeds thereof. The DIP Liens are senior and superior in priority to all other secured and unsecured creditors of the Debtor's estate, with the sole exception of the $2,812.69 secured claim of the Harris County Municipal Utility District No. 102.

12.     This Interim DIP Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the DIP Liens granted herein, effective as of the Petition Date, without any further action by Debtor or DIP Lender and without the execution, filing or recordation of any financing statements, security agreements, mortgages, certificates or other agreements, documents or instruments. Notwithstanding the foregoing, the Debtor shall execute and deliver to the DIP Lender such financing statements, mortgages, instruments, certificates, agreements and other documents as the DIP Lender may reasonably request from time to time to provide further evidence of the perfection of the DIP Liens, and any such documents filed by the DIP Lender shall be deemed filed as of the Petition Date.

13.     In accordance with Bankruptcy Code § 364(c)(1), to the extent the DIP Liens do not satisfy the DIP Obligations, the DIP Obligations shall constitute claims with priority in

*ACTIVE 62523530v3*

payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), or 726 (to the extent permitted by law), and/or 364(c)(1), and any other provision of the Bankruptcy Code (other than section 506(c) of the Bankruptcy Code), and shall at all times be senior to the rights of the Debtor, any chapter 11 trustee, any chapter 7 trustee or any other creditor in this chapter 11 case (the "DIP Super-Priority Claims"); provided, however, that the DIP Super-Priority Claims shall be subject to the Carve-Out.

14.     While any portion of the DIP Obligations remains unpaid or any of the DIP Loan Documents remains in effect, the Debtor shall not seek entry of any order approving or authorizing (under Bankruptcy Code §§ 105 or 364, or otherwise) (a) the granting of any lien or security interest in any of the DIP Collateral in favor of any party other than the DIP Lender or (b) the obtaining of credit or the incurring of indebtedness that is entitled to superpriority administrative status, in either case *pari passu* with or superior to that granted to the DIP Lender pursuant to this Interim DIP Order, unless, in connection with any transaction cited in clause (a) or (b) of this Paragraph, such request by the Debtor seeks to authorize and direct that the full amount of the DIP Obligations shall first be paid indefeasibly and in full.

15.     The DIP Liens in the DIP Collateral, the DIP Super-Priority Claim, the Adequate Protection Liens, and the Adequate Protection Super-Priority Claim, shall, in each instance, be subject only to the Permitted Existing Liens and the right to payment of the following (the "Carve-Out"):

(i)     Statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6); and

ACTIVE 62523530v3

(ii)     Fees payable to the Clerk of this Court.

16.     None of the DIP Loans, proceeds thereof, or DIP Collateral may be used to fund, directly or indirectly, any effort to: (a) object to or contest in any manner, or raise any defenses to the validity, perfection, priority, or enforceability of the DIP Obligations owing to the DIP Lender or the DIP Liens in favor of the DIP Lender securing such DIP Obligations; or (b) assert any claims or causes of action of any type against the DIP Lender, including, without limitation, any Avoidance Actions, or any claim or cause of action under the DIP Facility against the DIP Lender.

17.     The DIP Lender, at its election, is authorized to apply all Cash Proceeds (to the extent any payment is due and owing with respect to any DIP Obligations under the DIP Loan Documents) now or hereafter coming into the DIP Lender's possession or control to payment of the DIP Obligations in accordance with the terms of the DIP Credit Agreement. All such applications shall be final and not subject to challenge by any person, including any trustee.

18.     The DIP Facility shall terminate and the DIP Loans and all other DIP Obligations shall mature and be due and owing, upon the DIP Lender's election, at the earliest of the maturity dates set forth in the DIP Credit Agreement.

19.     The Debtor shall indemnify and hold harmless the DIP Lender, and each of their respective partners, members, officers, directors, employees, affiliates, successors, assigns, agents, counsel and other advisors (collectively, the "Indemnified Parties") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party.

20.     The automatic stay imposed by Bankruptcy Code § 362(a) is hereby modified, to the extent necessary, to implement and effectuate the terms and conditions of this Interim DIP Order.

21.     The Debtor is authorized to perform all acts and execute and comply with the terms of such other documents, instruments, and agreements in addition to the DIP Loan Documents, as the DIP Lender may reasonably require, as evidence of and for the protection of the DIP Obligations, or which otherwise may be deemed reasonably necessary by the DIP Lender to effectuate the terms and conditions of this Interim DIP Order and the DIP Loan Documents. The Debtor and the DIP Lender are hereby authorized to implement, in accordance with the terms of the DIP Loan Documents, any non-material modifications of the DIP Loan Documents without further order of this Court.

22.     Upon the indefeasible payment in full in cash, and the termination of, the DIP Facility, the Debtor shall execute and deliver in favor of the DIP Lender a valid and binding termination and release agreement, in form and substance reasonably acceptable to the DIP Lender.

23.     By executing the DIP Loan Documents or taking any actions pursuant to this Interim DIP Order or the Final DIP Order, the DIP Lender shall not: (1) be deemed to be in control of the operations or liquidation of the Debtor; or (2) be deemed to be acting as a "responsible person" with respect to the operation, management, or liquidation of the Debtor.

24.     The DIP Lender shall not be required to file any proof of claim in the chapter 11 case for any claim under the DIP Loan Documents, or for any claim allowed herein.

25.     Unless the DIP Lender consents thereto, no order shall be entered confirming a plan in these chapter 11 cases unless such order provides for the indefeasible and final payment of the

12

DIP Obligations in full in cash on the earlier of: (1) the effective date thereof; and (2) the Maturity Date.

26.     The DIP Lender's failure, at any time or times hereafter, to require strict performance by the Debtor (or by any trustee) of any provision of this Interim DIP Order or the DIP Loan Documents shall not waive, affect, or diminish any right of the DIP Lender thereafter to demand strict compliance and performance therewith. No delay on the part of the DIP Lender in the exercise of any right or remedy under this Interim DIP Order, the DIP Loan Documents, the Bankruptcy Code, or applicable nonbankruptcy law shall preclude any other or further exercise of any right or remedy. The DIP Lender shall not be deemed to have suspended or waived any of its rights or remedies under this Interim DIP Order, the DIP Loan Documents, the Bankruptcy Code, or applicable nonbankruptcy law unless such suspension or waiver is in writing, signed by a duly authorized officer of such party, and directed to the Debtor.

27.     Any stay, modification, reversal, or vacation of this Interim DIP Order shall not affect the validity and enforceability of any DIP Obligations of the Debtor to the DIP Lender incurred pursuant to this Interim DIP Order or the validity, priority, or enforceability of any of the DIP Liens and DIP Super-Priority Claims granted to the DIP Lender under this Interim DIP Order. Notwithstanding any such stay, modification, reversal, or vacation, all DIP Liens and Super-Priority Claims granted under this Interim DIP Order, the DIP Loans made pursuant to this Interim DIP Order in respect of the DIP Credit Agreement, and all DIP Obligations incurred by the Debtor pursuant hereto and pursuant to the terms of the DIP Loan Documents prior to the effective date of any such stay, modification, reversal, or vacation shall be governed in all respects by the original provisions of this Interim DIP Order, and the DIP Lender shall be entitled to all the rights,

privileges, and benefits, including, without limitation, the DIP Liens, and priorities granted herein with respect to all such DIP Obligations.

28.     The provisions of this Interim DIP Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any plan of reorganization in this chapter 11 case (and, to the extent not satisfied in full, the DIP Obligations shall not be discharged by the entry of any such order, notwithstanding Bankruptcy Code § 1141(d)); (b) converting this chapter 11 case to a chapter 7 case; (c) appointing a chapter 11 trustee, or (d) dismissing this chapter 11 case. The terms and provisions of this Interim DIP Order as well as the DIP Super-Priority Claims and DIP Liens granted pursuant to this Interim DIP Order and the DIP Loan Documents shall continue in full force and effect notwithstanding the entry of such order, and such DIP Super-Priority Claims and DIP Liens shall maintain their priority as provided by this Interim DIP Order until all of the DIP Obligations are paid indefeasibly and in full.

29.     The provisions of this Interim DIP Order shall be binding upon and inure to the benefit of the DIP Lender, the Debtor, and their respective successors and assigns, including any trustee appointed or elected in these chapter 11 cases, whether under chapter 11 or chapter 7.

30.     Notwithstanding any provision to the contrary in either this Interim DIP Order or in the DIP Loan Documents, KRG Kingwood, LLC shall not be deemed to have waived any objection(s) to the provisions or terms thereof relating to the DIP Facility, all such rights are hereby expressly reserved.

31.     If there is any inconsistency between the terms of the DIP Loan Documents and the provisions of this Interim DIP Order, the provisions of this Interim DIP Order shall control to the extent of such inconsistency.

32.     Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim DIP Order shall be valid, take full effect, and be enforceable immediately upon entry hereof; there shall be no stay of execution or effectiveness of this Interim DIP Order; and any stay of the effectiveness of this Interim DIP Order that might otherwise apply is hereby waived for cause shown.

33.     A hearing to consider entry of the Final DIP Order and final approval of the DIP Facility (the "Final Hearing") is scheduled for February 14, 2022, at 1:00 p.m. CT before the Honorable Chris Lopez, in the United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Street, Houston, Texas 77002. Within two (2) business days following entry of this Interim DIP Order, the Debtor shall serve or cause to be served by United States mail, first-class postage prepaid, notice of entry of this Interim DIP Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of the Interim DIP Order and the Motion, on (a) the parties having been given notice of the Interim Hearing and (b) any party which has filed prior to such date a request for notices with this Court. The Final Hearing Notice shall state that any party-in-interest objecting to the entry of the proposed Final DIP Order shall file written objections with the Court no later than February 10, 2022 at 4:00 p.m. (prevailing Central time). The Final Hearing may be continued from time to time without further notice other than given in open court.

34.     The Court has and will retain jurisdiction to enforce this Interim DIP Order according to its terms.

Signed: January 29, 2022

_____
Christopher Lopez
United States Bankruptcy Judge

15

# EXHIBIT A

## SENIOR SECURED DEBTOR IN POSSESSION
## LOAN AND SECURITY AGREEMENT

THIS SENIOR SECURED DEBTOR IN POSSESSION LOAN AND SECURITY AGREEMENT ("Agreement") is entered into this [____] day of January, 2022, between **Dickey's Barbecue Restaurants, Inc.,** a Texas corporation ("Lender"), and **Smokinkwr LLC,** a Texas limited liability company ("Borrower"). All schedules, riders and exhibits annexed hereto are incorporated herein and made a part hereof.

WHEREAS, on December 14, 2021 (the "Petition Date"), Borrower commenced Chapter 11 Case No. 21-33989 (the "Chapter 11 Case") by filing a voluntary petition under Chapter 11 of the Bankruptcy Code (as defined below) with the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court");

WHEREAS, Borrower continues to operate its business and manage its properties as a debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Lender is willing to extend credit to Borrower to fund Borrower's operations upon the terms and conditions set forth herein; and

WHEREAS, Borrower has agreed to secure all of the obligations under this Agreement by granting to Lender a security interest in and lien upon all or substantially all of its existing and after-acquired assets.

NOW, THEREFORE, for good and valuable consideration, the parties hereto, intending to be bound hereby, agree as follows:

## SECTION 1.  DEFINITIONS

1.1      **Defined Terms**. When used in this Agreement or in any schedule or rider hereto, the following terms shall have the following meanings (terms defined in the singular to have the same meaning when used in the plural and vice versa).

"Addison Distribution" means the monthly distribution of Revolving Loan proceeds described in Section 2.1(e) of this Agreement.

"Addison Landlord" means **[TX-0087 Addison's Landlord]**.

"Addison Lease" means that certain lease agreement, dated as of **[date of lease]**, among Borrower and Addison Landlord.

"Approved Budget" has the meaning set forth in the Interim Order.

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Court" has the meaning set forth in the recitals to this Agreement.

"<u>Bankruptcy Default</u>" means the occurrence of any of the following in connection with the Chapter 11 Case:

(a) the entry of an order in the Chapter 11 Case confirming a plan of reorganization or liquidation that does not contain a provision for the full payment of all obligations under this Agreement;

(b) the entry of an order amending, supplementing, staying, vacating or otherwise modifying this Agreement without the written consent of Lender;

(c) the Final Order, in form and substance acceptable to Lender, is not entered promptly following the expiration of the Interim Order;

(d) the Final Order, in form and substance acceptable to Lender, is not entered on or before the date that is seventy-five (75) days after the entry of the Interim Order;

(e) the appointment of a trustee in the Chapter 11 Case or the appointment of an examiner in the Chapter 11 Case (or Borrower applies for, consents to, or acquiesces in, any such relief);

(f) the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code (or Borrower applies for, consents to, or acquiesces in, any such relief);

(g) the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (i) to allow any creditor to execute upon or enforce a Lien on any Collateral, or (ii) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case is with respect to any portion of the Collateral having a value, individually or in the aggregate, in excess of $25,000 or which would otherwise have a Material Adverse Effect;

(h) the commencement of a suit or action against Lender by or on behalf of Borrower or its bankruptcy estate;

(i) the breach of and/or failure of Borrower to perform any of its obligations under this Agreement; and

(j)  the Bankruptcy Court or any other court of competent jurisdiction enters an order or judgment, or Borrower applies for, consents to, or acquiesces in, the entry of such order or judgment, in the Chapter 11 Case modifying, limiting, subordinating or avoiding (i) the priority of any obligations owing to Lender under this Agreement, or (ii) the perfection, priority or validity of any Lien securing such obligations.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Case.

"Borrower's Bank Account" means the Deposit Account of Borrower identified on Exhibit A to this Agreement (or such other Deposit Account of Borrower that has been designated as such, in writing, by Borrower to Lender).

"Borrower's Books" means all of Borrower's books and records relating to its existence, governance, assets, liabilities or financial condition or any of the Collateral, including minute books; ledgers and records indicating, summarizing or evidencing Borrower's assets or liabilities; all information relating to Borrower's business operations; and all computer records, programs, discs or tape files, printouts, runs, and other information prepared or stored electronically, including the equipment or any website or third party storage provider containing or hosting such information.

"Borrower's Locations" means Borrower's franchises located at **[insert franchise locations]**.

"Carve-Out" has the meaning provided in the DIP Order.

"Carve-Out Amount" has the meaning provided in the DIP Order.

"Chapter 11 Case" has the meaning set forth in the recitals to this Agreement.

"Closing Date" means the date on which the initial Revolving Loan is funded hereunder, which shall be no later than the first Monday after the Bankruptcy Court's approval of this Agreement.

"Collateral" means all of the property and interests in property described in this Agreement, all property described in any of the Security Documents as security for the payment or performance of any of the Obligations, and all other property and interests in property that now or hereafter secure (or are intended to secure) the payment or performance of any of the Obligations.

"Default" means an event or condition the occurrence of which would, with the lapse of time or the giving of notice, or both, become an Event of Default.

"Deposit Account" means any deposit account (as that term is defined in the UCC).

"DIP Order" means the Interim Order or the Final Order, whichever is in effect as of the relevant date in question.

"Dollars" and the sign "$" means lawful money of the United States of America.

"Event of Default" means the occurrence of any one of the events set forth in Section 8 of this Agreement.

"Environmental Law" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on Borrower or its subsidiaries, relating to the environment, the effect of the environment on employee health, or Hazardous Materials, in each case as amended from time to time.

"Fees" means all fees payable to Lender pursuant to this Agreement.

"Final Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to Lender, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless Lender waives such requirement), together with all extensions, modifications and amendments thereto, in form and substance satisfactory to Lender, which, among other matters but not by way of limitation, authorizes Borrower to obtain credit, incur (or guaranty) indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super priority of Lender's claims.

"Frisco Distribution" means the monthly distribution of Revolving Loan proceeds described in Section 2.1(b) of this Agreement.

"Frisco Landlord" means **[TX-0426 Frisco's Landlord]**.

"Frisco Lease" means that certain lease agreement, dated as of **[date of lease]**, among Borrower and Frisco Landlord.

"Full Payment" means the full, final and indefeasible payment in full of all of the Obligations.

"GAAP" means generally accepted accounting principles in the United States of America in effect from time to time.

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Intellectual Property" means all intellectual and similar property of a Person, including inventions, designs, patents, copyrights, trademarks, service marks, trade names, trade secrets, confidential or proprietary information, customer lists, know-how, software and databases; all embodiments or fixations thereof and all related documentation, applications, registrations and franchises; all licenses or other rights to use any of the foregoing; and all books and records relating to the foregoing.

"Interim Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extension, modifications, and amendments thereto, in form and substance satisfactory to Lender which,

among other matters but not by way of limitation, authorizes, on an interim basis, Borrower to execute and perform under the terms of this Agreement and the other Loan Documents, substantially in the form of Exhibit B.

"Kingwood Distribution" means the monthly distribution of Revolving Loan proceeds described in Section 2.1(d) of this Agreement.

"Kingwood Landlord" means **[TX-0774 Kingwood's Landlord]**.

"Kingwood Lease" means that certain lease agreement, dated as of **[date of lease]**, among Borrower and Kingwood Landlord.

"LaMarque Distribution" means the monthly distribution of Revolving Loan proceeds described in Section 2.1(c) of this Agreement.

"LaMarque Landlord" means **[TX-1750 LaMarque's Landlord]**.

"LaMarque Lease" means that certain lease agreement, dated as of **[date of lease]**, among Borrower and LaMarque Landlord.

"Lien" means any interest in property securing an obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based on common law, statute or contract. The term "Lien" shall also include reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases and other title exceptions and encumbrances affecting property. For the purpose hereof, Borrower shall be deemed to be the owner of any property which it has acquired or held subject to a conditional sale agreement or other arrangement pursuant to which title to the property has been retained by or vested in some other Person for security purposes.

"Loan" means an advance of money made by Lender to Borrower pursuant to the terms of this Agreement.

"Loan Documents" means, collectively, this Agreement (including any rider hereto), the DIP Order, and any other documents and agreements entered into between Lender and Borrower in connection with this Agreement or to evidence or govern the terms of any of the Obligations.

"Local Bankruptcy Rules" means the local bankruptcy rules of the Bankruptcy Court as the same may from time to time be in effect and applicable to the Chapter 11 Case.

"Material Adverse Effect" means a material adverse effect on any of (a) the condition (financial or otherwise), business, performance, operations or property of Borrower and its subsidiaries taken as a whole; (b) the ability of Borrower to perform its obligations under any Loan Document; (c) the validity or enforceability of any Loan Document or the material rights and remedies of Lender under any Loan Document; or (d) a material impairment of the enforceability or priority of Lender's Liens with respect to all or a material portion of the Collateral.

"Material Agreement" means any agreement, instrument or arrangement to which Borrower is a party for which default in the performance, observance or fulfillment of any of the material

obligations, covenants or conditions contained therein could reasonably be expected to have a Material Adverse Effect.

"<u>Obligations</u>" means all debts, liabilities, obligations, covenants, and duties at any time or times owing by Borrower to Lender of any kind and description, whether incurred pursuant to or evidenced by any of the Loan Documents or pursuant to any other agreement between Lender and Borrower or otherwise, and whether direct or indirect, absolute or contingent, due or to become due, or joint or several, including the principal of and interest on any Loan. Without limiting the generality of the foregoing, the term "Obligations" shall include all debts, liabilities and obligations incurred by Borrower to Lender in the Bankruptcy Case and any interest, fees or other charges accrued in the Bankruptcy Case, whether or not any such interest, fees or other charges are recoverable from Borrower or its estate under 11 U.S.C. §506.

"<u>Person</u>" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"<u>Petition Date</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Postpetition</u>" means the time period beginning immediately upon the filing of the Chapter 11 Case.

"<u>Prepetition</u>" means the time period ending immediately prior to the filing of the Chapter 11 Case.

"<u>Revolving Loan</u>" means each loan to be made by Lender to Borrower pursuant to <u>Section 2.1</u> of this Agreement.

"<u>Security Documents</u>" means each instrument or agreement now or at any time hereafter securing or assuring payment of the whole or any part of the Obligations, including this Agreement.

"<u>Taxes</u>" means any taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein, and all interest, penalties or similar liabilities with respect thereto.

"<u>UCC</u>" means the Uniform Commercial Code (or any successor statute) as adopted and in force in the State of Texas from time to time or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code (or any successor statute) of such state.

"<u>US Foods Distribution</u>" means the weekly distribution of Revolving Loan proceeds described in <u>Section 2.1(a)</u> of this Agreement.

1.2  **UCC Terms**. All other capitalized terms contained in this Agreement and not otherwise defined herein shall have, when the context so indicates, the meanings provided for by the UCC to the extent the same are used or defined therein.

1.3  **Super Priority Nature of Obligations**.

(a)  The priority of Lender's claims against, and Liens on and in the Collateral of, Borrower shall be as set forth in the DIP Order.

(b)  All Obligations shall constitute administrative expenses of Borrower in the Chapter 11 Case, with administrative priority and senior secured status under Sections 364(c) and 364(d) of the Bankruptcy Code. Subject to the Carve-Out, such administrative claim shall have priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of Borrower, Borrower's estate, and any successor trustee or estate representative in the Chapter 11 Case or any subsequent proceedings or cases under the Bankruptcy Code. The Liens granted to Lender on and in the Collateral of Borrower, and the priorities accorded to the Obligations, shall have the priority and senior secured status afforded by Sections 364(c) and 364(d)(l) of the Bankruptcy Code (all as more fully set forth in the DIP Order) senior to all claims and interests other than the Carve-Out.

(c)  Lender's Liens on and in the Collateral of Borrower and Lender's administrative claims under Sections 364(c)(l) and 364(d) of the Bankruptcy Code afforded the Obligations shall also have priority over any claims arising under Section 506(c) of the Bankruptcy Code subject and subordinate only to the Carve-Out. Except as set forth herein or in the DIP Order, no other claim having a priority superior or *pari passu* to that granted to Lender by the DIP Order shall be granted or approved while any Obligations under this Agreement remain outstanding. Except for the Carve-Out, no costs or expenses of administration shall be imposed against Lender or any of its Collateral under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, and Borrower hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under sections 105, 506(c) or 552, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against Lender.

1.4  **Payment of the Obligations**. Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, Lender shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

1.5  **No Discharge; Survival of Claims**. Borrower agrees that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization in the Chapter 11 Case (and Borrower pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the superpriority administrative claim granted to Lender pursuant to the DIP Order and described in this Agreement and the Liens granted to Lender pursuant to the Interim Order and Final Order and described in this Agreement shall not be affected in any manner by the entry of an order confirming a plan of reorganization in the Chapter 11 Case.

1.6 **Waiver of Priming Rights**. Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligations shall be outstanding, without limiting any terms or conditions of the DIP Order, Borrower hereby irrevocably waives any right, (a) to grant or impose, or request that the Bankruptcy Court grant or impose, under section 364 of the Bankruptcy Code or otherwise, Liens on or security interests in any of the Collateral securing the Obligations, which are *pari passu* with, equal to or superior to the Liens and security interests held by Lender, (b) to grant or impose, or request that the Bankruptcy Court grant or impose, under section 364 of the Bankruptcy Code or otherwise, claims or expenses against Borrower, which are *pari passu* with, equal to or superior to the Obligations, and (c) to use, or to request that the Bankruptcy Court authorize the use of, Cash Collateral (as defined in the DIP Order) or proceeds of Loans, except for such consensual uses expressly provided under the DIP Order.

## SECTION 2. LOAN AND TERMS OF REPAYMENT

2.1 **Revolving Loans**. Upon the Bankruptcy Court's approval of this Agreement, on the Closing Date and every subsequent month thereafter until this Agreement is terminated [or the Obligations arising under all Revolving Loans mature, Lender shall advance a monthly Revolving Loan to Borrower in the total principal amount not to exceed **[$260,000.00]**, with such Revolving Loan proceeds to be distributed by Lender as follows:

(a) Lender shall pay US Foods, Inc. each week (such weekly payment date to be determined in Lender's reasonable discretion), on behalf of Borrower, an amount that Lender reasonably determines is appropriate to supply Borrower's Locations for such week (approximately $48,000 per week);

(b) Lender shall pay Frisco Landlord **[$10,172.52 (need exact monthly rent amount)]** each month (such monthly payment date to be determined in accordance with the terms of the Frisco Lease) on behalf of Borrower's obligations under the Frisco Lease;

(c) Lender shall pay LaMarque Landlord **[$8,000.00 (need exact monthly rent amount)]** each month (such monthly payment date to be determined in accordance with the terms of the LaMarque Lease) on behalf of Borrower's obligations under the LaMarque Lease;

(d) Lender shall pay Kingwood Landlord [**$7,472.00 (need exact monthly rent amount)]** each month (such monthly payment date to be determined in accordance with the terms of the Kingwood Lease) on behalf of Borrower's obligations under the Kingwood Lease; and

(e) Lender shall pay Addison Landlord **[$12,679.96 (need exact monthly rent amount)]** each month (such monthly payment date to be determined in accordance with the terms of the Addison Lease) on behalf of Borrower's obligations under the Addison Lease.

2.2 **Payments**. All payments with respect to the Obligations shall be made as follows:

(a) As payment for the amounts advanced under the US Foods Distribution, Lender shall debit Borrower's Bank Account for the exact amount of each US Foods Distribution 7 days after such US Foods Distribution occurs;

(b) As payment for the amounts advanced under the Frisco Distribution, Lender shall debit Borrower's Bank Account $2,543.13 on Monday of every week after the Closing Date;

(c) As payment for the amounts advanced under the LaMarque Distribution, Lender shall debit Borrower's Bank Account $2,000.00 on Monday of every week after the Closing Date;

(d) As payment for the amounts advanced under the Kingwood Distribution, Lender shall debit Borrower's Bank Account $1,868.00 on Monday of every week after the Closing Date;

(e) As payment for the amounts advanced under the Addison Distribution, Lender shall debit Borrower's Bank Account $3,169.99 on Monday of every week after the Closing Date; and

(f) For any of the Obligations not arising under any Revolving Loan, Borrower shall make payments to Lender for the amount owed under such Obligations on the date when due, in immediately available funds, without any offset or counterclaim.

2.3 **Fees and Reimbursement of Expenses**. Borrower shall be obligated to pay all of Lender's reasonable fees and expenses, including attorneys' fees and costs, incurred in connection with this Agreement and any Revolving Loan.

2.4 **No Prepayment Penalty**. Borrower shall have the right to prepay the Obligations under this Agreement in full at any time without the imposition of any prepayment fee or penalty.

2.5 **No Promissory Note**. No promissory note shall evidence the Obligations under any Revolving Loan; provided, however, that Borrower will provide a promissory note to Lender, in form and substance acceptable to Lender, upon written request.

**SECTION 3. TERM AND TERMINATION**

3.1 **Term**. The Obligations under all Revolving Loans shall mature and be payable in full at the earlier of: (1) the first business day that is three months after the entry of the Interim Order; (2) confirmation of a chapter 11 plan in the Chapter 11 Case; (3) conversion of the Chapter 11 Case to chapter 7; (4) dismissal of the Chapter 11 Case; or (5) appointment of a chapter 11 trustee in the Chapter 11 Case.

3.2 **Termination**. At any time that an Event of Default exists, Lender may terminate this Agreement upon 5 days' notice to Borrower.

**SECTION 4. CREATION OF SECURITY INTEREST**

4.1 **Grant of Security Interest**. Without limitation of any of the provisions of the DIP Order, to secure the prompt payment and performance of all of the Obligations, Borrower hereby grants to Lender a continuing security interest in and Lien upon all personal and real property of Borrower, including all of the following property and interests in property of Borrower, whether now owned or existing or hereafter created, acquired or arising and wheresoever located: (i) all

cash and cash equivalents; (ii) all funds in any deposit account, securities account or other account of Borrower and all cash and other property deposited therein or credited thereto from time to time; (iii) all accounts and other receivables (including for the avoidance of doubt all intercompany receivables owed to Borrower); (iv) all contract rights; (v) all instruments, documents and chattel paper; (vi) all securities (whether or not marketable); (vii) all goods, equipment, inventory and fixtures; (viii) all real property interests; (ix) all interests in leaseholds, (x) all franchise rights; (xi) all patents, trade names, trademarks (other than intent-to-use trademarks), copyrights and all other intellectual property; (xii) all general intangibles; (xiii) all equity interests or capital stock, limited liability company interests, partnership interests and financial assets; (xiv) all investment property; (xv) all supporting obligations; (xvi) all letters of credit and letter of credit rights; (xvii) all commercial tort claims; (xviii) unearned premiums, refunds, and proceeds related to any insurance policies; (xix) all other claims and causes of action, including proceeds thereof (including, but not limited to, subject to entry of the Final Order, all claims and causes of action arising under Chapter 5 of the Bankruptcy Code and the proceeds thereof); (xx) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records); (xxi) to the extent not covered by the foregoing, all other assets or properties of Borrower, whether tangible, intangible, real, personal or mixed; and (xxii) all products, offspring, profits and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Borrower from time to time with respect to any of the foregoing.

       4.2    **Perfection of Security Interest**. Without limitation of any of the provisions of the DIP Order relating to the automatic perfection of Lender's Liens, promptly after Lender's request therefor, Borrower shall execute or cause to be executed and delivered to Lender such instruments, assignments, title certificates or other documents as are necessary under the UCC or other applicable law (including any motor vehicle certificate of title act) to perfect (or continue the perfection of) Lender's Liens upon the Collateral and shall take such other action as may be requested by Lender to give effect to or carry out the intent and purposes of this Agreement. Unless prohibited by applicable law, Borrower hereby irrevocably authorizes Lender to execute and file in any jurisdiction any financing statement or amendment thereto on Borrower's behalf, including financing statements that indicate the Collateral (i) as all assets or all personal property of Borrower or words to similar effect or (ii) as being of equal or lesser scope, or with greater or lesser detail, than as set forth in this Agreement. Borrower also hereby ratifies its authorization for Lender to have filed in any jurisdiction any like financing statement or amendment thereto if filed prior to the date hereof.

## SECTION 5.  CONDITIONS PRECEDENT

       5.1    **Initial Conditions Precedent**. Lender shall not be obligated to fund each Revolving Loan unless each of the following conditions has been satisfied:

      (a) Borrower has executed and delivered each such Loan Document, all in form and substance satisfactory to Lender.

(b) The DIP Order shall be in full force and effect and shall not have been reversed, modified, amended, subject to a pending appeal, stayed or vacated (other than, as to the Interim Order, by the Final Order) absent the prior written consent of Lender.

## SECTION 6.  BORROWER'S REPRESENTATIONS AND WARRANTIES

6.1     **Administrative Priority; Lien Priority; DIP Order**.

(a) The Obligations constitute an allowed administrative expense in the Chapter 11 Case, having priority in payment over all other administrative expenses and claims against Borrower now existing or hereafter arising, of any kind or nature whatsoever, including without limitation all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code.

(b) Pursuant to Section 364(c)(2) of the Bankruptcy Code and the DIP Order, all Obligations are secured by a perfected Lien on the Collateral, subject to no other Lien (except as provided in the DIP Order) in any of the Collateral which is not encumbered by a Prior Lien (as defined in the DIP Order).

(c) Pursuant to Section 364(d)(1) of the Bankruptcy Code and the DIP Order, all of the Obligations are secured by (1) a perfected Lien on the Collateral which came into existence or was acquired by Borrower on or after the Petition Date, subject to no other Lien except as provided in the DIP Order, and (2) a perfected Lien on the Collateral which came into existence or was acquired by Borrower prior to the Petition Date, subject to no other Lien except as provided in the DIP Order.

(d) On the Closing Date, the Interim Order is, and from and after the entry of the Final Order, the Final Order will be, in full force and effect, and neither the Interim Order nor the Final Order has been reversed, vacated, modified, amended or stayed, except for modifications and amendments that are reasonably acceptable to Lender and are not stayed in any respect.

6.2     **Approved Budget**.    Borrower has furnished the Approved Budget to Lender. The Approved Budget is reasonable and was prepared on a reasonable basis and in good faith by Borrower and is based on reasonable assumptions based on the best information available to Borrower, and Borrower is not aware of any facts or information that would lead it to believe that the Approved Budget is incorrect or misleading in any material respect.  The Borrower shall comply with the Approved Budget in all respects.

6.3     **Appointment of Trustee or Examiner; Liquidation**. No order has been entered or is pending in the Chapter 11 Case (a) for the appointment of a Chapter 11 trustee, (b) for the appointment of an examiner with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Sections 1104(d) and 1106(b) of the Bankruptcy Code or (c) to convert the Chapter 11 Case to a Chapter 7 case or to dismiss the Chapter 11 Case.

6.4     **Chapter 11 Case**. The Chapter 11 Case was commenced by the filing of a voluntary petition on the Petition Date. The Chapter 11 Case has not been dismissed. The motion for approval

of this Agreement was proper and sufficient pursuant to the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules of the Bankruptcy Court.

## SECTION 7. AFFIRMATIVE COVENANTS

At all times that this Agreement remains in effect, Borrower covenants that it shall:

7.1 **Notices**. Notify Lender, promptly after Borrower obtains knowledge thereof, of (i) any Default or Event of Default; (ii) the commencement of any action, suit or other proceeding against, or any demand for arbitration with respect to, Borrower; (iii) the occurrence or existence of any default (or claimed default) by Borrower relating to this Agreement or any Loan; or (iv) any other event or transaction which has or could reasonably be expected to have a Material Adverse Effect.

7.2 **Rights and Facilities**. Maintain and preserve all rights (including all rights related to Intellectual Property), franchises and other authority adequate for the conduct of its business; maintain its properties, equipment and facilities in good order and repair; conduct its business in an orderly manner without voluntary interruption; and maintain and preserve its existence.

7.3 **Insurance**. In addition to the insurance required by the Loan Documents with respect to the Collateral, maintain with its current insurers or with other financially sound and reputable insurers having a rating of at least A- or better by Best's Ratings, a publication of A.M. Best Company, (i) insurance with respect to its properties and business against such casualties and contingencies of such type (including product liability, workers' compensation, larceny, embezzlement or other criminal misappropriation insurance) and in such amounts and with such coverages, limits and deductibles as is customary in the business of Borrower (ii) marine cargo coverage, in such amounts and with such coverages, limits and deductibles as is customary in the business of Borrower, and (iii) business interruption insurance, in an amount approved by Lender.

7.4 **Visits and Inspections**. Permit representatives of Lender from time to time, as often as may be reasonably requested, but only during normal business hours and (except when a Default or Event of Default exists) upon reasonable prior notice to Borrower to: visit and inspect properties of Borrower; inspect, audit and make extracts from Borrower's books and records; and discuss with its officers, employees and independent accountants Borrower's financial conditions, business prospects and results of operations.

7.5 **Taxes; Other Charges**. Pay and discharge all Taxes (and other charges the non-payment of which could result in a Lien on Borrower's assets) in accordance with the requirements of the Bankruptcy Code to the extent permitted under the DIP Order, and, if requested by Lender, shall provide proof of payment or, in the case of withholding or other employee taxes, deposit of payments required by applicable law. Borrower shall deliver to Lender copies of all Tax returns (and amendments thereto) promptly after the filing thereof.

7.6 **Financial Statements and Other Information**. Keep adequate records and books of account with respect to its business activities in which proper entries are made in accordance with GAAP reflecting all its financial transactions.

7.7 **Compliance with Laws**. Comply with all laws relating to Borrower, the conduct of its business and the ownership and use of its assets, including ERISA, all Environmental Laws, OSHA, the Fair Labor Standards Act and all other laws regarding the collection, payment and deposit of the Taxes, and shall obtain and keep in full force and effect any and all governmental and regulatory approvals necessary to the ownership of its properties or the conduct of its business and shall promptly report any non-compliance to Lender.

7.8 **Reimbursement for Lender Expenses**. Upon the demand of Lender, promptly reimburse Lender for all Lender's reasonable fees and expenses, including attorneys' fees and costs, incurred in connection with this Agreement and any Revolving Loan, and Borrower hereby authorizes and approves all Loans by Lender in payment of items constituting such fees and expenses.

## SECTION 8. EVENTS OF DEFAULTS

8.1 **Events of Default**. The occurrence or existence of any one or more of the following events or conditions shall constitute an Event of Default:

(a) Borrower shall fail to pay any of the Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration or otherwise);

(b) Borrower fails or neglects to perform, keep or observe any term, provision, condition, covenant or agreement, in this Agreement (including, without limitation, compliance with the Approved Budget), in any of the other Loan Documents, or in any other present or future agreement between Borrower and Lender;

(c) Borrower is enjoined, restrained or in any way prevented by court order from continuing to conduct all or any material part of its business affairs; or

(d) A Bankruptcy Default shall occur.

8.2 **Cumulative Rights; No Waiver**. All covenants, conditions, warranties, guaranties, indemnities and other undertakings of Borrower in the DIP Order, this Agreement or any of the other Loan Documents shall be deemed cumulative, and Lender shall have all other rights and remedies not inconsistent herewith as provided under the UCC or other applicable law. No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Default or Event of Default on one occasion shall be deemed to be a continuing waiver or applicable to any other occasion. No waiver or course of dealing shall be established by the failure or delay of Lender to require strict performance by Borrower with any term of the Loan Documents, or to exercise any rights or remedies with respect to the Collateral or otherwise.

## SECTION 9. GENERAL PROVISIONS

9.1 **Effectiveness, Successors and Assigns**. This Agreement shall be binding and deemed effective when executed by Borrower and accepted by Lender, and when so accepted, shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided that Borrower may not assign this Agreement or any rights hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely void. No consent to an

assignment by Lender shall release Borrower from its Obligations to Lender. Lender may assign this Agreement and its rights and duties hereunder. Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in, Lender's rights and benefits hereunder.

9.2 **Section Headings; Interpretation**. Section headings and section numbers have been set forth herein for convenience only. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or Borrower, whether under any rule of construction or otherwise. This Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of the parties hereto.

9.3 **Indulgences Not Waivers**. Lender's failure at any time or times to require strict performance by Borrower of any provision of this Agreement or any of the other Loan Documents shall not waive, affect or otherwise diminish any right of Lender thereafter to demand strict compliance and to performance with such provision.

9.4 **Severability; Survival**. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

9.5 **Modification; Entire Agreement**. This Agreement cannot be changed or terminated orally. This Agreement and the other Loan Documents represent the entire understanding of the parties with respect to the subject matter hereof and thereof and supersede all prior agreements, understandings, negotiations and inducements regarding the same subject matter.

9.6 **Counterparts; Facsimile Signatures**. This Agreement and any amendments hereto may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. Counterparts of each of the Loan Documents may be delivered by facsimile or electronic mail and the effectiveness of each such Loan Document and signatures thereon shall, subject to applicable law, have the same force and effect as manually signed originals and shall be binding on all parties thereto.

9.7 **Governing Law**. This Agreement shall be deemed to have been made in the State of Texas and shall be governed by and construed in accordance with the internal laws (without regard to conflict of law provisions) of the State of Texas.

9.8 **Consent to Forum**. Borrower and Lender consent to the exclusive jurisdiction of the Bankruptcy Court in any action, suit or other proceeding arising out of or relating to this Agreement or any of the other Loan Documents. Subject to the terms of the DIP Order, nothing herein shall limit the right of Lender to bring proceedings against Borrower in the courts of any other jurisdiction where Collateral may be located. Nothing in this Agreement shall be deemed or operate to affect the right of Lender to serve legal process in any other manner permitted by law or to preclude the enforcement by Lender of any judgment or order obtained in such forum or the

taking of any action under this Agreement to enforce same in any other appropriate forum or jurisdiction.

9.9 **Waiver and Release of Certain Claims and Rights**. **TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BORROWER HEREBY KNOWINGLY, INTENTIONALLY AND INTELLIGENTLY WAIVES (WITH THE BENEFIT OF ADVICE OF LEGAL COUNSEL OF ITS OWN CHOOSING): (I) THE RIGHT TO TRIAL BY JURY (WHICH LENDER HEREBY ALSO WAIVES) IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM OF ANY KIND ARISING OUT OF, RELATED TO OR BASED IN ANY WAY UPON ANY OF THE LOAN DOCUMENTS, THE OBLIGATIONS OR THE COLLATERAL; (II) SUBJECT TO THE TERMS OF THE DIP ORDER, PRESENTMENT, PROTEST, DEFAULT, NON-PAYMENT, MATURITY, RELEASE, COMPROMISE, SETTLEMENT, EXTENSION OR RENEWAL OF ANY OR ALL COMMERCIAL PAPER, ACCOUNTS, CONTRACT RIGHTS, DOCUMENTS, INSTRUMENTS, CHATTEL PAPER AND GUARANTIES AT ANY TIME HELD BY LENDER ON WHICH BORROWER MAY IN ANY WAY BE LIABLE AND HEREBY RATIFIES AND CONFIRMS WHATEVER LENDER MAY DO IN THIS REGARD; (III) SUBJECT TO THE TERMS OF THE DIP ORDER, NOTICE PRIOR TO TAKING POSSESSION OR CONTROL OF ANY OF THE COLLATERAL AND THE REQUIREMENT TO DEPOSIT OR POST ANY BOND OR OTHER SECURITY WHICH MIGHT OTHERWISE BE REQUIRED BY ANY COURT OR APPLICABLE LAW PRIOR TO ALLOWING LENDER TO EXERCISE ANY OF LENDER'S SELF-HELP OR JUDICIAL REMEDIES TO OBTAIN POSSESSION OF ANY OF THE COLLATERAL; (IV) THE BENEFIT OF ALL VALUATION, APPRAISEMENT AND EXEMPTION LAW; (V) ANY CLAIM AGAINST LENDER ON ANY THEORY OF LIABILITY, FOR DIRECT, ACTUAL, SPECIAL, INDIRECT, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, (A) ANY PREPETITION ACTS, CONDUCT, OR TRANSACTIONS AND (B) ANY OF THE LOAN DOCUMENTS, ANY TRANSACTION THEREUNDER, THE ENFORCEMENT OF ANY REMEDIES BY LENDER OR THE USE OF ANY PROCEEDS OF ANY LOANS; (VI) NOTICE OF ACCEPTANCE OF THIS AGREEMENT BY LENDER; AND (VII) THE RIGHT TO ASSERT ANY CONFIDENTIAL RELATIONSHIP THAT IT MAY HAVE UNDER APPLICABLE LAW WITH ANY ACCOUNTING FIRM AND/OR SERVICE BUREAU IN CONNECTION WITH ANY INFORMATION REQUESTED BY LENDER PURSUANT TO OR IN ACCORDANCE WITH THIS AGREEMENT (AND BORROWER AGREES THAT LENDER MAY CONTACT DIRECTLY ANY SUCH ACCOUNTING FIRM AND/OR SERVICE BUREAU IN ORDER TO OBTAIN ANY SUCH INFORMATION).**

9.10 **Additional Provisions**. Time is of the essence of this Agreement and the other Loan Documents. No provision of this Agreement or any of the other Loan Documents shall be construed against or interpreted to the disadvantage of any party hereto by any governmental authority by reason of such party having or being deemed to have structured, drafted or dictated such provision.

9.11 **Lender as Party-in-Interest**. Borrower hereby stipulates and agrees that Lender is and shall remain a party in interest in the Chapter 11 Case and shall have the right to participate, object and be heard in any motion or proceeding in connection therewith. Nothing in this

Agreement or any other Loan Document shall be deemed to be a waiver of any of Lender's rights or remedies under applicable law or documentation. Without limitation of the foregoing, Lender shall have the right to make any motion or raise any objection it deems to be in its interest.

9.12.    **Credit Bids**. Lender has the right to credit bid its claims under this Agreement or the DIP Order, as applicable, pursuant to Section 363(k) of the Bankruptcy Code, and Borrower agrees that it shall not object to Lender's right to credit bid.

9.13.    **Conflict of Terms**. If any provision in this Agreement or any other Loan Document conflicts with any provision in the DIP Order, the provision in the DIP Order shall govern and control.

[*Signatures on following page*]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, to be effective on the date first set forth above.

BORROWER:

**SMOKINKWR LLC**

By: _____
Name:
Title:

LENDER:

**DICKEY'S BARBECUE RESTAURANTS, INC.**

By: _____
Name:
Title:

## EXHIBIT A

## BORROWER'S BANK ACCOUNT

Bank Name:          [              ]
Bank Address:       [              ]
                    [              ]
ABA Number:         [              ]
Account Number:     [              ]
Reference:          [              ]
Address:            [              ]
                    [              ]

**EXHIBIT B**

**INTERIM ORDER**

(See attached.)

# EXHIBIT B

| | Dec 14-19, 2021 | Dec 20-26, 2021 | Dec 27 - Jan 2, 2022 |
|---|---|---|---|
| **3PV On Hold and Prior Month Carry Over** | | $ 89,851.69 | $ 85,096.87 |
| | | | |
| **Income** | | | |
| **4000 Net Sales** | | | |
| 4100 Non Catering Sales | 82,569.23 | 85,978.36 | 79,856.36 |
| 4200 Catering Sales | 11,221.68 | 12,802.18 | 3,028.59 |
| | | | |
| **Total 4000 Sales** | $ 93,790.91 | $ 98,780.54 | $ 82,884.95 |
| **Total Income** | $ 93,790.91 | $ 98,780.54 | $ 82,884.95 |
| **Cost of Goods Sold** | | | |
| **5000 Cost of Goods Sold** | | | |
| 5100 Meat | 0.00 | 0.00 | 0.00 |
| 5200 Grocery | 0.00 | 0.00 | 0.00 |
| 5205 Produce | 0.00 | 0.00 | 0.00 |
| 5300 Beverage | 0.00 | 0.00 | 0.00 |
| **Alcohol** | 0.00 | 0.00 | 0.00 |
| 5400 Paper | 0.00 | 0.00 | 0.00 |
| 5600 Wood | 0.00 | 0.00 | 0.00 |
| **Total 5000 Cost of Goods Sold** | $ 0.00 | $ 0.00 | $ 0.00 |
| **Total Cost of Goods Sold** | $ 0.00 | $ 0.00 | $ 0.00 |
| **Gross Profit** | $ 93,790.91 | $ 98,780.54 | $ 82,884.95 |
| **Expenses** | | | |
| **6000 Payroll Labor Expenses** | | | |
| 6015 Management Salary | 0.00 | 37,470.93 | 0.00 |
| 6025 Salaries and Wages | 0.00 | 56,845.05 | 0.00 |
| 6026 Payroll Expense | 0.00 | 1,350.00 | 0.00 |
| 6100 Overtime | 0.00 | 0.00 | 0.00 |
| 6125 Contractor Payment | 0.00 | 0.00 | 0.00 |
| 6225 Correction Payment | 0.00 | 0.00 | 0.00 |
| 6275 Reimbursements | 0.00 | 0.00 | 0.00 |
| **Total 6000 Payroll Labor Expenses** | $ 0.00 | $ 95,665.98 | $ 0.00 |
| **6300 Employer Taxes** | | | |
| **6320 Worker's Compensation** | | | |
| **6325 Payroll Processing Fees** | | 250.00 | |
| **7000 Franchise Fees** | | | |
| 7025 Marketing | | | |
| 7050 Royalty Expense | | | |
| 7060 Training Expenses | | | |
| **Total 7000 Franchise Fees** | $ 0.00 | $ 250.00 | $ 0.00 |

| | | | | | |
|---|---|---:|---|---:|---:|
| **7200 Advertising & Marketing** | | | | | |
| 7205 Digital Signage | | | | | |
| **Total 7200 Advertising & Marketing** | $ | 0.00 | $ | 0.00 | $ 0.00 |
| **7300 Rent & Lease** | | | | | |
| **7400 Utilities** | | | | | |
| 7410 Water | | | | 3,220.60 | |
| 7420 Gas/CO2 | | | | | |
| 7430 Electricity | | | | | |
| 7440 Phone | | | | | |
| 7445 Cable/Internet | | | | | |
| 7450 Alarm & Security | | | | | |
| **Total 7400 Utilities** | | 0.00 | | 3,220.60 | 0.00 |
| **Corporate and Area overhead Expenses** | | | | | |
| 7505 Knife Sharpening | | | | | |
| 7506 Window Cleaning | | | | | |
| **Total 7500 Other Business Expenses** | $ | 0.00 | $ | 0.00 | $ 0.00 |
| **7800 Repairs & Maintenance** | | | | | |
| 7810 Plumbing | | | | | 3,169.58 |
| 7811 Pest Control | | | | | |
| 7812 Landscaping & Lawn Services | | | | | |
| 7813 Janitorial / Cleaning | | | | | |
| 7814 Hood Cleaning | | | | | |
| 7815 Grease Trap Service | | | | | |
| 7816 General Repairs | | | | | |
| 7817 Equipment/ Machine | | | | | |
| 7819 HVAC | | | | | |
| **Total 7800 Repairs & Maintenance** | $ | 0.00 | $ | 0.00 | $ 3,169.58 |
| **7820 Automobile** | | | | | |
| **7850 Dues & Subscriptions** | | | | | |
| **7860 Licenses & Fees** | | | | | |
| **7900 Insurance** | | | | | |
| **7950 Office Supplies & Software** | | | | | |
| **7955 Equipment & Supplies** | | | | | 702.35 |
| **8000 Ask My Accountant** | | | | | |
| **8010 Travel** | | | | | |
| **8015 Meals & Entertainment** | | | | | |
| **8100 Bank Charges & Fees** | | | | | |
| 8110 Credit Card Fees | | | | | |
| 8112 Merchant Services | | | | | |
| 8115 Bank Fees | | | | | |
| 8120 3PV Fees | | 3,939.22 | | 4,148.78 | 3,481.17 |
| **Total 8100 Bank Charges & Fees** | $ | 3,939.22 | $ | 4,148.78 | $ 3,481.17 |
| **8150 Cash Over / Under** | | | | | |
| **8200 Equipment Rental** | | | | | |
| 8201 Ice Machine Rental | | | | | |
| **Total 8200 Equipment Rental** | $ | 0.00 | $ | 0.00 | $ 0.00 |
| **8400 Uniforms** | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 8580 Property Taxes | | | | | | |
| 8650 Trash / Waste Removal | | | | | | 500.00 |
| 8830 Miscellaneous Expense | | | | | | |
| 8835 Delivery | | | | | | |
| 8850 Legal & Professional Services | | | | | | |
|    8851 Legal | | | | | | |
|    8852 Consulting | | | | | | |
|    8853 Accounting | | | | | | |
| Total 8850 Legal & Professional Services | $ | 0.00 | $ | 0.00 | $ | 0.00 |
| 8920 Line Service | | | | | | |
| 8930 Outside Services/Grease Trap | | | | | | |
| 8950 Reimbursable Expenses | | | | | | |
| **Adequate Protection Payments** | | | | | | |
|    Unapplied Cash Bill Payment Expense | | | | | | |
| Total Expenses | $ | 3,939.22 | $ | 103,535.36 | $ | 7,853.10 |
| Net Operating Income | $ | 89,851.69 | $ | 85,096.87 | $ | 160,128.72 |
| | | | | | | |
| Sales Tax Collect | | | | | | 32,557.22 |
| Sales Tax Paid | | | | | | 32,557.22 |
| | | | | **Net** | | **0.00** |

**Repayment to DBRI after motion is aproved from the court**

# Dickeys Barbecue Pit
## Forcasted Budget
### January 8 to March 6, 2022

| | Jan 3-9, 2022 | Jan 10-16, 2022 | Jan 17-23, 2022 | Jan 25-30, 2022 | Jan 31 - Feb 6, 2022 |
|---|---|---|---|---|---|
| | $ 160,128.72 | $ 156,299.49 | $ 311,091.15 | $ 352,872.12 | $ 413,409.37 |
| | | | This includes 250,000.00 of released funds | | |
| | 78,581.06 | 145,036.00 | 145,326.07 | 145,616.72 | 145,907.96 |
| | 11,787.16 | 21,755.40 | 21,798.91 | 21,842.51 | 21,886.19 |
| | $ 90,368.22 | $ 166,791.40 | $ 167,124.98 | $ 167,459.23 | $ 167,794.15 |
| | $ 90,368.22 | $ 166,791.40 | $ 167,124.98 | $ 167,459.23 | $ 167,794.15 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 162,515.55 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 69,649.52 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 11,608.25 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 92,866.03 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 34,824.76 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 6,000.00 |
| | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 377,464.12 |
| | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 377,464.12 |
| | $ 90,368.22 | $ 166,791.40 | $ 167,124.98 | $ 167,459.23 | -$ 209,669.97 |
| | 35,461.52 | 0.00 | 26,713.31 | 0.00 | 26,820.27 |
| | 51,319.18 | 0.00 | 73,461.60 | 0.00 | 73,755.74 |
| | 1,350.00 | 0.00 | 1,350.00 | 0.00 | 1,350.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | $ 88,130.70 | $ 0.00 | $ 101,524.91 | $ 0.00 | $ 101,926.02 |
| | | | | 28,532.16 | 10,192.60 |
| | | | | 51.10 | 51.10 |
| | 250.00 | | 250.00 | | 250.00 |
| | | | 6,685.00 | 11,726.28 | 12,066.39 |
| | | | 8,356.25 | 9,381.03 | 9,653.11 |
| | | | | | 140.00 |
| | $ 250.00 | $ 0.00 | $ 15,291.25 | $ 21,158.41 | $ 22,160.60 |

| | | | | |
|---|---|---|---|---|
| | | 177.42 | 581.00 | 581.00 |
| $ 0.00 | $ 0.00 | $ 177.42 | $ 581.00 | $ 581.00 |
| | | | | 77,734.23 |
| | | | | 1,080.18 |
| | 94.50 | | | 242.39 |
| | | | | 5,511.23 |
| | | | 2,750.00 | |
| 465.94 | 363.82 | | 500.00 | |
| 465.94 | 458.32 | 0.00 | 3,250.00 | 6,833.80 |
| | | | 8,400.00 | 8,400.00 |
| | | | | 655.08 |
| | | | 290.00 | |
| $ 0.00 | $ 0.00 | $ 0.00 | $ 8,690.00 | $ 9,055.08 |
| | 2,100.00 | | | |
| | | | | 975.00 |
| | | | 50.00 | 50.00 |
| | 839.32 | | 570.02 | 75.00 |
| | | | | 625.00 |
| | 1,596.87 | | 238.15 | 250.00 |
| | | | 975.00 | |
| $ 0.00 | $ 4,536.19 | $ 0.00 | $ 1,833.17 | $ 1,975.00 |
| 1,305.34 | | | | |
| | | | 1,399.97 | 1,399.97 |
| | | | | 2,950.23 |
| | | | 75.00 | 1,670.53 |
| | 550.00 | | | |
| | | | 4,080.75 | 4,199.10 |
| | 134.05 | | | |
| | | | 140.00 | 140.00 |
| 3,795.47 | 7,005.24 | 7,019.25 | 7,033.29 | 7,047.35 |
| $ 3,795.47 | $ 7,005.24 | $ 7,153.30 | $ 11,254.03 | $ 11,386.46 |
| | | | 85.00 | 706.25 |
| $ 0.00 | $ 0.00 | $ 0.00 | $ 85.00 | $ 706.25 |
| | | | 375.00 | 375.00 |

|  |  |  |  |  |  |  |  |  | 1,240.00 |  | 1,240.00 |
|  |  |  |  |  |  |  |  |  |  |  | 3,683.75 |
| $ | 0.00 | $ | 0.00 | $ | 0.00 | $ | 0.00 | $ | | | 0.00 |
|  |  |  |  |  |  |  |  |  | 397.13 |  | 397.13 | 397.13 |
|  |  |  |  |  |  |  |  |  | 28,000.00 |  | 25,000.00 |
| $ | 94,197.45 | $ | 11,999.75 | $ | 125,344.01 | $ | 106,921.97 | $ | | | 279,568.75 |
| $ | 156,299.49 | $ | 311,091.15 | $ | 352,872.12 | $ | 413,409.37 | -$ | | | 75,829.34 |

| | Feb 7-13, 2022 | Feb 14-20, 2022 | Feb 21-27, 2022 | Jan 28, 2022 to March 6, 2022 | Total |
|---|---|---|---|---|---|
| -$ | 75,829.34 | -$ 93,714.63 | -$ 144,239.92 | -$ 84,832.85 | |
| | | | | | |
| | 146,199.77 | 146,492.17 | 146,785.16 | 147,078.73 | $1,495,427.60 |
| | 21,929.97 | 21,973.83 | 22,017.77 | 22,061.81 | $214,106.00 |
| | | | | | $0.00 |
| $ | 168,129.74 | $ 168,466.00 | $ 168,802.93 | $ 169,140.54 | $ 1,709,533.59 |
| $ | 168,129.74 | $ 168,466.00 | $ 168,802.93 | $ 169,140.54 | $ 1,709,533.59 |
| | | | | | |
| | 23,538.16 | 23,585.24 | 23,632.41 | 23,679.68 | 256,951.04 |
| | 10,087.78 | 10,107.96 | 10,128.18 | 10,148.43 | 110,121.87 |
| | 1,681.30 | 1,684.66 | 1,688.03 | 1,691.41 | 18,353.65 |
| | 13,450.38 | 13,477.28 | 13,504.23 | 13,531.24 | 146,829.17 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 5,043.89 | 5,053.98 | 5,064.09 | 5,074.22 | 55,060.94 |
| | 750.00 | 750.00 | 750.00 | 750.00 | 9,000.00 |
| $ | 54,551.52 | $ 54,659.12 | $ 54,766.94 | $ 54,874.97 | $ 596,316.66 |
| $ | 54,551.52 | $ 54,659.12 | $ 54,766.94 | $ 54,874.97 | $ 596,316.66 |
| $ | 113,578.22 | $ 113,806.88 | $ 114,035.99 | $ 114,265.57 | $ 1,113,216.93 |
| | | | | | |
| | 0.00 | 26,927.66 | 0.00 | 27,035.48 | 180,429.17 |
| | 0.00 | 74,051.06 | 0.00 | 74,347.56 | 403,780.21 |
| | 0.00 | 1,350.00 | 0.00 | 1,350.00 | 8,100.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| $ | 0.00 | $ 102,328.72 | $ 0.00 | $ 102,733.04 | $ 592,309.37 |
| | 0.00 | 10,232.87 | 0.00 | 10,273.30 | 59,230.94 |
| | 51.10 | 51.10 | 51.10 | | 255.50 |
| | | 250.00 | | 250.00 | 1,500.00 |
| | | | | | 0.00 |
| | 12,420.21 | 12,788.53 | 13,172.20 | 6,765.62 | 75,624.23 |
| | 9,936.17 | 10,230.82 | 10,537.76 | 8,457.03 | 66,552.17 |
| | | | | | 140.00 |
| $ | 22,407.47 | $ 23,320.45 | $ 23,761.07 | $ 15,472.65 | $ 144,071.90 |

| | | | | |
|---:|---:|---:|---:|---:|
| 581.00 | 581.00 | 581.00 | 581.00 | 3,663.42 |
| $ 581.00 | $ 581.00 | $ 581.00 | $ 581.00 | $ 3,663.42 |
| 76,620.63 | | | 76,620.63 | 230,975.49 |
| | 390.00 | | 128.53 | 4,819.31 |
| 1,462.52 | | | 238.67 | 2,038.08 |
| | | | 11,317.36 | 16,828.59 |
| | | 2,750.00 | | 5,500.00 |
| | 524.87 | 500.00 | | 2,354.63 |
| | | | | 0.00 |
| 1,462.52 | 914.87 | 3,250.00 | 11,684.56 | $ 31,540.61 |
| 8,400.00 | 8,400.00 | 8,400.00 | $ 8,400.00 | $ 50,400.00 |
| | 655.08 | | | $ 1,310.16 |
| 290.00 | | 290.00 | | $ 870.00 |
| $ 8,690.00 | $ 9,055.08 | $ 8,690.00 | $ 8,400.00 | $ 52,580.16 |
| | | | | 0.00 |
| | | | | 5,269.58 |
| 975.00 | 975.00 | 975.00 | 975.00 | 4,875.00 |
| 50.00 | 50.00 | 50.00 | | 250.00 |
| 75.00 | 75.00 | 75.00 | | 1,709.34 |
| | | | | 625.00 |
| 1,350.00 | | | | 1,350.00 |
| 250.00 | 250.00 | 250.00 | 924.46 | 3,759.48 |
| | | | | 0.00 |
| | | | | 975.00 |
| $ 2,700.00 | $ 1,350.00 | $ 1,350.00 | $ 1,899.46 | $ 18,813.40 |
| | | | | 1,305.34 |
| | | | | 0.00 |
| | | | | 0.00 |
| 1,624.97 | 1,399.97 | 1,399.97 | | 7,224.85 |
| 1,010.00 | 1,010.00 | 1,560.00 | 2,500.00 | 9,030.24 |
| 2,695.00 | 75.00 | 75.00 | 7,751.15 | 13,044.03 |
| | | | | 0.00 |
| | | | 550.00 | |
| | | | | 0.00 |
| 4,322.23 | 4,450.41 | 4,583.93 | 4,723.11 | 26,359.53 |
| | | | 116.99 | 251.04 |
| 140.00 | 140.00 | 140.00 | 140.00 | 840.00 |
| 7,061.45 | 7,075.57 | 7,089.72 | 7,103.90 | 71,800.41 |
| $ 11,523.68 | $ 11,665.98 | $ 11,813.65 | $ 12,084.00 | $ 99,250.98 |
| | | | | 0.00 |
| | | | | 0.00 |
| 85.00 | 85.00 | 85.00 | 85.00 | 1,131.25 |
| $ 85.00 | $ 85.00 | $ 85.00 | $ 85.00 | $ 1,131.25 |
| 375.00 | 375.00 | 375.00 | | 1,875.00 |

|  |  |  |  |  | 0.00 |
| 1,240.00 | 1,240.00 | 1,240.00 | 1,240.00 |  | 7,940.00 |
|  |  |  |  |  | 3,683.75 |
|  |  |  |  |  | 0.00 |
|  |  |  |  |  | 0.00 |
|  |  |  |  |  | 0.00 |
|  |  |  |  |  | 0.00 |
|  |  |  |  |  | 0.00 |
| $ | 0.00 | $ | 0.00 | $ | 0.00 | $ | 0.00 | $ | 0.00 |
| 397.13 | 397.13 | 397.13 | 397.13 |  | 2,779.91 |
|  |  |  |  |  | 0.00 |
|  |  |  |  |  | 0.00 |
|  |  |  | 25,000.00 | $ | 78,000.00 |
|  |  |  |  |  | 0.00 |
| $ | 131,463.51 | $ | 164,332.18 | $ | 54,628.92 | $ | 276,971.92 | $ | 1,360,756.14 |
| -$ | 93,714.63 | -$ | 144,239.92 | -$ | 84,832.85 | -$ | 247,539.21 | $ | 922,593.46 |

| | $34,824.30 |
| | $34,824.30 |
| **Net** | **$0.00** |

162,515.55
69,649.52
11,608.25
92,866.03
0.00
34,824.76
6,000.00

**EXHIBIT B**

**Approved Budget**

|  | Dec 14-19, 2021 | Dec 20-26, 2021 | Dec 27 - Jan 2, 2022 |
|---|---|---|---|
| **3PV On Hold and Prior Month Carry Over** |  | $ 89,851.69 | $ 85,096.87 |
| **Income** |  |  |  |
| **4000 Net Sales** |  |  |  |
| 4100 Non Catering Sales | 82,569.23 | 85,978.36 | 79,856.36 |
| 4200 Catering Sales | 11,221.68 | 12,802.18 | 3,028.59 |
| **Total 4000 Sales** | $ 93,790.91 | $ 98,780.54 | $ 82,884.95 |
| **Total Income** | $ 93,790.91 | $ 98,780.54 | $ 82,884.95 |
| **Cost of Goods Sold** |  |  |  |
| **5000 Cost of Goods Sold** |  |  |  |
| 5100 Meat | 0.00 | 0.00 | 0.00 |
| 5200 Grocery | 0.00 | 0.00 | 0.00 |
| 5205 Produce | 0.00 | 0.00 | 0.00 |
| 5300 Beverage | 0.00 | 0.00 | 0.00 |
| **Alcohol** | 0.00 | 0.00 | 0.00 |
| 5400 Paper | 0.00 | 0.00 | 0.00 |
| 5600 Wood | 0.00 | 0.00 | 0.00 |
| **Total 5000 Cost of Goods Sold** | $ 0.00 | $ 0.00 | $ 0.00 |
| **Total Cost of Goods Sold** | $ 0.00 | $ 0.00 | $ 0.00 |
| **Gross Profit** | $ 93,790.91 | $ 98,780.54 | $ 82,884.95 |
| **Expenses** |  |  |  |
| **6000 Payroll Labor Expenses** |  |  |  |
| 6015 Management Salary | 0.00 | 37,470.93 | 0.00 |
| 6025 Salaries and Wages | 0.00 | 56,845.05 | 0.00 |
| 6026 Payroll Expense | 0.00 | 1,350.00 | 0.00 |
| 6100 Overtime | 0.00 | 0.00 | 0.00 |
| 6125 Contractor Payment | 0.00 | 0.00 | 0.00 |
| 6225 Correction Payment | 0.00 | 0.00 | 0.00 |
| 6275 Reimbursements | 0.00 | 0.00 | 0.00 |
| **Total 6000 Payroll Labor Expenses** | $ 0.00 | $ 95,665.98 | $ 0.00 |
| **6300 Employer Taxes** |  |  |  |
| **6320 Worker's Compensation** |  |  |  |
| **6325 Payroll Processing Fees** |  | 250.00 |  |
| **7000 Franchise Fees** |  |  |  |
| 7025 Marketing |  |  |  |
| 7050 Royalty Expense |  |  |  |
| 7060 Training Expenses |  |  |  |
| **Total 7000 Franchise Fees** | $ 0.00 | $ 250.00 | $ 0.00 |

| | | | |
|---|---|---|---|
| **7200 Advertising & Marketing** | | | |
| 7205 Digital Signage | | | |
| **Total 7200 Advertising & Marketing** | $ 0.00 | $ 0.00 | $ 0.00 |
| **7300 Rent & Lease** | | | |
| **7400 Utilities** | | | |
| 7410 Water | | 3,220.60 | |
| 7420 Gas/CO2 | | | |
| 7430 Electricity | | | |
| 7440 Phone | | | |
| 7445 Cable/Internet | | | |
| 7450 Alarm & Security | | | |
| **Total 7400 Utilities** | 0.00 | 3,220.60 | 0.00 |
| **Corporate and Area overhead Expenses** | | | |
| 7505 Knife Sharpening | | | |
| 7506 Window Cleaning | | | |
| **Total 7500 Other Business Expenses** | $ 0.00 | $ 0.00 | $ 0.00 |
| **7800 Repairs & Maintenance** | | | |
| 7810 Plumbing | | | 3,169.58 |
| 7811 Pest Control | | | |
| 7812 Landscaping & Lawn Services | | | |
| 7813 Janitorial / Cleaning | | | |
| 7814 Hood Cleaning | | | |
| 7815 Grease Trap Service | | | |
| 7816 General Repairs | | | |
| 7817 Equipment/ Machine | | | |
| 7819 HVAC | | | |
| **Total 7800 Repairs & Maintenance** | $ 0.00 | $ 0.00 | $ 3,169.58 |
| **7820 Automobile** | | | |
| **7850 Dues & Subscriptions** | | | |
| **7860 Licenses & Fees** | | | |
| **7900 Insurance** | | | |
| **7950 Office Supplies & Software** | | | |
| **7955 Equipment & Supplies** | | | 702.35 |
| **8000 Ask My Accountant** | | | |
| **8010 Travel** | | | |
| **8015 Meals & Entertainment** | | | |
| **8100 Bank Charges & Fees** | | | |
| 8110 Credit Card Fees | | | |
| 8112 Merchant Services | | | |
| 8115 Bank Fees | | | |
| 8120 3PV Fees | 3,939.22 | 4,148.78 | 3,481.17 |
| **Total 8100 Bank Charges & Fees** | $ 3,939.22 | $ 4,148.78 | $ 3,481.17 |
| **8150 Cash Over / Under** | | | |
| **8200 Equipment Rental** | | | |
| 8201 Ice Machine Rental | | | |
| **Total 8200 Equipment Rental** | $ 0.00 | $ 0.00 | $ 0.00 |
| **8400 Uniforms** | | | |

| | | | | | |
|---|---|---|---|---|---|
| **8580 Property Taxes** | | | | | |
| **8650 Trash / Waste Removal** | | | | | 500.00 |
| **8830 Miscellaneous Expense** | | | | | |
| **8835 Delivery** | | | | | |
| **8850 Legal & Professional Services** | | | | | |
| **8851 Legal** | | | | | |
| **8852 Consulting** | | | | | |
| **8853 Accounting** | | | | | |
| **Total 8850 Legal & Professional Services** | $ | **0.00** | $ | **0.00** | $ **0.00** |
| **8920 Line Service** | | | | | |
| **8930 Outside Services/Grease Trap** | | | | | |
| **8950 Reimbursable Expenses** | | | | | |
| <span style="color:red">**Adequate Protection Payments**</span> | | | | | |
| **Unapplied Cash Bill Payment Expense** | | | | | |
| **Total Expenses** | $ | **3,939.22** | $ | **103,535.36** | $ **7,853.10** |
| **Net Operating Income** | $ | **89,851.69** | $ | **85,096.87** | $ **160,128.72** |
| | | | | | |
| **Sales Tax Collect** | | | | | 32,557.22 |
| **Sales Tax Paid** | | | | | 32,557.22 |
| | | | | **Net** | **0.00** |

<mark>**Repayment to DBRI after motion is aproved from the court**</mark>

# Dickeys Barbecue Pit
## Forcasted Budget
### January 8 to March 6, 2022

| Jan 3-9, 2022 | Jan 10-16, 2022 | Jan 17-23, 2022 | Jan 25-30, 2022 | Jan 31 - Feb 6, 2022 |
|---|---|---|---|---|
| $ 160,128.72 | $ 156,299.49 | $ 311,091.15 | $ 352,872.12 | $ 413,409.37 |
| | | | This includes 250,000.00 of released funds | |
| 78,581.06 | 145,036.00 | 145,326.07 | 145,616.72 | 145,907.96 |
| 11,787.16 | 21,755.40 | 21,798.91 | 21,842.51 | 21,886.19 |
| $ 90,368.22 | $ 166,791.40 | $ 167,124.98 | $ 167,459.23 | $ 167,794.15 |
| $ 90,368.22 | $ 166,791.40 | $ 167,124.98 | $ 167,459.23 | $ 167,794.15 |
| 0.00 | 0.00 | 0.00 | 0.00 | 162,515.55 |
| 0.00 | 0.00 | 0.00 | 0.00 | 69,649.52 |
| 0.00 | 0.00 | 0.00 | 0.00 | 11,608.25 |
| 0.00 | 0.00 | 0.00 | 0.00 | 92,866.03 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 34,824.76 |
| 0.00 | 0.00 | 0.00 | 0.00 | 6,000.00 |
| $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 377,464.12 |
| $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 377,464.12 |
| $ 90,368.22 | $ 166,791.40 | $ 167,124.98 | $ 167,459.23 | -$ 209,669.97 |
| 35,461.52 | 0.00 | 26,713.31 | 0.00 | 26,820.27 |
| 51,319.18 | 0.00 | 73,461.60 | 0.00 | 73,755.74 |
| 1,350.00 | 0.00 | 1,350.00 | 0.00 | 1,350.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| $ 88,130.70 | $ 0.00 | $ 101,524.91 | $ 0.00 | $ 101,926.02 |
| | | | 28,532.16 | 10,192.60 |
| | | | 51.10 | 51.10 |
| 250.00 | | 250.00 | | 250.00 |
| | | 6,685.00 | 11,726.28 | 12,066.39 |
| | | 8,356.25 | 9,381.03 | 9,653.11 |
| | | | | 140.00 |
| $ 250.00 | $ 0.00 | $ 15,291.25 | $ 21,158.41 | $ 22,160.60 |

| | | | | |
|---|---|---|---|---|
| | | 177.42 | 581.00 | 581.00 |
| $ 0.00 | $ 0.00 | $ 177.42 | $ 581.00 | $ 581.00 |
| | | | | 77,734.23 |
| | | | | 1,080.18 |
| | 94.50 | | | 242.39 |
| | | | | 5,511.23 |
| | | | 2,750.00 | |
| 465.94 | 363.82 | | 500.00 | |
| 465.94 | 458.32 | 0.00 | 3,250.00 | 6,833.80 |
| | | | 8,400.00 | 8,400.00 |
| | | | | 655.08 |
| | | | 290.00 | |
| $ 0.00 | $ 0.00 | $ 0.00 | $ 8,690.00 | $ 9,055.08 |
| | 2,100.00 | | | |
| | | | | 975.00 |
| | | | 50.00 | 50.00 |
| | 839.32 | | 570.02 | 75.00 |
| | | | | 625.00 |
| | 1,596.87 | | 238.15 | 250.00 |
| | | | 975.00 | |
| $ 0.00 | $ 4,536.19 | $ 0.00 | $ 1,833.17 | $ 1,975.00 |
| 1,305.34 | | | | |
| | | | 1,399.97 | 1,399.97 |
| | | | | 2,950.23 |
| | | | 75.00 | 1,670.53 |
| | 550.00 | | | |
| | | | 4,080.75 | 4,199.10 |
| | 134.05 | | | |
| | | | 140.00 | 140.00 |
| 3,795.47 | 7,005.24 | 7,019.25 | 7,033.29 | 7,047.35 |
| $ 3,795.47 | $ 7,005.24 | $ 7,153.30 | $ 11,254.03 | $ 11,386.46 |
| | | | 85.00 | 706.25 |
| $ 0.00 | $ 0.00 | $ 0.00 | $ 85.00 | $ 706.25 |
| | | | 375.00 | 375.00 |

|  |  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  | 1,240.00 |  | 1,240.00 |
|  |  |  |  |  |  |  |  | 3,683.75 |
| $ | 0.00 | $ | 0.00 | $ | 0.00 | $ | 0.00 | $ | 0.00 |
|  |  |  |  |  |  | 397.13 | 397.13 |  | 397.13 |
|  |  |  |  |  |  | 28,000.00 |  | 25,000.00 |
| $ | 94,197.45 | $ | 11,999.75 | $ | 125,344.01 | $ | 106,921.97 | $ | 279,568.75 |
| $ | 156,299.49 | $ | 311,091.15 | $ | 352,872.12 | $ | 413,409.37 | -$ | 75,829.34 |

| | Feb 7-13, 2022 | | Feb 14-20, 2022 | | Feb 21-27, 2022 | | Jan 28, 2022 to March 6, 2022 | | Total |
|---|---|---|---|---|---|---|---|---|---|
| -$ | 75,829.34 | -$ | 93,714.63 | -$ | 144,239.92 | -$ | 84,832.85 | | |
| | | | | | | | | | |
| | 146,199.77 | | 146,492.17 | | 146,785.16 | | 147,078.73 | **$** | **1,495,427.60** |
| | 21,929.97 | | 21,973.83 | | 22,017.77 | | 22,061.81 | **$** | **214,106.00** |
| | | | | | | | | **$** | **0.00** |
| $ | 168,129.74 | $ | 168,466.00 | $ | 168,802.93 | $ | 169,140.54 | $ | 1,709,533.59 |
| $ | 168,129.74 | $ | 168,466.00 | $ | 168,802.93 | $ | 169,140.54 | $ | 1,709,533.59 |
| | | | | | | | | | |
| | 23,538.16 | | 23,585.24 | | 23,632.41 | | 23,679.68 | | 256,951.04 |
| | 10,087.78 | | 10,107.96 | | 10,128.18 | | 10,148.43 | | 110,121.87 |
| | 1,681.30 | | 1,684.66 | | 1,688.03 | | 1,691.41 | | 18,353.65 |
| | 13,450.38 | | 13,477.28 | | 13,504.23 | | 13,531.24 | | 146,829.17 |
| | 0.00 | | 0.00 | | 0.00 | | 0.00 | | 0.00 |
| | 5,043.89 | | 5,053.98 | | 5,064.09 | | 5,074.22 | | 55,060.94 |
| | 750.00 | | 750.00 | | 750.00 | | 750.00 | | 9,000.00 |
| $ | 54,551.52 | $ | 54,659.12 | $ | 54,766.94 | $ | 54,874.97 | $ | 596,316.66 |
| $ | 54,551.52 | $ | 54,659.12 | $ | 54,766.94 | $ | 54,874.97 | $ | 596,316.66 |
| $ | 113,578.22 | $ | 113,806.88 | $ | 114,035.99 | $ | 114,265.57 | $ | 1,113,216.93 |
| | | | | | | | | | |
| | 0.00 | | 26,927.66 | | 0.00 | | 27,035.48 | | 180,429.17 |
| | 0.00 | | 74,051.06 | | 0.00 | | 74,347.56 | | 403,780.21 |
| | 0.00 | | 1,350.00 | | 0.00 | | 1,350.00 | | 8,100.00 |
| | 0.00 | | 0.00 | | 0.00 | | 0.00 | | 0.00 |
| | 0.00 | | 0.00 | | 0.00 | | 0.00 | | 0.00 |
| | 0.00 | | 0.00 | | 0.00 | | 0.00 | | 0.00 |
| | 0.00 | | 0.00 | | 0.00 | | 0.00 | | 0.00 |
| $ | 0.00 | $ | 102,328.72 | $ | 0.00 | $ | 102,733.04 | $ | 592,309.37 |
| | 0.00 | | 10,232.87 | | 0.00 | | 10,273.30 | | 59,230.94 |
| | 51.10 | | 51.10 | | 51.10 | | | | 255.50 |
| | | | 250.00 | | | | 250.00 | | 1,500.00 |
| | | | | | | | | | 0.00 |
| | 12,420.21 | | 12,788.53 | | 13,172.20 | | 6,765.62 | | 75,624.23 |
| | 9,936.17 | | 10,230.82 | | 10,537.76 | | 8,457.03 | | 66,552.17 |
| | | | | | | | | | 140.00 |
| $ | 22,407.47 | $ | 23,320.45 | $ | 23,761.07 | $ | 15,472.65 | $ | 144,071.90 |

| | | | | |
|---|---|---|---|---|
| 581.00 | 581.00 | 581.00 | 581.00 | 3,663.42 |
| $ 581.00 | $ 581.00 | $ 581.00 | $ 581.00 | $ 3,663.42 |
| 76,620.63 | | | 76,620.63 | 230,975.49 |
| | 390.00 | | 128.53 | 4,819.31 |
| 1,462.52 | | | 238.67 | 2,038.08 |
| | | | 11,317.36 | 16,828.59 |
| | | 2,750.00 | | 5,500.00 |
| | 524.87 | 500.00 | | 2,354.63 |
| | | | | 0.00 |
| 1,462.52 | 914.87 | 3,250.00 | 11,684.56 | $ 31,540.61 |
| 8,400.00 | 8,400.00 | 8,400.00 | $ 8,400.00 | $ 50,400.00 |
| | 655.08 | | | $ 1,310.16 |
| 290.00 | | 290.00 | | $ 870.00 |
| $ 8,690.00 | $ 9,055.08 | $ 8,690.00 | $ 8,400.00 | $ 52,580.16 |
| | | | | 0.00 |
| | | | | 5,269.58 |
| 975.00 | 975.00 | 975.00 | 975.00 | 4,875.00 |
| 50.00 | 50.00 | 50.00 | | 250.00 |
| 75.00 | 75.00 | 75.00 | | 1,709.34 |
| | | | | 625.00 |
| 1,350.00 | | | | 1,350.00 |
| 250.00 | 250.00 | 250.00 | 924.46 | 3,759.48 |
| | | | | 0.00 |
| | | | | 975.00 |
| $ 2,700.00 | $ 1,350.00 | $ 1,350.00 | $ 1,899.46 | $ 18,813.40 |
| | | | | 1,305.34 |
| | | | | 0.00 |
| | | | | 0.00 |
| 1,624.97 | 1,399.97 | 1,399.97 | | 7,224.85 |
| 1,010.00 | 1,010.00 | 1,560.00 | 2,500.00 | 9,030.24 |
| 2,695.00 | 75.00 | 75.00 | 7,751.15 | 13,044.03 |
| | | | | 0.00 |
| | | | 550.00 | |
| | | | | 0.00 |
| 4,322.23 | 4,450.41 | 4,583.93 | 4,723.11 | 26,359.53 |
| | | | 116.99 | 251.04 |
| 140.00 | 140.00 | 140.00 | 140.00 | 840.00 |
| 7,061.45 | 7,075.57 | 7,089.72 | 7,103.90 | 71,800.41 |
| $ 11,523.68 | $ 11,665.98 | $ 11,813.65 | $ 12,084.00 | $ 99,250.98 |
| | | | | 0.00 |
| | | | | 0.00 |
| 85.00 | 85.00 | 85.00 | 85.00 | 1,131.25 |
| $ 85.00 | $ 85.00 | $ 85.00 | $ 85.00 | $ 1,131.25 |
| 375.00 | 375.00 | 375.00 | | 1,875.00 |

|  |  |  |  |  | 0.00 |
|---|---|---|---|---|---|
| 1,240.00 | 1,240.00 | 1,240.00 | 1,240.00 |  | 7,940.00 |
|  |  |  |  |  | 3,683.75 |
|  |  |  |  |  | 0.00 |
|  |  |  |  |  | 0.00 |
|  |  |  |  |  | 0.00 |
|  |  |  |  |  | 0.00 |
|  |  |  |  |  | 0.00 |
| $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ | 0.00 |
| 397.13 | 397.13 | 397.13 | 397.13 |  | 2,779.91 |
|  |  |  |  |  | 0.00 |
|  |  |  |  |  | 0.00 |
|  |  |  | 25,000.00 | $ | 78,000.00 |
|  |  |  |  |  | 0.00 |
| $ 131,463.51 | $ 164,332.18 | $ 54,628.92 | $ 276,971.92 | $ | 1,360,756.14 |
| -$ 93,714.63 | -$ 144,239.92 | -$ 84,832.85 | -$ 247,539.21 | $ | 922,593.46 |

| | $34,824.30 |
|---|---|
| | $34,824.30 |
| **Net** | **$0.00** |

162,515.55
69,649.52
11,608.25
92,866.03
0.00
34,824.76
6,000.00