EXHIBIT "B"

## ASSIGNMENT AND ASSUMPTION AGREEMENT WITH LANDLORD'S CONSENT

This Assignment and Assumption Agreement with Landlord's Consent (this "Agreement"), dated as of _____, 2020, is made and entered into by and among Taalvi, LLC, ("Landlord"), MARSHLAND FOODS, LLC ("Assignor"), and SMOKINKWR, LLC ("Assignee").

6/22/2020

**WHEREAS**, Assignor, Assignee and the other parties thereto intend to enter into that certain Asset Purchase Agreement (as may be amended, supplemented otherwise modified from time to time, the "Sale Agreement"), and in connection therewith, Assignor has agreed to assign all of its right, title and interest in, to and under, and Assignee has agreed to assume all of Assignor's duties and obligations under, the Lease (as defined below); and

**WHEREAS**, Assignor desires to assign to Assignee all of Assignor's right, title and interest, as tenant in, to and under that certain lease dated as of May 1, 2018, by and between Assignor and Landlord (as amended, the "Lease") attached hereto as Exhibit A, covering certain premises  consist of approximately 2000 square feet of floor located at 11401 Broadway St, Pearland, TX 77584 as further described in the Lease (the "Leased Premises"); and

**WHEREAS**, the approval of Landlord is required in order to effectuate such assignment, and Landlord is willing to approve the assignment and to release the guaranty of Rick El Mogazi, Kris Hickingbottom, and Robert Ray and incorporated herein by reference upon the terms and conditions hereinafter stated.

**NOW, THEREFORE**, in consideration of One Dollar ($1.00) and other good and valuable consideration, the mutual receipt and sufficiency of which are hereby acknowledged, the undersigned hereby covenant, agree and represent as follows:

1.  Effective Date.  This Agreement shall only become effective upon the Closing (as defined in the Sale Agreement) of the transactions contemplated under the Sale Agreement by Assignor and Assignee. This Agreement shall then become automatically effective (the "Effective Date"). In the event that the Closing is not consummated under the Sale Agreement, this Agreement shall be void *ab initio*.

2.  Assignment and Assumption.  Contingent upon the occurrence of the Effective Date, Assignor, assigns, transfers, releases and sets over unto Assignee and its successors and assigns, all of Assignor's right, title and interest in, to and under the Lease (including, but not limited to, any and all security and other deposits posted and advance rent paid under the Lease), and Assignee, as of the Effective Date, accepts the foregoing assignment and assumes and agrees to perform and comply with all of the terms, covenants, conditions and agreements set forth in the Lease on the part of the tenant therein to be fulfilled, kept, observed and performed arising from and after the Effective Date.  For the avoidance of doubt, Assignor shall remain liable for any failure by Assignor to perform and comply with all of the terms, covenants, conditions and agreements set forth in the Lease on the part of the tenant therein to be fulfilled, kept, observed and performed prior to the Closing.

3.      Consent.   Contingent upon receipt of the Security Deposit, Landlord hereby consents to the above assignment by Assignor to Assignee and releases the guaranty of Rick El Mogazi, Kris Hickingbottom, and Robert Ray and Replace them with a guaranty of Brian M Hubbard.  Landlord further agrees that, notwithstanding anything to the contrary contained in the Lease, Assignee shall have all of the rights (including, but not limited to, extension and renewal rights) of the tenant under the Lease, as if Assignee were the original named tenant.

4.      Representations and Warranties.   Assignor acknowledges and agrees that (i) the Lease is in full force and effect and has not been modified except as shown on Exhibit A (ii) to its knowledge, no party is in default of its obligations under the Lease and all obligations, including monetary obligations, under the Lease to be performed by the parties under the Lease have been fully performed and satisfied, and (iii) no claim of offset, counterclaim or deductions to any rent or other sum due or to become due under the Lease exists. Landlord acknowledges and agrees that (i) the Lease has not been modified except as shown on Exhibit A and (ii) the Lease is in full force and effect and to Landlord's knowledge, Assignor is not in default in any material respect under the Lease.

5.      Entire Agreement; Modification; Counterparts; Liability; Binding Nature.   This Agreement, together with the Sale Agreement, contains the entire understanding between the parties hereto and thereto, and any other prior understandings or agreements of any kind, oral or written, regarding the subject matter hereof and thereof are hereby merged in this Agreement. This Agreement and any of the provisions hereof may not be modified, amended or supplemented except by a writing executed by the applicable parties hereto. This Agreement may be executed in any number of counterparts (including by facsimile and electronic pdf), and each such counterpart when so executed and delivered shall be deemed to be an original, and all such counterparts together shall constitute one and the same fully executed instrument.  No party hereto may assign this Agreement without the prior written consent of the other parties hereto. All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of Assignor, Assignee and Landlord, and their respective successors and permitted assigns.

6.      Terms of the Sale Agreement.   Solely between Assignor and Assignee, this Agreement is subject to all of the terms, conditions and limitations set forth in the Sale Agreement.  Nothing contained in this Agreement shall release either Assignor or Assignee from any of their respective obligations under the Sale Agreement or in any way diminish, limit, enlarge or modify any of the representations, warranties, indemnities, covenants, agreements or in general, any rights and remedies, and any of the obligations of such parties set forth in the Sale Agreement. Solely between Assignor and Assignee, in the event of any conflict or inconsistency between the terms of the Sale Agreement and the terms hereof, the terms of the Sale Agreement shall govern.

7.      Security Deposit. Concurrently with Assignee's execution of this Assignment and Assumption Agreement, Assignee will deposit with Landlord the sum of TWELVE THOUSAND AND SIX DOLLARS AND 0/100 DOLLARS ($12,006.00) ("Security Deposit") as security for the full and faithful performance by Assignee hereof. If Assignee defaults with respect to any provisions of the Lease Agreement, including but not limited to the provisions relating to the payment of rent, Landlord may (but shall not be required to) use, apply or retain

all or any part of the security deposit for the payment of any rent or any other sum in default, or for the payment of any amount which Landlord may spend or become obligated to spend by reason of Assignee's default, or to compensate Landlord for any other loss or damage which Landlord may suffer by reason of Assignee's default. If any portion of said deposit is so used or applied Assignee shall, within five (5) days after written demand thereof, deposit cash with Landlord in an amount sufficient to restore the security deposit to its original amount and Assignee's failure to do so shall be a default under the Lease. Landlord shall not be required to keep this security deposit separate from its general funds, and Assignee shall not be entitled to interest on such deposit. If Assignee shall fully and faithfully perform every provision of this lease to be performed by it, the security deposit or any balance thereof shall be returned to Assignee following expiration of the Lease Term.

8.     Transfer of Security Deposit In the event of a sale or other transfer of Landlord's interest in the Lease, Landlord shall transfer and deposit to Landlord's successor in interest and upon such transfer, Landlord shall be relieved of any all liability for or obligation with respect to the Security Deposit. Assignee shall look solely to such successor in interest of Landlord for return of the remaining balance, if any, of the Security Deposit.

9.     Governing Law.   This Agreement shall be governed by and construed in accordance with the internal Laws of the State of Texas without giving effect to any choice or conflict of law provision or rule that would cause the application of Laws of any jurisdictions other than those of the State of Texas.

10.     Further Assurances.   Each of the parties hereto shall execute and deliver, at the reasonable request of any other party hereto, such additional documents, instruments, conveyances and assurances and take such further actions as such other party may reasonably request to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

11.     Severability.   Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the parties hereto agree that the court making such determination shall have the power to limit the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.  In the event such court does not exercise the power granted to it in the prior sentence, the parties hereto agree to replace such invalid or unenforceable term or provision with a valid and enforceable term or provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable term.

12.     Interpretation; Headings.   Every term and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any party.  All headings herein are inserted only for convenience and ease of reference and are not to be

considered in the construction or interpretation of any provision of this Agreement.

[*Signature Pages Follow.*]

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the date first set forth above.

**ASSIGNOR**:

MARSHLAND FOODS, LLC

By: _____
Rick ElMogazi
3E16C75787C24CE...

**ASSIGNEE**:

SMOKINKWR, LLC

By: _____
tony sawyer
8A94191AA38E4...

Name: _____

Title: Director of Operations/OO

**LANDLORD**:

Taalvi, LLC

By: _____
Thanh Nguyen
A4C8D...

Name: Manager

Title: _____

DocuSign Envelope ID: BE20E8C6-9F9B-4CE7-B1C2-168B13F54C42

<u>Exhibit A</u>
The Lease
(attached)

DocuSign Envelope ID: BE20E8C6-9F0B-4CF7-B1C2-168B13F54C42

DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

## STANDARD SHOPPING CENTER LEASE AGREEMENT

VAQUERO KIRBY PARTNERS, LP
as Landlord

to

MARSHLAND FOODS, LLC
as Tenant

## TABLE OF CONTENTS

1.  LEASE SUMMARY ........................................................................... 1
2.  GRANT ......................................................................................... 5
3.  TERM .......................................................................................... 5
4.  BASE RENT AND SECURITY DEPOSIT ........................................ 6
5.  OPERATING EXPENSES ............................................................... 8
6.  TENANT REPAIRS AND MAINTENANCE ....................................... 9
7.  LANDLORD'S REPAIRS ............................................................... 10
8.  UTILITY SERVICE ...................................................................... 10
9.  SIGNS ......................................................................................... 11
10. USE ............................................................................................ 11
11. INSURANCE ................................................................................ 12
12. COMPLIANCE WITH APPLICABLE LAWS AND ENVIRONMENTAL REQUIREMENTS 13
13. ASSIGNMENT AND SUBLETTING ................................................ 14
14. ALTERATIONS AND IMPROVEMENTS ......................................... 15
15. CONDEMNATION ........................................................................ 17
16. FIRE AND CASUALTY ................................................................. 17
17. WAIVER OF SUBROGATION ....................................................... 18
18. WAIVER ...................................................................................... 18
19. INDEMNITY AND EXCULPATION ................................................ 19
20. ASSIGNMENT OF LANDLORD'S INTEREST IN LEASE ................. 19
21. LANDLORD'S LIEN ..................................................................... 19
22. MERCHANT'S ASSOCIATION ...................................................... 20
23. DEFAULT BY TENANT ................................................................ 20
24. REMEDIES FOR TENANT'S DEFAULT ........................................ 20
25. WAIVER OF DEFAULT OR REMEDY ........................................... 22
26. CHOICE OF LAW; VENUE; ATTORNEYS' FEES ........................... 22
27. HOLDING OVER .......................................................................... 22
28. RIGHTS OF LENDER .................................................................. 23
29. ESTOPPEL CERTIFICATES ......................................................... 24
30. SUCCESSORS ............................................................................. 24
31. REAL ESTATE COMMISSION ...................................................... 24
32. DEFAULT BY LANDLORD ........................................................... 24
33. TENANT'S LIENS ........................................................................ 25
34. ENTRY BY LANDLORD ............................................................... 25
35. ENTIRE AGREEMENT AND LIMITATION OF WARRANTIES ......... 25
36. FORCE MAJEURE ....................................................................... 26
37. MISCELLANEOUS ....................................................................... 26
38. NOTICE ...................................................................................... 27
39. LIMITATION ON DAMAGES ....................................................... 28
40. RELOCATION RIGHT .................................................................. 28
41. DISPLAYS ................................................................................... 28
42. AUCTIONS .................................................................................. 28
43. FINANCIAL STATEMENTS .......................................................... 28
44. HOURS OF BUSINESS ................................................................ 28
45. CONFIDENTIALITY ..................................................................... 28

SCHEDULE AND EXHIBITS:
SCHEDULE 1 – DEFINITIONS
EXHIBIT A – LEASED PREMISES
EXHIBIT B – LEGAL DESCRIPTION OF LAND

DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

EXHIBIT B-1 – LEGAL DESCRIPTION OF ADJACENT LAND
EXHIBIT C – PROHIBITED USES
EXHIBIT D – RULES AND REGULATIONS
EXHIBIT E – CONSTRUCTION RIDER
EXHIBIT F – ENCUMBRANCES
EXHIBIT G – TENANT ACCEPTANCE LETTER
EXHIBIT H – GUARANTY
EXHIBIT I – TENANT'S APPROVED SIGNAGE

# STANDARD SHOPPING CENTER LEASE AGREEMENT

## 1.    LEASE SUMMARY

Lease Date:             Date of Last Signature of Landlord and Tenant

Tenant:                 Marshland Foods, LLC d/b/a Dickey's Barbecue Pit

Address of Tenant:      949 Ryan St. Suite 220

Contact:                Rick ElMogazi                   Telephone:   3374190082

Landlord:               Vaquero Kirby Partners, LP

Address of Landlord:    3211 West 4th Street, Fort Worth, Texas 76107

Contact:                Emily L. Crockett        Telephone:    (214) 762-4528

Leased Premises:        Suite TBD (approximately 2,000 Rentable Square Feet) of the Shopping Center situated in Pearland, Brazoria County, Texas (the "**Leased Premises**"), as shown in <u>Exhibit A</u> attached hereto and incorporated by reference herein.  The term "**Rentable Square Feet**" will mean the ground floor square footage in the Leased Premises measured from the exterior face of all exterior walls and the center of all partitioned walls between adjoining premises within the same building, including storage, dock area, etc., as applicable.  The Rentable Square Feet of the Shopping Center shall equal the sum of the Rentable Square Feet of all tenant space in the Shopping Center then constructed, whether or not leased from time to time, in each case excluding Common Area and any garden center area or other outdoor sales area of the Shopping Center and measured from the exterior face of all exterior walls and the center of all partitioned walls between adjoining premises within the same building.

Term:                   This Lease shall be in full force and effect upon full execution and delivery of the Lease by both parties.  The "**Term**" of this Lease shall commence on the "**Rent Commencement Date**" (as defined below) and shall continue for a period of one hundred twenty (120) months after the Rent Commencement Date plus any partial month from the Rent Commencement Date to the end of the month in which the Rent Commencement Date falls if the Rent Commencement Date does not occur on the first day of the month (the "**Initial Term**").  For purposes of this Lease, the word "**Term**" shall mean the Initial Term and any Extension Term.

Extension Terms:        Tenant shall have the option to extend the Initial Term for two (2) consecutive five (5) year period(s) (each an "**Extension Term**") upon the same terms and conditions as contained in this Lease.  The Base Rent for each Extension Term shall be as set forth hereinbelow.  To exercise an

INITIAL

*RE*

*W*

TENANT
LANDLORD

extension option, Tenant shall give Landlord written notice ("**Tenant's Extension Notice**") at least one hundred eighty (180) days prior to the then-current Termination Date. With respect to the each Extension Term, within thirty (30) days after receipt of Tenant's Extension Notice, Landlord shall advise Tenant of the applicable Base Rent rate for the Leased Premises for the Extension Term. Tenant, within ten (10) days after the date on which Landlord advises Tenant of the applicable Base Rent rate for the Extension Term, shall either (i) give Landlord final binding written notice ("**Binding Notice**") of Tenant's exercise of its extension option, or (ii) if Tenant disagrees with Landlord's determination, provide Landlord with written notice of rejection of the extension option (the "**Rejection Notice**"). If Tenant fails to provide Landlord with either a Binding Notice or Rejection Notice within such ten (10) day period, Tenant's extension option shall be null and void and of no further force and effect. If Tenant provides Landlord with a Binding Notice, such notice shall be effective to extend the Term on the Base Rent rate provided by Landlord without further documentation.

Delivery Date: The date Landlord delivers possession of the Leased Premises to Tenant in the condition required by this Lease (which specifically excludes Tenant finish out),which Landlord anticipates will be by December 1, 2017. In the event that Landlord fails to deliver exclusive possession of all of the Leased Premises to Tenant in the condition required by this Lease by **March 1, 2018** (the "**Outside Delivery Date**"), then, Landlord shall pay Tenant Two Hundred and No/100 Dollars ($200.00) per day for each day following the Outside Delivery Date that delivery of possession to the Leased Premises is delayed. Landlord and Tenant acknowledge and agree that the Delivery Date and the Outside Delivery Date shall be postponed by the number of days such date is delayed due to events of Force Majeure and delays caused by Tenant.

Rent Commencement Date: Payments of Base Rent and Additional Rent under this Lease shall commence on the date that is one hundred and fifty (150) days after the Delivery Date (the "**Rent Commencement Date**"), regardless of the date the Tenant opens for business in the Leased Premises.

Termination Date: The last day of the one hundred twentieth (120th) full calendar month following the Rent Commencement Date, subject to the terms of this Lease

Monthly Base Rent:

| Year | Rent Per Square Foot | Monthly Base Rent |
|---|---|---|
| 1 – 5 | $36.00 | $6,000.00 |
| 6 – 10 | $39.60 | $6,600.00 |
| **Extension Term(s) (if applicable)** | | |
| 11 – 15 | Prevailing Market | Prevailing Market |
| 16 – 20 | Prevailing Market | Prevailing Market |



INITIAL
RE
WA
TENANT
LANDLORD

For purposes of the Extension Terms, "**Prevailing Market**" shall mean the arms' length fair market annual rental rate per rentable square foot under leases and amendments entered into on or about the date on which the Prevailing Market is being determined hereunder for space comparable to the Leased Premises in the Shopping Center and shopping centers comparable to the Shopping Center in the area of the Shopping Center. The determination of Prevailing Market shall take into account any material economic differences between the terms of this Lease and any comparison lease or amendment, such as rent abatements, construction costs and/or allowances and other concessions and the manner, if any, in which the landlord under any such lease is reimbursed for operating expenses and electricity (including base year for expenses). The determination of Prevailing Market shall also take into consideration any anticipated changes by Landlord in the Prevailing Market rate from the time such Prevailing Market rate is being determined and the time such Prevailing Market rate will become effective under this Lease.

| | |
|---|---|
| Additional Rent: | To be determined as set forth in the Lease, initially estimated to be $6.50 per Rentable Square Foot of the Leased Premises ($1,083.33 per month). Tenant acknowledges and agrees that the foregoing amount is solely based on Landlord's estimate of Additional Rent with respect to the Leased Premises. If at any time during the Term, Landlord determines that its estimate of the Additional Rent requires adjustment, Landlord may provide Tenant with a revised estimate, but not more often than once per calendar year, and Tenant agrees to pay such revised amount. |
| Land and Building: | Lying and being situated in the City of Pearland, Brazoria County, Texas located at the northeast corner of Broadway (FM 518) and Kirby Drive, Pearland, Brazoria County, Texas, consisting of improvements with a total of approximately 7,000 Rentable Square Feet (the "**Building**") and located on that certain real property legally described on <u>Exhibit B</u> (the "**Land**") (collectively, the "**Shopping Center**"). |
| Security Deposit: | None. |
| Tenant's Proportionate Share of the Shopping Center: | 28.39% |
| Tenant's Proportionate Share of the Entire Development | 17.09% |
| Permitted Use: | The Tenant shall use the Leased Premises solely for the operation of a fast casual and take out barbecue themed restaurant under the franchised trade name "Dickey's Barbecue Pit" and the incidental sale of retail merchandise bearing the logo of Dickey's Barbecue Pit. |
| Exclusivity: | Other than any tenants, occupants or purchasers who have entered into leases or agreements prior to the date of this Lease, to which this protected use clause does not apply, and only so long as (i) Tenant is not in default |

LEASE AGREEMENT – Page 3
348426.2

INITIAL
KE
TENANT
LANDLORD

under the Lease beyond any applicable notice and cure period, and (ii) Tenant is open for business to the public and operating in compliance with this Lease, Landlord shall not lease, sublease or sell space in the Building to another fast casual or take out restaurant, or operate or permit another fast casual or take out restaurant to operate in the Building, whose "Primary" use includes the sale of barbecue similar to that found on Tenant's menu (a "**Competing Use**") without Tenant's consent.  As used herein, "**Primary**" shall be defined as any business whose Competing Use sales are greater than forty percent (40%) of its gross revenues.

Tenant Improvement Allowance:

To partially defray Tenant's cost of performing Tenant's Work (defined below), Landlord shall pay Tenant an amount (the "**Tenant Improvement Allowance**") equal to $40.00 per Rentable Square Foot of the Leased Premises, to be used solely towards the actual out-of-pocket costs of Tenant's Work at the Leased Premises. The amount to be paid within thirty (30) days after the completion of Tenant's Work and the satisfaction of all of the following requirements: (i) Tenant's compliance with all requirements for Alterations set forth herein; (ii) completion of all improvements according to  Tenant's plans and specifications, as approved by Landlord (which approval shall not be unreasonably withheld); (iii) all bills have been paid to Tenant's contractors and any subcontractors and professionals, as evidenced by unconditional final lien waivers from all the foregoing; (iv) delivery of a certificate of occupancy for the Leased Premises; and (v) delivery of the Tenant Acceptance Letter to Landlord.

Guaranty:

Rick El Mogazi, Kris Hickingbottom, and Robert Ray shall execute the form of Lease Guaranty attached hereto as <u>Exhibit H</u> and incorporated herein by reference.

Trade Name:

The Tenant shall operate under the trade name Dickey's Barbecue Pit or such other name as is reasonably requested by Tenant.

Permit Contingency:

Landlord's and Tenant's obligations under the Lease are conditioned on Tenant obtaining, at its sole cost and expense, permits, licenses, and approvals necessary for the lawful construction of the Tenant's Work in the Leased Premises (collectively, the "**Permits**").   Tenant shall diligently pursue in good faith the Permits and will submit for the Permits within sixty (60) days after the Lease Date. Tenant shall have one hundred twenty (120) days from the Lease Date to obtain the Permits (the "**Permits Date**"), and Tenant shall provide written notice to Landlord on or before the Permits Date regarding the status of the Permits.   Landlord shall cooperate with Tenant, at no expense to Landlord, in Tenant's pursuit of the Permits.  If Tenant has been unable to obtain the Permits by the Permits Date, then Landlord may, but shall be under no obligation to, pursue the Permits on behalf of Tenant, in which case Tenant shall fully cooperate.  If Landlord is successful in obtaining the Permits, then Tenant shall promptly reimburse Landlord

INITIAL
TENANT
LANDLORD

DocuSign Envelope ID: BE20E86C-950B-4C57-B4C2-168B13E54C48

DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

for all reasonable expenses incurred in obtaining the Permits. If Landlord elects not to pursue the Permits or is unable to obtain the Permits by the date that is sixty (60) days from the Permits Date, then either Landlord or Tenant may terminate the Lease by providing written notice to the other. At such time as the Permits are obtained, Landlord's and Tenant's right to terminate the Lease, as set forth in this Section shall automatically expire.

2.      **GRANT**

THIS STANDARD SHOPPING CENTER LEASE AGREEMENT (the "**Lease**") is entered into by and between Landlord and Tenant, to be effective as of the Lease Date. For purposes of this Lease, capitalized terms and variations thereof have the meanings specified herein or in Schedule 1. In consideration of the rents, terms and covenants of this Lease, Landlord hereby leases demises and lets unto Tenant the Leased Premises, together with the non-exclusive right to use, in common with other tenants, the Common Areas of the Shopping Center.

3.      **TERM**

(a)      Term. The Term of this Lease shall be as set forth in Section 1, above, commencing on the Rent Commencement Date and terminating on the Termination Date subject to the extension rights, if any, set forth herein.

(b)      Condition of Leased Premises. Tenant acknowledges that, subject to Landlord's satisfaction of its delivery of possession obligations set forth in this Lease (including, without limitation, the completion of the work in Exhibit E attached hereto), it accepts the Leased Premises as suitable for Tenant's purposes and subject to all Encumbrances, ordinances, orders, directives, codes, permits, and other rules and regulations of all state, federal, municipal, or other agencies or bodies having jurisdiction with respect to the Shopping Center (collectively, the "**Applicable Laws**"). TENANT WAIVES ANY IMPLIED WARRANTY THAT THE LEASED PREMISES ARE SUITABLE FOR TENANT'S INTENDED PURPOSES. TENANT'S ACCEPTANCE OF THE LEASED PREMISES SHALL BE AN ACKNOWLEDGEMENT BY TENANT THAT IT HAS FULLY INSPECTED THE LEASED PREMISES AND, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, TENANT ACCEPTS THE LEASED PREMISES IN AN "AS IS, WHERE IS" CONDITION. Tenant acknowledges that Landlord's title to the Leased Premises is subject to the covenants, agreements, reservations, liens, easements, restrictions, use restrictions, and/or encumbrances of record and to those additional restrictions and governing documents that are described in Exhibit F hereto, as such may exist from time to time (collectively, the "**Encumbrances**"), and Tenant shall be responsible for complying with all Encumbrances during the Term.

Tenant and Landlord acknowledge that the current use of the Leased Premises or the improvements located on the Leased Premises, or both, or Tenant's Permitted Use of the Leased Premises, may or may not conform to any applicable zoning ordinance with respect to the permitted use, height, setback requirements, minimum parking requirements, coverage of improvements to total area of land, and other matters which may have a significant economic impact upon the intended use of Tenant. Tenant acknowledges that Tenant has or will independently investigate and verify to Tenant's satisfaction the extent of any such limitations or nonconforming uses of the Leased Premises. Tenant further acknowledges that Tenant is not relying upon any warranties or representations of Landlord concerning the permitted uses of the Leased Premises or with respect to any nonconforming uses of the improvements located on the Leased Premises.



INITIAL
RE
WA

TENANT
LANDLORD

(c)   <u>Tenant Improvements to be Made by Landlord</u>.  Landlord, at Landlord's sole cost and expense, shall perform the necessary improvements to deliver the Leased Premises to Tenant in the condition required by <u>Exhibit E</u> attached hereto.

(d)   <u>Tenant Acceptance of Leased Premises</u>.  Tenant acknowledges that none of Landlord, or its agents, employees or other representatives have made any representations or promises regarding construction, repairs, alterations, remodeling, or improvements to the Leased Premises unless such are expressly set forth in this Lease or any Exhibit hereto.  Tenant is solely responsible for applying for and obtaining a certificate of occupancy for the Leased Premises and will satisfy itself as to any restrictive covenants, Encumbrances and all zoning and similar restrictions and Applicable Laws prior to commencement of any construction.  Tenant agrees that if its occupancy of the Leased Premises is delayed, this Lease shall nonetheless continue in full force and effect.  Adjustment of the Delivery Date and the Rent Commencement Date as above provided shall constitute full settlement of all claims by Tenant against Landlord by reason of any such delay in possession of the Leased Premises.  Tenant's taking possession of the Leased Premises shall conclusively establish that the tenant improvements, if any, to be made by Landlord under the terms of this Lease have been completed in accordance with the plans and specifications therefor and that the Leased Premises are in good and satisfactory condition as of the date of Tenant's possession, unless Tenant notifies Landlord in writing specifying any bona fide deficiencies after taking possession.  Landlord shall use reasonable diligence to repair promptly such items but Tenant shall have no claim for damages or rebate or abatement of Rent by reason thereof.  In conjunction with, or at any time after, the Rent Commencement Date, Tenant shall, upon demand, execute and deliver to Landlord a Tenant Acceptance Letter in the form of <u>Exhibit G</u> to acknowledge the items set forth therein.

## 4.   BASE RENT AND SECURITY DEPOSIT

(a)   <u>Base Rent</u>.  Tenant agrees to pay to Landlord the Base Rent and Additional Rent as described in Section 1 of this Lease.  Payment of Base Rent and Additional Rent is subject to proration for partial months and to adjustment for early or delayed occupancy under the terms hereof.  Upon the date Tenant executes the Lease, the first month's Base Rent  and Additional Rent shall be payable to Landlord. All subsequent payments of Base Rent shall be made to Landlord monthly, in advance, in lawful money of the United States of America at the address stated below.  All installments of Base Rent shall be due and payable on or before the first (1st) business day of each month during the Lease Term, provided that if the Rent Commencement Date shall be a date other than the first day of a calendar month, the monthly Base Rent and Additional Rent shall be pro-rated to the end of that calendar month, and all succeeding installments of Base Rent shall be payable on or before the first day of each succeeding calendar month pursuant to the Terms hereof.  Tenant covenants and agrees that the obligation of Tenant to pay Rent hereunder is an independent covenant, and that all Rent shall be paid without demand, offset, deduction, or abatement except as may otherwise be expressly provided for in the Lease.

(b)   <u>Security Deposit</u>.  Intentionally omitted.

(c)   <u>Late Charge</u>.

(i)   Tenant's failure to pay Rent when due under this Lease may cause Landlord to incur unanticipated costs.  Therefore, if the monthly Base Rent payment is not received by Landlord on or before the tenth (10th) day of the month for which such Base Rent is due, or if any other Rent payment due Landlord by Tenant hereunder



DocuSign Envelope ID: BE20E86C6-959B-4C67-B1C2-168B13F54C4B
Case 21-33989   Document 128-2   Filed in TXSB on 03/18/22   Page 16 of 69

DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

is not received by Landlord within ten (10) days of the due date, a service charge of five percent (5%) of the amount of the payment due to Landlord by Tenant shall be additionally due and payable by Tenant as an administrative charge for the excess efforts necessitated by such tardiness in payment. Such service charge shall be cumulative of any other remedies Landlord may have for nonpayment of Rent and other sums payable under this Lease. Further, if Tenant shall fail to pay any Rent when same is due and payable, such unpaid amount shall bear interest from the due date thereof to the date of remittance at the rate of the lesser of: (i) eighteen percent (18%) per annum, or (ii) the maximum rate allowed by law. The parties agree that such late charge represents a fair and reasonable estimate of the cost Landlord will incur by reason of such late payment.

(ii)     For each Tenant payment check to Landlord that is returned by a bank for any reason, Tenant shall pay both a Late Charge (if applicable) and a Returned Rent Charge (herein so called) of $35.00 or such higher amount as shall be customarily charged by Landlord's bank at the time. If any check given to Landlord by Tenant shall not be honored by the bank upon which it is drawn, Landlord, at its options, may require all payments made by Tenant to Landlord or over the remainder of the Term to be by certified check.

(iii)    All Late Charges and any Returned Check Charge shall then become Additional Rent and shall be due and payable immediately along with such other Base Rent, Additional Rent, or other Lease costs then in arrears.

(iv)     Money paid by Tenant to Landlord shall be applied to Tenant's account in the following order: (1) to any unpaid Additional Rent, including, without limitation, Late Charges, Returned Check Charges, legal fees and/or court costs legally chargeable to Tenant and then (2) to unpaid Base Rent.

(v)      Nothing herein contained shall be construed so as to compel Landlord to accept any payment of Base Rent, Additional Rent, or other Lease costs in arrears or Late Charge or Returned Check Charge should Landlord elect to apply its rights and remedies available under this Lease or at law or equity in the event of default hereunder by Tenant. Landlord's acceptance of Base Rent, Additional Rent, or other Lease costs in arrears or Late Charge or Returned Check Charge pursuant to this Clause shall not constitute a waiver of Landlord's rights and remedies available under this Lease or at law or equity.

(d)     <u>Advance Payment Requirement</u>. If two (2) consecutive monthly Base Rent payments or any four (4) [in total, cumulative from the beginning of the Lease Term] monthly Base Rent payments during the Lease Term (or any renewal or extension thereof) are not received by Landlord within five (5) days of the due date, the Base Rent hereunder shall automatically become due and payable by Tenant in advance in quarterly installments equal to three (3) months' Base Rent each. Landlord shall notify Tenant of such change in the time for payment of Base Rent and, thereafter, the first of such quarterly Base Rent payments shall be due and payable on the first day of the next succeeding month and on the first day of every third (3rd) month thereafter. This remedy shall be cumulative of any other remedies of Landlord under this Lease for nonpayment of Rent.



INITIAL
TENANT
LANDLORD

5.      **OPERATING EXPENSES**

        (a)      "**Operating Expenses**" shall mean all of the following paid or payable by Landlord with respect to the Shopping Center or any portion thereof: (i) all federal, state and local sales, use, ad valorem, rental, value added, other taxes (other than Landlord's income or franchise taxes), regular and special assessments and other governmental charges and any assessments , dues or other monetary charges required per the Encumbrances; (ii) all insurance premiums, including, without limitation, public liability, casualty, rental and property damage insurance; (iii) all of those costs that are directly incurred in the operation, maintenance, repair, and security, if any, of the Shopping Center, including, but not limited to, the cost of all utilities, building supplies, janitorial and cleaning services, maintenance (including, if any, maintenance to the Common Areas), repairs, operation costs, if any, of the Common Areas, parking lot maintenance (including, among other costs, those for lighting, repairing, paint striping and resurfacing), labor and employee benefit costs (including wages, salaries, and fees of all personnel engaged in the management, operation, maintenance, repair, and security of the Shopping Center); (iv) all other fees to manage, supervise, and administer the Shopping Center including, but not limited to, management or administrative fees and such fees as may be paid to a third party; (v) any parking charges, utility surcharges, or other costs levied, assessed, or imposed by, or at the direction of, or resulting from statutes or regulations, or interpretations thereof, promulgated by any governmental authority in connection with the use or occupancy of the Shopping Center or the parking facilities serving the Shopping Center; (vi) costs that reduce Operating Expenses or are required to meet any Applicable Laws (excluding capital expenditures); and (vii) accounting fees and legal fees. For purposes of computing Tenant's Proportionate Share of the Shopping Center for Operating Expenses, after the first full calendar year of the Term, the Controllable Operating Expenses (hereinafter defined) shall not increase by more than five percent (5%) per year (determined non-cumulatively). "**Controllable Operating Expenses**" shall mean those set forth in Section (iv) hereof. Tenant acknowledges that the Land on which the Leased Premises is located is not currently assessed as a separate tax parcel. Thus, for Section (i) hereof, calculation of the amount due from Tenant shall be based on Tenant's Proportionate Share of the Entire Development. If the Land at any time during the Lease Term is assessed as a separate tax parcel, then for each calendar year during the Lease Term that the Land is a separate tax parcel the calculation of the amount due from Tenant pursuant to Section (i) hereof shall be based on Tenant's Proportionate Share of the Shopping Center.

        (b)      For each calendar year of the term of this Lease, Tenant shall pay to Landlord as "**Additional Rent**" hereunder Tenant's Proportionate Share of the Shopping Center and Tenant's Proportionate Share of the Entire Development of the Operating Expenses. Notwithstanding the foregoing, if any use of the Leased Premises by Tenant causes an increase in insurance costs, Tenant shall pay as Additional Rent the entire amount of any such increase, as described in Section 11 below.

        (c)      Along with the Base Rent, Tenant shall pay, monthly, one-twelfth of Tenant's Additional Rent as estimated and adjusted from time to time by Landlord, during the term of this Lease.  Within one hundred twenty (120) days after the end of each calendar year during the Term of this Lease, Landlord shall submit a reconciliation statement to Tenant setting forth (A) the Additional Rent due from Tenant for the preceding calendar year, (B) the amount of Additional Rent paid by Tenant during such calendar year, and (C) the amount, if any, either overpaid or remaining due from Tenant to Landlord ("**Reconciliation Statement**").  Within ten (10) days after receipt of such statement, Tenant shall remit to Landlord the amount said statement shows to be due from Tenant or, if Tenant has overpaid, Landlord shall credit the amount overpaid to the Additional Rent next due from Tenant or shall refund such excess to Tenant, whichever Tenant shall so direct.



    (d)     For the calendar years in which this Lease commences and terminates, Tenant's liability for the Additional Rent for such partial calendar years shall be subject to pro rata adjustment based upon the number of days of the term elapsing during such partial year. Where the applicable charges are not available prior to the end of the term hereof, then the aforesaid adjustment shall be made between Landlord and Tenant after Landlord shall have received the charges for such period, it being specifically agreed that Landlord's and Tenant's obligations under this section shall survive the expiration of the term of this Lease.

    (e)     The failure of Landlord to exercise its rights hereunder to estimate Operating Expenses and require payment of same as Additional Rent or the failure of Landlord to submit a reconciliation statement as called for herein shall not constitute a waiver of such rights which rights may be exercised from time to time at Landlord's discretion.

    (f)     Tenant shall be responsible for insuring and paying all taxes upon Tenant's equipment, inventory, machinery, goods, supplies, fixtures, Alterations (below defined) or other improvements, and other property located on the Leased Premises.

## 6. TENANT REPAIRS AND MAINTENANCE

    (a)    <u>Tenant Maintenance Obligations</u>. Tenant, at Tenant's sole expense, shall maintain all parts of the Leased Premises and their appurtenances (except those for which Landlord is expressly responsible pursuant to Section 7(a) of this Lease), including, without limitation the interior, plate glass, doors and tenant signage, in good, clean and sanitary condition. Without limiting the generality of the foregoing, Tenant shall also be responsible for the maintenance, repair and replacement of all lighting, heating, air conditioning, plumbing and other electrical, mechanical and electromotive installation, equipment and fixtures located solely within or solely serving the Leased Premises and also include all utility repairs in ducts, conduits, pipes and wiring, and any sewer stoppage located solely within or solely serving the Leased Premises.

    (b)    <u>Tenant Repair Obligations</u>. Tenant shall not damage or disturb the integrity, structural integrity, or support of any wall, roof, or foundation of the Building. Any damage to these areas caused by Tenant or Tenant's Representatives shall be promptly repaired by Tenant at its sole cost and expense and in accordance with Landlord's plans and specifications. In the event that Tenant or Tenant's Representatives is responsible in any way for voiding all or a portion of the warranty for the roof, Tenant shall, at its sole cost and expense, reinstate the voided warranty for the roof, if possible, and if not possible, shall be responsible for the cost of all repairs, maintenance, and replacement associated with the portion of the roof for which the warranty was voided. At any time Tenant or Tenant's Representatives desires to access the roof in any way, Tenant shall be required to obtain the prior written consent of Landlord and shall be required to use Landlord's vendor for the warranty, if necessary.

    (c)    <u>Condition Upon Termination of Lease</u>. At the termination of this Lease, Tenant shall deliver the Leased Premises "broom clean" to Landlord in the same good order and condition as existed at the Rent Commencement Date of this Lease, ordinary wear, natural deterioration beyond the control of Tenant, and damage by fire, tornado or other casualty excepted.

    (d)    <u>Tenant's Service Contracts</u>. Tenant shall at its own cost and expense, enter into a regularly scheduled preventative maintenance contract with a maintenance contractor for servicing all heating, ventilation, and air-conditioning systems and equipment within, and any other equipment or machinery installed by Landlord in, or solely serving, the Leased Premises. The maintenance contractor and service contract are subject to Landlord approval, which shall not be unreasonably withheld. The service contract must include all services suggested by the equipment manufacturer within the operation/maintenance



INITIAL

TENANT

LANDLORD

DocuSign Envelope ID: BE20E86C-950B-4C57-B1C2-168B13F54C42

DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

manual and must become effective (with a copy delivered to Landlord) within thirty (30) days of the Delivery Date.  If Tenant fails to enter into such service contract as required, Landlord shall have the right to do so on Tenant's behalf, and Tenant agrees to pay Landlord the cost and expense of same upon demand, and such amount shall be considered Additional Rent.

(e)   <u>Tenant Negligence</u>.  In addition to, and not in limitation of, the foregoing, it is expressly understood that Tenant shall repair and pay for all damage caused by Tenant; by Tenant's employees, officers, directors, partners, agents, invitees, licensees, contractors, representatives, or those for whom Tenant is legally responsible (the "**Tenant's Representatives**") or by Tenant's default hereunder.

(f)   <u>Landlord Repair and Tenant Reimbursement</u>.  If Landlord shall give Tenant written notice of defects or need for repairs for which Tenant is responsible under this Lease, and if Tenant shall fail to make same within ten (10) days of Landlord's notification or such shorter or longer time as is reasonable if expedited repair is needed, Landlord shall have the option to cure said defect or repair, and Tenant shall pay to Landlord, as Additional Rent, all costs and expenses incurred on demand.

## 7.   LANDLORD'S REPAIRS

(a)   <u>Structural and Systems Repairs</u>.  Landlord shall be responsible, at its expense, for, but only for, the structural integrity of the roof, foundation and exterior walls of the Leased Premises.  In further limitation on Landlord's responsibilities hereunder, (i) any repair to the roof, foundation or exterior walls occasioned by the act or omission of Tenant or Tenant's Representatives shall be the responsibility of Tenant as provided in Section 6(b); (ii) the term "walls" as used in this Section 7(a) shall not include windows, glass or plate glass, interior doors, special store fronts, office entries or exterior doors; and (iii) Landlord's liability with respect to any defects, repairs, or maintenance for which Landlord is responsible at its expense under this Lease shall be limited to the cost of such repairs or maintenance or the curing of such defect.  Landlord shall also be responsible for the maintenance, repair and replacement of all lighting, heating, air conditioning, plumbing and other electrical, mechanical and electromotive installation, equipment and fixtures located outside the Leased Premises and not solely serving the Leased Premises and also include all utility repairs in ducts, conduits, pipes and wiring, and any sewer stoppage located outside the Leased Premises and not solely serving the Leased Premises.  Tenant shall promptly give Landlord written notice of defects or need for repairs for which Landlord is responsible under this Lease, after which Landlord shall have fifteen (15) days to commence to repair or cure such defect, except in cases where such defects or need for repairs constitute an emergency or prohibit Tenant from being able to use the Leased Premises, in which case Landlord shall, as soon as reasonably possible, commence to repair or cure such defect.

(b)   <u>Common Area Maintenance</u>.  Landlord shall maintain the Common Areas of the Shopping Center in a condition that Landlord determines in its sole discretion to be appropriate.  If the need for any such work shall come to the attention of Tenant, Tenant will promptly so notify Landlord in writing.  Any costs incurred by Landlord pursuant to this Sections 7(a) and 7(b) shall be included as an Operating Expense.

## 8.   UTILITY SERVICE

Tenant shall be responsible pursuant to Section 5(a) for reimbursing Landlord for Tenant's Proportionate Share of the Shopping Center for the cost of all utilities, including water, trash and recycling services provided to the Shopping Center.  Landlord, in Landlord's sole discretion, may elect to have the Leased Premises separately submetered or metered, and Tenant shall be responsible for the initial connection



INITIAL
TENANT
LANDLORD

charges and deposits and all charges and costs for separately metered or submetered utility services, including heat, gas, electricity, and telephone services; provided, Landlord shall pay all initial impact fees related to the delivery the Leased Premises to Tenant in the condition required by this Lease. Tenant shall be responsible for all periodic utility usage charges regarding services associated exclusively with the Leased Premises and pay directly to provider the cost of all heat, gas, electricity, telephone and other telecommunications services including, but not limited to, initial connection charges and deposits. Tenant shall pay all costs caused by Tenant introducing excessive pollutants into the sanitary or storm sewer system, including permits, fees, assessments, fines and charges levied by any governmental subdivision for any pollutants or solids other than ordinary human waste. Notwithstanding the foregoing, Tenant shall remain responsible for reimbursing Landlord for the costs of all utilities provided to the Leased Premises and Tenant's Proportionate Share of the Shopping Center for all utilities provided to the Common Areas, which Landlord may bill Tenant for quarterly and Tenant will pay within thirty (30) days of receipt of invoice therefor. Except for impact fees, any costs incurred by Landlord pursuant to this Section 8 shall be included as an Operating Expense.

## 9.   SIGNS

Tenant may affix and maintain upon the glass panes and supports of the show windows, and if within twelve (12) inches of any window, upon the exterior walls of the Leased Premises, only such signs, advertising placards, names, insignia, trademarks and descriptive material as shall have first received the written approval of Landlord as to type, size, color, location, copy nature and display qualities. Anything to the contrary in this Lease notwithstanding, Tenant shall not affix any sign to the roof.

Subject to Landlord's approval and compliance with all Applicable Laws and sign criteria, Tenant, at Tenant's sole cost and expense, shall have the right to install the following signage:

(a)   Dickey's Barbecue Pit standard signage on the exterior of the Leased Premises;

(b)   Dickey's Barbecue Pit standard signage on the on the multi-tenant pylon/monument sign for the Shopping Center (the "**Shopping Center Sign**");

(c)   Promotional banners and temporary outside signage from time to time for promotional events held at the Leased Premises, as required by the Dickey's franchise agreement, for a period not to exceed ten (10) days at a time; and

(d)   A promotional banner for the opening of the Tenant's business at the Leased Premises (e.g. "Coming Soon" or "Now Open") on the exterior façade of the Premises for ninety (90) days prior and sixty (60) following Tenant's opening at the Leased Premises.

Tenant, at its sole cost and expense, is responsible for the fabrication and installation of the Tenant's signage panels on the Shopping Center Sign and the installation and maintenance of all of Tenant's other signage. Landlord has approved Tenant's standard signage package set forth in Exhibit I attached hereto and incorporated herein but makes no representation as to whether or not such package and the foregoing items set forth in this Section comply with Applicable Laws.

## 10.   USE

(a)   Use.  Tenant warrants and represents to Landlord that the Leased Premises shall be used solely for the Permitted Use set forth in Section 1 and for no other purpose including those purposes prohibited by Exhibit C attached hereto and incorporated herein. Tenant's use shall further be subject to and restricted by the applicable rules and regulations to the Shopping Center set forth on Exhibit D attached

LEASE AGREEMENT – Page 11
348426.2



DocuSign Envelope ID: BE20E8C6-950B-4C57-B1C2-168B13F54C48
DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

hereto and incorporated herein, as same may be adopted or amended from time to time by the Landlord and the Encumbrances. Any change in such use may be made only with the prior written approval of Landlord.

(b)    Parking.  Tenant, its employees, and customers shall have the non-exclusive right to use the parking areas of the Shopping Center.  In addition, subject to Landlord's prior approval and compliance with Applicable Laws, Tenant shall be entitled to park a catering vehicle in the parking areas of the Shopping Center.

(c)    Promotional Events.  Subject to Landlord's prior approval and compliance with all Applicable Laws, Tenant may engage in special promotional events at the Leased Premises from time to time, as required by the Dickey's franchise agreement, including, without limitation, soft opening and grand opening events.

## 11.    INSURANCE

(a)    Landlord Policies.  Landlord shall at all times during the Lease Term maintain a policy or policies of insurance insuring the Shopping Center for loss or damage by fire, explosion, and other customary hazards, subject to commercially reasonable deductible amounts.  Such policies will not insure any personal property (including, but not limited to any furniture, machinery, goods, or supplies) of Tenant or which Tenant may have in the Leased Premises or any fixtures installed by or paid for by Tenant upon or within the Leased Premises or any Alterations or other improvements which Tenant may construct or install on the Leased Premises or any of Tenant's Signs, insurance for all of which shall be Tenant's responsibility.

(b)    Effect of Tenant's Use.  Tenant shall not permit the Leased Premises to be used in any way which would be hazardous or which would in any way increase the cost of or render void any insurance on the Leased Premises, and Tenant shall immediately, on demand, cease any use which violates the foregoing or to which Landlord's insurer or any governmental or regulatory authority objects.

(c)    Tenant Insurance.  Tenant, at its sole cost and expense, shall procure and maintain throughout the Term of this Lease a policy or policies of insurance insuring Landlord and Tenant against all claims for property damages, personal injury or death of others occurring on or in connection with: (i) the Leased Premises; (ii) the condition of the Leased Premises; (iii) Tenant's operations in and maintenance and use of the Leased Premises; (iv) Tenant's and Tenant's Representatives' use of the Common Areas of the Shopping Center, and (v) Tenant's liability assumed under this Lease.  The limits of such policy or policies shall be not less than **$1,000,000.00** combined single limit coverage per occurrence for injury to persons (including death) and/or property damage or destruction, including loss of use.  Tenant shall be solely responsible for and agrees to keep all personal property and equipment in the Leased Premises fully insured and to maintain adequate business interruption insurance.

(d)    Additional Tenant Insurance Obligations.  All such policies shall be procured by Tenant from insurance companies satisfactory to Landlord naming the following as additional insureds: (i) Landlord; and (ii) Landlord's lender, if any.  All such policies must be in broad form satisfactory to Landlord and Tenant shall obtain any available endorsements required by Landlord.  Certified copies of such policies together with receipt for payment of premiums, shall be delivered to Landlord prior to the Delivery Date of this Lease.  Not less than fifteen (15) days prior to the expiration date of any such policies, certified copies of renewal policies and evidence of the payment of renewal premiums shall be delivered to Landlord.  All such original and renewal policies shall provide for at least thirty (30) days written notice to Landlord before such policy may be canceled or changed to reduce insurance coverage provided thereby.


INITIAL
TENANT
LANDLORD

DocuSign Envelope ID: BE20E8C6-950B-4C57-B1C2-168B13F54C4B   Case 21-33989  Document 128-2   Filed in TXSB on 03/18/22   Page 22 of 69

DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

12.   **COMPLIANCE WITH APPLICABLE LAWS AND ENVIRONMENTAL REQUIREMENTS**

(a)   Tenant shall comply with all Applicable Laws relating to the use, condition and occupancy of and business conducted on the Leased Premises, including without limitation, the Americans with Disabilities Act, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response, Compensation and Liability Act, and the rules, regulations and directives of the U.S. Environmental Protection Agency.   Tenant shall be responsible for the costs of any alterations or modifications of the Leased Premises that may be required under Applicable Laws for Tenant's specific use or occupancy.

(b)   Except for Hazardous Material contained in products used by Tenant in de minimis quantities for ordinary cleaning and office purposes in compliance with all Environmental Requirements, Tenant shall not permit or cause any party to bring any Hazardous Material upon the Leased Premises or transport, store, use, generate, manufacture, dispose, or release any Hazardous Material on or from the Leased Premises without Landlord's prior written consent.   Tenant, at its sole cost and expense, shall operate its business in the Leased Premises in compliance with all Environmental Requirements and all requirements of this Lease and shall not cause or allow any use of the Leased Premises that would constitute a public or private nuisance.   Tenant shall not install or place any above-ground or underground storage tanks on the Property.   Tenant shall promptly deliver to Landlord a copy of any notice of violation relating to the Leased Premises of any Environmental Requirement.

(c)   The term "**Environmental Requirements**" means all applicable present and future statutes, regulations, ordinances, rules, codes, judgments, permits, authorizations, orders, policies or other similar requirements of any governmental authority, agency or court regulating or relating to health, safety, or environmental conditions on, under, or about the Leased Premises or the environment, including without limitation, the following:  the Comprehensive Environmental Response, Compensation and Liability Act; the Resource Conservation and Recovery Act; the Clean Air Act; the Clean Water Act; the Toxic Substances Control Act and all state and local counterparts thereto, and any common or civil law obligations including, without limitation, nuisance or trespass, and any other requirements of this Lease.  The term "**Hazardous Materials**" means and includes any substance, material, waste, pollutant, or contaminant that is or could be regulated under any Environmental Requirement or that may adversely affect human health or the environment, including, without limitation, any solid or hazardous waste, hazardous substance, asbestos, petroleum (including crude oil or any fraction thereof, natural gas, synthetic gas, polychlorinated biphenyls (PCBs), and radioactive material).  For purposes of Environmental Requirements, to the extent authorized by law, Tenant is and shall be deemed to be the responsible party, including without limitation, the "owner" and "operator" of Tenant's "facility" and the "owner" of all Hazardous Materials brought on the Leased Premises by Tenant, its agents, employees, contractors or invitees, and the wastes, by-products, or residues generated, resulting, or produced therefrom.

(d)   Tenant shall indemnify, defend, and hold Landlord harmless from and against any and all losses (including, without limitation, diminution in value of the Leased Premises or the Shopping Center and loss of rental income from the Shopping Center), claims, demands, actions, suits, damages (including, without limitation, punitive damages), expenses (including, without limitation, remediation, removal, repair, corrective action, or cleanup expenses), and costs (including, without limitation, actual attorneys' fees, consultant fees or expert fees and including, without limitation, removal or management of any asbestos brought into the Leased Premises or disturbed in breach of the requirements of this section, regardless of whether such removal or management is required by law) which are brought or recoverable against, or suffered or incurred by Landlord as a result of any release of Hazardous Materials by Tenant, its agents,



employees, contractors, assignees, or invitees or any breach of the requirements under this section by Tenant, its agents, employees, contractors, subtenants, assignees, or invitees regardless of whether Tenant had knowledge of such noncompliance.  The obligations of Tenant under this section shall survive any termination of this Lease.

## 13.    ASSIGNMENT AND SUBLETTING

(a)    Tenant shall not, without prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed:

(i)    Assign or in any manner transfer this Lease or any estate or interest therein;

(ii)    Permit an assignment of this Lease or any estate or interest therein by operation of law;

(iii)    Sublet any part of Leased Premises;

(iv)    Grant any license, concession or other right of occupancy of any portion of the Leased Premises; or

(v)    Permit the use of the Leased Premises by any parties other than Tenant, its agents and employees except as may be required by Tenant in order to carry out the Permitted Use as set forth in this Lease.

(b)    Any such acts without Landlord's prior written consent shall be void and of no effect.

(c)    Any assignment or subletting of this Lease shall be expressly subject to all of the terms and provisions of this Lease, including any use restrictions.  Tenant shall not, without Landlord's prior written consent, assign this Lease or sublet all or any portion of the Leased Premises for any monthly rent which is, or could become, less than the Rent from time to time due hereunder (per square foot), and any such act shall be void and of no effect.  Consent by Landlord to one or more assignments or sublettings shall not operate as a waiver of Landlord's rights as to any subsequent assignments and sublettings.

(d)    In the event of an approved subletting or assignment, Landlord agrees to accept payment of Rent from Tenant, Tenant's assignee or sublessee.  Notwithstanding any assignment or subletting, Tenant and any guarantor of Tenant's obligations under this Lease shall at all times remain fully responsible and liable for the payment of the Rent herein specified and for compliance with all of Tenant's other obligations under this Lease.  No direct collection by Landlord from any such assignee or sublessee shall be construed to constitute a novation or a release of Tenant or any guarantor of Tenant from the performance of its obligations hereunder.  Receipt by Landlord of rent from any assignee, sublessee or occupant of the Leased Premises shall not be deemed a waiver of the covenant contained in this Lease against assignment and subletting or a release of Tenant under this Lease. The receipt by Landlord from any such assignee or sublessee obligated to make payments of rent shall be a full and complete release, discharge, and acquittance to such assignee or sublessee to the extent of any amount so paid to Landlord.  Landlord is authorized and empowered, on behalf of Tenant to endorse the name of Tenant upon any check, draft, or other instrument payable to Tenant evidencing payment of rent or any part thereof, and to receive and apply the proceeds therefrom in accordance with the terms hereof.  Tenant shall not mortgage, pledge or otherwise encumber its interest in this Lease or in the Leased Premises.



INITIAL

TENANT
LANDLORD

(e)      If Tenant requests Landlord's consent to an assignment of this Lease or subletting of all or a part of the Leased Premises, it shall submit to Landlord, in writing, the name of the proposed assignee or subtenant and the nature and character of the business of the proposed assignee or subtenant, the term, use, rent and other particulars of the proposed subletting or assignment, including, without limitation, evidence satisfactory to Landlord that the proposed subtenant or assignee is financially responsible and will immediately occupy and thereafter use the Leased Premises (or any sublet portion thereof for the remainder of the Term of this Lease (or for the entire term of the sublease, if shorter).

(f)      In the event of any subletting or assignment by Tenant as hereinabove provided, if any rents received by Tenant under any such sublease are in excess of the Rent payable by Tenant under this Lease (per square foot), or any additional consideration is paid to Tenant by the assignee under such assignment, the Tenant shall be permitted to retain such excess Rent or consideration received by Tenant during the Term.

(g)      Landlord shall be reimbursed by Tenant for any costs or expenses incurred as a result of Tenant's request to consent to any such assignment or subletting, including reasonable legal costs.

(h)      Notwithstanding anything to the contrary set forth in this Section 13, Tenant shall have the right to assign the Lease without Landlord's consent to any of the following (a "**Permitted Transferee**"), (i) any successor corporation or other entity resulting from a merger, consolidation or purchase of Tenant; (ii) any entity which controls, is controlled by, or is under common control with Tenant; or (iii) any entity succeeding in the business or assets of Tenant (hereinafter, collectively, referred to as "**Permitted Transfer**"), provided: (1) Tenant is not in default under this Lease; (2) if such proposed transferee is a successor to Tenant by purchase, said proposed transferee shall acquire all or substantially all of the ownership interests or assets of Tenant's business or, if such proposed transferee is a successor to Tenant by merger or consolidation, the continuing or surviving entity shall own all or substantially all of the assets of Tenant; (3) Tenant shall give Landlord written notice at least thirty (30) days prior to the effective date of the proposed Permitted Transfer (provided that, if prohibited by confidentiality in connection with a proposed Permitted Transfer, Tenant shall give Landlord written notice within ten (10) days after the effective date of the proposed Permitted Transfer); (4) transferee assumes in writing all of Tenant's obligations under this Lease; and (5) Landlord receives a fully executed copy of the assignment between Tenant and the Permitted Transferee.  Tenant and any guarantor of Tenant's obligations under this Lease shall nevertheless at all times remain fully responsible and liable for the payment of Rent and the performance and observance of all of Tenant's other obligations under the Lease following any Permitted Transfer in accordance with Section 13(d) above.

14.      **ALTERATIONS AND IMPROVEMENTS**

(a)      <u>Landlord Consent Required</u>.  Following the Delivery Date and subject to the terms and conditions contained herein, Tenant shall be allowed to make initial alterations to develop, construct, and fixturize (with Dickeys' Barbecue Pit standard décor and fixtures) the Leased Premises in accordance with the terms of this Lease (the "**Tenant's Work**").   All of Tenant's construction, improvements and Alterations, including, without limitation, the Tenant's Work, will comply with all Applicable Laws. Tenant shall not make or perform, or permit the making or performance of, any initial or subsequent tenant finish work or any Alterations without Landlord's prior consent. Landlord shall be under no obligation to allow Alterations of any kind and may withhold its consent without cause. Notwithstanding the foregoing provisions or Landlord's consent to any Alterations, all Alterations shall be made and performed in conformity with and subject to the following provisions: (1) all Alterations shall be made and performed at Tenant's sole cost and expense (subject to the Tenant Improvement Allowance for the Tenant's Work) in a



good and workmanlike manner; (2) Alterations shall be made only by contractors or mechanics approved by Landlord, such approval not to be unreasonably withheld; and Landlord may post on or about the Leased Premises notices of non-responsibility for payment; (3) Tenant shall submit to Landlord detailed plans and specifications (including architectural layout, mechanical and structural drawings) for each proposed Alteration and shall not commence any such Alteration without first obtaining Landlord's written approval of such plans and specifications, and Tenant shall reimburse Landlord for Landlord's costs of reviewing such plans and specifications (provided, Tenant acknowledges that any Landlord review is solely for Landlord's own purposes and does not imply nor shall Landlord have any liability for, compliance with Applicable Laws); (4) prior to the commencement of each proposed Alteration, Tenant shall furnish to Landlord a certificate evidencing worker's compensation insurance coverage for all persons to be employed in connection with such Alterations, including those to be employed by all contractors and subcontractors, and of comprehensive public liability insurance (including property damage coverage) in which Landlord, its agents, and any lessor under any ground or underlying lease, and any mortgagee of the Building shall be named as parties insured, which policies shall be issued by companies and shall be in form and amounts satisfactory to Landlord and shall be maintained by Tenant until the completion of such Alteration; (5) Tenant shall cause its contractor and each subcontractor to provide Landlord with a certificate of completion of the Alterations and a bills paid affidavit and final lien waiver; (6) Tenant shall, if required by Landlord at the time of Landlord's consent to the Alterations, agree to restore the Leased Premises at the termination of this Lease to their condition prior to making such Alterations; (7) all permits, approvals and certificates required by all governmental authorities shall be timely obtained by Tenant and submitted to Landlord and (8) all materials and equipment to be incorporated in the Leased Premises as a result of all Alterations shall be new and first quality, and such materials or equipment shall not be subject to any lien, encumbrance, chattel mortgage or title retention or security agreement.  Tenant shall keep the Leased Premises and the Shopping Center free from any liens arising out of any work performed, materials furnished, or obligations incurred by or on behalf of Tenant and Tenant shall and does hereby indemnify and hold harmless Landlord therefrom.

(b)     <u>Compliance with Laws</u>.  Notwithstanding Landlord's approval of plans and specifications for any Alterations, all Alterations shall be made and performed in full compliance with all Applicable Laws, orders, including, without limitation, all directions, pursuant to law, of all public officers, and with all applicable rules, orders, regulations and requirements of the local Board of Fire Underwriters or any similar body.  Landlord's approval shall not in any way be considered an indication that the plans and specifications comply with Applicable Laws.  Whether such Alterations are being performed by Tenant in connection with Tenant's initial occupancy of the Leased Premises or subsequently, Tenant agrees to make proper application for, and obtain, a building permit and a certificate of occupancy from the city in which the Leased Premises are located.  Tenant shall furnish copies of such permit and certificate to Landlord promptly after issuance of same.

(c)     <u>Ownership Improvements</u>.  All appurtenances, fixtures, improvements, and other property attached to or installed in the Leased Premises, whether by Landlord or Tenant or others, and whether at Landlord's expense or Tenant's expense, or the joint expense of Landlord and Tenant, shall be and remain the property of Landlord.  If no Event of Default has occurred, Landlord may, at its sole option and in its sole discretion, and if Landlord so elects Tenant shall, remove any such property belonging to Tenant at the end of the Term hereof, and Tenant shall repair or, at Landlord's option, shall pay to Landlord the cost of repairing any damage arising from such removal.  Any replacements of any property of Landlord, whether made at Tenant's expense or otherwise, shall be and remain the property of Landlord.



DocuSign Envelope ID: BE20E8C6-950B-4C57-B1C2-168B13F54C48
DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

## 15.   CONDEMNATION

If the whole or any substantial part of the Leased Premises shall be taken or condemned for any public or quasi-public use under governmental law, ordinance or regulation or by right of eminent domain, or by private purchase in lieu thereof, then Landlord may, at its option, terminate this Lease and the Rent shall be abated during the unexpired portion of this Lease, effective when the physical taking of said Leased Premises shall occur.  In the event this Lease is not terminated, the Rent for any portion of the Leased Premises so taken or condemned shall be abated during the unexpired Term of this Lease effective when the physical taking of said portion of the Leased Premises shall occur.  All compensation awarded for any such taking or condemnation or sale proceeds in lieu thereof, shall be the property of Landlord, and Tenant shall have no claim thereto, the same being hereby expressly waived by Tenant, except for any portions of such award or proceeds which are specifically allocated by the condemning or purchasing party for the taking of or damage to trade fixtures of Tenant, which Tenant specifically reserves to itself.  In the event all or a portion of the Rent is abated pursuant to the provisions of this Paragraph, the Rent shall be apportioned for such monthly period(s) of which abatement begins as reasonably determined by Landlord.

## 16.   FIRE AND CASUALTY

(a)   <u>Notice by Tenant</u>.  If the Leased Premises should be damaged or destroyed by fire, tornado, or other casualty, Tenant shall give immediate verbal and written notice thereof to Landlord.

(b)   <u>Destruction of Building</u>.  If the Leased Premises should be totally destroyed by fire, tornado, or other casualty, or if it should be so damaged thereby that rebuilding or repairs cannot reasonably be completed within one hundred eighty (180) days after the date on which Landlord is notified by Tenant of such damage, at the option of either Landlord or Tenant, this Lease shall terminate, and the Rent shall be abated during the unexpired portion of this Lease effective upon the date of occurrence of such damage.

(c)   <u>Restoration of Building</u>.  If the Leased Premises should be damaged by any peril that will be wholly compensated (subject to deductibles) by the insurance maintained by Landlord or if Landlord, in its sole discretion, so chooses notwithstanding a deficiency in such proceeds, and if rebuilding or repairs can reasonably be completed within one hundred eighty (180) days after the date on which Landlord is notified by Tenant of such damage, this Lease shall not terminate, and Landlord shall then proceed with reasonable diligence to rebuild and repair the Leased Premises to substantially the same condition in which it existed prior to such damage.  Landlord shall not be required, however, to rebuild, repair, or replace Tenant's furniture, fixtures, Alterations, inventory or other personal property.   If the Leased Premises are untenantable in whole or in part during restoration, the Rent payable hereunder during the period in which they are untenantable shall be reduced by the amount of business or rent interruption insurance proceeds actually received by Landlord with respect to the Leased Premises.  If Landlord should fail to complete such repairs and rebuilding within one hundred eighty (180) days (exclusive of delays due to Force Majeure) after the date on which Landlord is notified by Tenant of such damage, Tenant may terminate this Lease by delivering written notice of termination to Landlord.  Such termination shall be Tenant's exclusive remedy and all rights and obligations of the parties under the Lease shall then cease.  If Landlord does not receive insurance proceeds sufficient for restoration (such as when its mortgagee does not allow the proceeds to be used for such purposes) and if restoration is economically reasonably feasible, Tenant will have the option of supplementing available proceeds to allow restoration, and Tenant's actual costs will be reimbursed through a monthly pro rata credit against rent beginning after Landlord's mortgage has been paid in full.

(d)   <u>Tenant Responsibility</u>.  Notwithstanding the foregoing provisions of this Section 16, Tenant agrees that if the Leased Premises, the Building and/or Shopping Center are damaged by fire or other

<u>LEASE AGREEMENT</u> – Page 17
348426.2



INITIAL

TENANT
LANDLORD

DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

casualty caused by the fault or negligence of Tenant or Tenant's Representatives, Tenant shall have no option to terminate this Lease even if the damage cannot be repaired within one hundred eighty (180) days, and the Rent shall not be abated or reduced before or during the repair period.  Tenant shall pay to Landlord, as Additional Rent, within ten (10) days of Landlord's demand therefor the Landlord's deductible under the Landlord's insurance of the Leased Premises, Building and/or the Shopping Center.

(e) <u>Landlord Termination Option</u>.  Notwithstanding anything herein to the contrary, if Landlord or its lender requires that the insurance proceeds be applied to such indebtedness, then Landlord shall have the right to terminate this Lease by delivering written notice of termination to Tenant within fifteen (15) days after such requirement is imposed.  All rights and obligations under this Lease shall then cease.

## 17.    WAIVER OF SUBROGATION

To the extent that Landlord or Tenant receives casualty insurance proceeds, such recipient hereby waives and releases any and all rights, claims, demands and causes of action such recipient may have against the other on account of any loss or damage occasioned to such recipient or its businesses, real and personal properties, the Leased Premises, the Shopping Center, or its contents, arising from any risk or peril covered by any insurance policy carried by either party and for which such proceeds are actually received.  Inasmuch as the above mutual waivers will preclude the assignment of any such claim by way of subrogation (or otherwise) to an insurance company (or any other person), each party hereto agrees immediately to give to its respective insurance companies written notice of the terms of such mutual waivers and to have their respective insurance policies properly endorsed, if necessary, to prevent the invalidation of such insurance coverages by reason of such waivers.  This provision shall be cumulative of Section 18 below.

## 18.    WAIVER

To the fullest extent permitted by law, Tenant, on its behalf and on behalf of its officers, directors, owners, contractors, subcontractors, employees, agents, and invitees (the "**Tenant Parties**"), waives all fines, suits, losses, costs, liabilities, claims, demands, actions, and judgments of every kind and character, whether at law or in equity (collectively, the "**Claims**") against Landlord, its authorized representatives, and their respective officers, directors, owners, agents, employees, and contractors (the "**Landlord Parties**"), and knowingly and voluntarily assumes the risk of, and agrees that Landlord Parties are not liable to any Tenant Parties for any of the following:

(i) any injury or damage to person or property (including the resulting loss of use, economic losses and consequential or resulting damages of any kind from any cause) due to the condition or design of, or any defect in, the Leased Premises or the Shopping Center that exists now or occurs in the future;

(ii) any injury or damage to person or property (including the resulting loss of use, economic losses and consequential or resulting damages of any kind from any cause) due to the Leased Premises or the Shopping Center or related improvements or appurtenances being out of repair, or defects in or failure of pipes or wiring, or backing up of drains, or the bursting or leaking of pipes, faucets, and plumbing fixtures, or gas, water, steam, electricity, or oil leaking, escaping, or flowing into the Leased Premises;

<u>LEASE AGREEMENT</u> – Page 18
348426.2



DocuSign Envelope ID: BE20E86C-950B-4C57-B1C2-168B13E54C48
Case 21-33989   Document 128-2   Filed in TXSB on 03/18/22   Page 28 of 69

DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

      (iii)     any loss or damage caused by the acts or omissions of other lessees in the Shopping Center or of any other persons; or

      (iv)     any loss or damage to property or person occasioned by theft, fire, act of God, public enemy, injunction, riot, insurrection, war, court order, requisition, order of governmental authority, and any other cause.

## 19.     INDEMNITY AND EXCULPATION

EXCEPT TO THE EXTENT LIABILITY OF TENANT MAY BE WAIVED UNDER SECTION 17, TENANT SHALL INDEMNIFY, DEFEND, AND HOLD ALL LANDLORD PARTIES HARMLESS (AND WAIVES ANY CLAIM AGAINST ANY LANDLORD PARTY WITH RESPECT THERETO) FROM ALL CLAIMS, (INCLUDING THOSE CLAIMS RESULTING IN PART FROM THE NEGLIGENCE OF ANY LANDLORD PARTY BUT NOT INCLUDING THOSE CLAIMS RESULTING SOLELY FROM THE NEGLIGENCE OF ANY LANDLORD PARTY OR RESULTING FROM THE GROSS NEGLIGENCE OR INTENTIONAL MISCONDUCT OF ANY LANDLORD PARTY), ARISING OUT OF OR RELATING (DIRECTLY OR INDIRECTLY) TO THIS LEASE, THE TENANCY CREATED UNDER THIS LEASE, OR THE LEASED PREMISES, INCLUDING, WITHOUT LIMITATION: (I) ANY BODILY INJURY, DEATH AND/OR PROPERTY DAMAGE OCCURRING IN OR RESULTING FROM AN OCCURRENCE IN THE LEASED PREMISES DURING THE TERM; (II) ANY BREACH OR DEFAULT IN PERFORMANCE OF ANY OBLIGATION ON TENANT'S PART TO BE PERFORMED UNDER THIS LEASE, WHETHER BEFORE OR DURING THE TERM OR AFTER ITS EXPIRATION OR EARLIER TERMINATION; (III) ANY ACT, OMISSION, NEGLIGENCE, OR MISCONDUCT OF ANY TENANT PARTY, OR OF ANY OTHER PERSON ENTERING UPON THE LEASED PREMISES; (IV) ANY ALTERATIONS, ACTIVITIES, WORK, OR THINGS DONE, PERMITTED, ALLOWED, OR SUFFERED BY TENANT PARTIES IN, AT, OR ABOUT THE LEASED PREMISES OR THE SHOPPING CENTER, INCLUDING THE VIOLATION BY ANY TENANT PARTY OF ANY APPLICABLE LAW; AND (V) THE OCCUPANCY OR USE BY ANY TENANT PARTY OF THE LEASED PREMISES OR THE SHOPPING CENTER.

## 20.     ASSIGNMENT OF LANDLORD'S INTEREST IN LEASE

Landlord shall have the right to transfer and assign, in whole or in part, its rights and obligations with respect to the Shopping Center, the Leased Premises, and this Lease, including Tenant's Security Deposit. Upon and after such transfer, Landlord shall be released from any further obligation under this Lease; provided such successor agrees in writing to assume all of the obligations and responsibilities of Landlord under the Lease and Tenant agrees to look solely to Landlord's successor for the performance of such obligations.

## 21.     LANDLORD'S LIEN

In addition to any statutory lien for Rent in Landlord's favor, Landlord shall have, and Tenant hereby grants to Landlord, a continuing security interest for all Rent and other sums of money becoming due under this Lease from Tenant upon all personal property of Tenant (including, but not limited to Tenant's furniture, trade fixtures, equipment and inventory) situated on or arising from the Leased Premises. Such property shall not be removed without the consent of Landlord which consent may be withheld by Landlord until all of Tenant's duties and obligations have been performed in full. In the event of a default under this Lease, Landlord shall have, in addition to any other remedies provided in this Lease or by law, all rights and remedies under the Texas Uniform Commercial Code, including without limitation the right to sell the


INITIAL
TENANT
LANDLORD

property described in this Section at public or private sale upon five (5) days' notice to Tenant. Tenant hereby authorizes Landlord to file such financing statements and other instruments necessary or desirable in Landlord's discretion to perfect the security interest hereby created.

**22.     MERCHANT'S ASSOCIATION** Intentionally omitted.

**23.     DEFAULT BY TENANT**

The following shall be "**Events of Default**" by Tenant under this Lease:

(a)     Any failure by Tenant to pay Rent or make any other payment required to be made by Tenant hereunder;

(b)     A failure by Tenant to observe and perform any other provision of this Lease to be observed or performed by the Tenant, where such failure continues for fifteen (15) days after written notice thereof by Landlord to Tenant, except that this fifteen (15) day period shall be extended for a reasonable period of time if the alleged default is not reasonably capable of cure within such fifteen (15) day period and Tenant proceeds to diligently cure the default; provided that Landlord shall not be required to provide Tenant notice of, and an opportunity to cure, a default under this subsection on more than one (1) occasion during any consecutive twelve (12) month period or more than four (4) occasions total throughout the Term of this Lease;

(c)     Tenant shall file a petition or be adjudged bankrupt or insolvent under the Federal Bankruptcy Act, as amended, or any similar law or statute of the United States or any state or a receiver or trustee shall be appointed for all or substantially all of the assets of Tenant and such bankruptcy or receivership shall not be dismissed within thirty (30) days; or Tenant shall make a transfer in fraud of creditors or shall make an assignment for the benefit of creditors or shall be unable to pay its debts to third parties as same become due;

(d)     Tenant assigning or subletting this Lease, or any estate or interest therein, in violation of this Lease;

(e)     Tenant's abandonment, desertion, or vacation of any part of the Leased Premises, whether or not Tenant is in default of the Rent payments due under this Lease or Tenant's removal or attempted removal of all or a substantial amount of Tenant's goods, equipment, or other personal property; or

(f)     Tenant's guarantor, if any, becomes insolvent.

**24.     REMEDIES FOR TENANT'S DEFAULT**

Upon the occurrence of any Event of Default by Tenant, Landlord shall have the option to pursue any one or more of the following remedies without any prior notice or demand:

(a)     Landlord may terminate this Lease, in which event Tenant shall, immediately surrender the Leased Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which it may have, enter upon and take possession of the Leased Premises, and expel or remove Tenant and any other person who may be occupying all or any part of the Leased Premises. Landlord shall not be liable for prosecution or any claim for damages as a result of such actions. Tenant agrees to pay on demand the amount of all losses, costs, expenses, deficiencies, and damages, including, without limitation, reasonable reconfiguration expenses, rental concessions and other inducements to new tenants, advertising



INITIAL

TENANT
LANDLORD

expenses and broker's commissions, which Landlord may incur or suffer by reason of Tenant's default or the termination of this Lease under this subsection, whether through inability to rent the Leased Premises on satisfactory terms or otherwise. Tenant acknowledges that its obligation to pay Base Rent and all Additional Rent hereunder is not only compensation for use of the Leased Premises but also compensation for sums already expended and/or being expended by Landlord with respect to its obligations hereunder and with respect to the Leased Premises, and Tenant acknowledges that Tenant's default in timely payment of all sums due hereunder shall constitute significant financial loss to Landlord. If Landlord elects to terminate the Lease by reason of an Event of Default, then, notwithstanding such termination, Tenant shall be liable for and shall pay to Landlord the sum of all Rent and other indebtedness accrued to the date of such termination, plus, as liquidated damages for such default and not as a penalty, an amount equal to the present value of the Rent for the remaining portion of the Term (had such Term not been terminated by Landlord prior to the date of expiration) using a five percent (5%) present value discount factor less the present value of the fair market rental value of the Leased Premises during such period using a five percent (5%) present value discount factor. Alternatively, if Landlord elects to terminate the Lease by reason of an event of default, in lieu of exercising the rights of Landlord described in the preceding sentence, Landlord may instead hold Tenant liable for all Rent and other indebtedness accrued to the date of such termination, plus such Rent and other indebtedness that would otherwise have been due by Tenant to Landlord during the period following termination of the Term measured from the date of the termination by Landlord until the Termination Date (had Landlord not elected to terminate the Lease due to the Event of Default) diminished by any net sums thereafter received by Landlord through reletting the Leased Premises during that period (after deducting expenses incurred by Landlord). Actions to collect amounts due by Tenant pursuant to this subsection may be brought from time to time by Landlord, on one or more occasions, without the necessity of Landlord waiting until expiration of the Term. Tenant will never be entitled to any excess of Rent (or Rent plus other sums) obtained by reletting over and above the Rent provided for in this Lease.

(b)     Without termination of this Lease, Landlord may enter upon and take possession of the Leased Premises and expel or remove Tenant and any other person who may be occupying all or any part of the Leased Premises (without being liable for prosecution or any claim for damages therefor) and relet the Leased Premises on behalf of Tenant and receive directly the rent from the reletting. Tenant agrees to pay Landlord on demand any deficiency that may arise by reason of any reletting of the Leased Premises and to reimburse Landlord on demand for any losses, costs, and expenses, including without limitation, reconfiguration expenses, rental concessions and other inducements to new tenants, advertising costs or broker's commissions, which Landlord may incur or suffer as a result of Tenant's default or in reletting the Leased Premises. In the event Landlord is successful in reletting the Leased Premises at a rental in excess of that agreed to be paid by Tenant pursuant to this Lease, Tenant agrees that Tenant shall not be entitled, under any circumstances, to such excess rental, and Tenant does hereby specifically waive any claim to such excess rental.

(c)     Without terminating this Lease, Landlord may enter upon the Leased Premises (without being liable for prosecution or any claim for damages therefor) and do whatever Tenant is obligated to do under the terms of this Lease. Upon receipt of a demand therefor from Landlord, Tenant shall reimburse Landlord for all costs and expenses incurred by Landlord in performing such obligations and a reasonable profit and overhead of ten percent (10%) of such costs and expenses. Further, Tenant agrees to reimburse Landlord on demand for any losses incurred by Landlord as a result of Tenant's failure. Tenant further agrees that Landlord shall not be liable for any damages resulting to Tenant from effecting compliance with Tenant's obligations under this subsection, unless caused by the gross negligence or intentional misconduct of Landlord.

(d)     Landlord may pursue any remedy provided at law or in equity.

LEASE AGREEMENT – Page 21
348426.2



(e)     Landlord shall use a good faith effort to mitigate its damages and Landlord's duty to mitigate shall be limited to using good faith efforts to relet the Leased Premises; provided, however, that in no event shall Landlord be required to: (i) give priority to the Leased Premises over other premises owned or managed by Landlord or any of its affiliates, (ii) agree to any lease terms that it deems to be unacceptable, (iii) relet the Leased Premises for less than the prevailing market rate, (iv) relet to a tenant or for a use, which is not in keeping Landlord's desired character of the Shopping Center or Landlord's desired tenant mix for the Shopping Center, (v) expend any monies for finish-out requested by a prospective tenant unless Landlord, in its sole and absolute discretion approves both the lease terms and the creditworthiness of such prospective tenant, or (vi) accept a prospective tenant for the Leased Premises or any portion thereof which is an existing or prospective tenant elsewhere in the Shopping Center.

(f)     No re-entry or reletting of the Leased Premises or any filing or service of an unlawful detainer action or similar action shall be construed as an election by Landlord to terminate this Lease unless a written notice of such intention is given by Landlord to Tenant.  Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease and Tenant's right to possession hereunder.

(g)     Tenant agrees that the provisions of this Lease will override and control any conflicting provisions of Sections 93.002 and 93.003 of the Texas Property Code, as well as any successor statute.

## 25.     WAIVER OF DEFAULT OR REMEDY

Failure of Landlord to declare a default immediately upon its occurrence, or delay in taking any action in connection with an Event of Default, shall not be a waiver of the default.  Landlord shall have the right to declare the default at any time and take such action as is lawful or authorized under this Lease.  Pursuit of any one or more of the remedies set forth in Section 24 above shall not preclude pursuit of any one or more of the other remedies provided therein or elsewhere in this Lease or as provided by law, nor shall pursuit of any remedy be a forfeiture or waiver of any Rent or damages accruing to Landlord by reason of the violation of any of the terms of this Lease.  Failure by Landlord to enforce one or more of its remedies upon an Event of Default shall not be construed as a waiver of the default or of any other violation or breach of any of the terms contained in this Lease.

## 26.     CHOICE OF LAW; VENUE; ATTORNEYS' FEES

It is specifically stipulated that this Lease shall be interpreted and construed according to the laws of the State of Texas, and any suit brought on this Lease shall be maintained in Tarrant County.  In the event either party files a lawsuit in connection with this Lease or any provisions contained herein, then the party that prevails in such action shall be entitled to recover from the non-prevailing party, in addition to all other remedies or damages as limited herein, reasonable attorneys' fees and costs of court incurred in such lawsuit.  The provisions of this Section 26 shall survive the expiration or termination of this Lease.

## 27.     HOLDING OVER

(a)     Tenant will, at the termination of this Lease by lapse of time or otherwise, surrender immediate possession to Landlord.  If Landlord agrees in writing that Tenant may hold over after the expiration or termination of this Lease and if the parties do not otherwise agree, the hold over tenancy shall be subject to termination by Landlord at any time upon not less than one (1) day advance written notice, or by Tenant at any time upon not less than thirty (30) days advance written notice.  Further, all of the terms

LEASE AGREEMENT – Page 22
348426.2


INITIAL
TENANT
LANDLORD

and provisions of this Lease shall be applicable during the hold over period, except that Tenant shall pay Landlord, as Base Rent for the period of any hold over, an amount equal to one and one-half times (1 ½) the Base Rent in effect on the date of termination, computed on a daily basis for each day of the hold over period, plus all Additional Rent and other sums due hereunder. If Tenant shall fail immediately to surrender possession of the Leased Premises to Landlord upon termination of this Lease, by lapse of time or otherwise, and Landlord has not agreed to such continued possession, as above provided, then, until Landlord can dispossess Tenant under the terms hereof or otherwise, Tenant shall pay Landlord from time to time upon demand, as Base Rent for the period of any such hold over, an amount equal to two and one-half times (2 ½) the Base Rent in effect on the date of termination, computed on a daily basis for each day of the hold over period, plus all Additional Rent and other sums due hereunder. No holding over by Tenant, whether with or without consent of Landlord, shall operate to extend this Lease except as otherwise expressly agreed by the parties. The preceding provisions of this section shall not be construed as Landlord's consent for Tenant to hold over.

(b)     Notwithstanding any provision to the contrary herein, in the event that Tenant fails to deliver to Landlord (and surrender possession of) all of the Leased Premises upon the expiration or earlier termination of this Lease on the date of expiration or earlier termination, then Landlord may, without judicial process and without notice of any kind, immediately enter upon and take absolute possession of the Leased Premises or applicable portion thereof, expel or remove Tenant and any other person or entity who may be occupying the Leased Premises or applicable portion thereof, change the locks on the Leased Premises or an applicable portion thereof (in which event, Tenant shall have no right to any key for the new locks), and take any other actions as are necessary for Landlord to take absolute possession of the Leased Premises or applicable portion thereof, including removing Tenant's property, subject to Section 21 hereof.

## 28.     RIGHTS OF LENDER

Tenant accepts this Lease subject and subordinate to any recorded mortgage presently existing or hereafter to exist with respect to the Leased Premises. Further, but without limiting the preceding sentence, Landlord is hereby irrevocably vested with full power and authority to subordinate and/or to evidence such subordination of Tenant's interest under this Lease to any mortgage hereafter placed on the Leased Premises, and Tenant agrees upon demand to execute such additional instruments subordinating this Lease, and further defining the terms of such subordination, as well as the attornment discussed below, as Landlord or the holder of any such mortgage, may require. Tenant agrees to provide to the holder of any such mortgage, whose name and address have been provided to Tenant (a lender), a copy of each notice to Landlord which alleges any act, omission, or condition that might constitute a default by Landlord hereunder and mortgagee, in its sole discretion, shall have all rights of Landlord hereunder to cure any such default. If the interests of Landlord under this Lease shall be transferred to any Purchaser by reason of foreclosure or other proceedings for enforcement of any mortgage on the Leased Premises, at the election of the Purchaser Tenant shall be bound to the Purchaser under the terms and conditions of this Lease for the balance of the remaining Lease Term, including any extensions or renewals, with the same force and effect as if the Purchaser were Landlord under this Lease; provided, however, that such Purchaser shall not be liable or bound to Tenant (i) for any act or omission of any prior landlord, (ii) for any offsets or defenses that Tenant might have against any prior landlord, (iii) for or by any Rent that Tenant might have paid for more than the current month, (iv) by any amendment or modification of, or consensual termination agreement with respect to, the Lease made without the mortgagee's consent, (v) for any Security Deposit given by Tenant to a prior landlord unless such deposit is actually received by such Purchaser, (vi) for any repairs or replacements required by this Lease arising prior to the date Purchaser takes possession of the Leased Premises, or (vii) for any moving, relocation or refurbishment allowance or any construction of or payment or allowance for tenant improvements to the Leased Premises or any part thereof for the benefit of Tenant except as set forth in this Lease. Tenant further agrees at the election of the Purchaser to attorn to

LEASE AGREEMENT – Page 23
348426.2


INITIAL
TENANT
LANDLORD

DocuSign Envelope ID: BE20E86C6-950B-4C67-B4C2-168B13F54C4B
DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

the Purchaser, including the mortgagee if it be the Purchaser, as its Landlord. Such attornment shall be effective without the execution of any further instruments upon the Purchaser's succeeding to the interest of Landlord under this Lease. The respective rights and obligations of Tenant and the Purchaser upon the attornment, to the extent of the then remaining balance of the Term of this Lease and any extensions and renewals, shall be and are the same as those set forth in this Lease, but Tenant agrees upon demand to execute such additional instruments defining the terms of such attornment as Landlord or the Purchaser may require. Each such mortgagee and each such Purchaser shall be a third-party beneficiary of the provisions of this Section.

### 29.   ESTOPPEL CERTIFICATES

(a)     Tenant agrees to furnish from time to time within ten (10) days of request by Landlord or its lender a statement certifying that Tenant is in possession of the Leased Premises; the Leased Premises are acceptable; this Lease is in full force and effect; this Lease is unmodified, or, if modified, referencing all modifications; Tenant claims no present charge, lien, or claim of offset against Rent, or, if Tenant does have such claim, the details of such claim; the Rent is paid for the current month but is not paid and will not be paid for more than one month in advance (except estimated Additional Rent under Section 5); there is no existing default under this Lease, or, if there is an Event of Default, the details of such default; and such other matters as may be reasonably required by Landlord or Landlord's lender.

(b)     If Tenant fails to provide such certificate within ten (10) days after a request by Landlord, Tenant shall be deemed to have approved the contents of any such certificate submitted to Tenant by Landlord and Landlord is hereby authorized to so certify.

### 30.   SUCCESSORS

This Lease shall be binding upon and inure to the benefit of Landlord and Tenant and their respective heirs, personal representatives, successors and assigns.

### 31.   REAL ESTATE COMMISSION

Tenant and Landlord represent and warrant to the other that it has not dealt with any broker, agent, or other person in connection with this transaction OTHER THAN STREETWISE RETAIL ADVISORS, LLC AND EDGE REALTY PARTNERS (COLLECTIVELY, THE "**BROKERS**") WHICH SHALL BE PAID A COMMISSION PURSUANT TO SEPARATE WRITTEN AGREEMENTS WITH LANDLORD, and that no broker, agent, or other person brought about this transaction, other than the Brokers. If any broker or other intermediary, other than the Brokers, claims to have dealt with either party in connection with this Lease or to have been the inducing cause of this transaction, the party under whom such broker or intermediary is claiming shall indemnify, defend, and save the other party harmless of and from any claim for commission or compensation by such broker or intermediary.

### 32.   DEFAULT BY LANDLORD

Landlord shall be in default of this Lease if it fails to perform any provision of this Lease that it is obligated to perform, and if the failure to perform is not cured within fifteen (15) days after written notice of the default has been given to Landlord by Tenant. If the default cannot reasonably be cured within fifteen (15) days, Landlord shall not be in default of this Lease if Landlord commences to cure the default within such fifteen-day period and diligently and in good faith continues to cure the default until completion, provided the same is capable of being cured by Landlord. If Landlord shall have failed to cure a default under this



Section 32 after expiration of the applicable time for cure of a particular default, Tenant, at its election, but without obligation therefor may as its sole and exclusive remedy seek specific performance of any obligation of Landlord.

## 33.    TENANT'S LIENS

Tenant shall have no authority, express or implied, to create or place or allow to be imposed any lien or encumbrance of any kind or nature whatsoever upon, or in any manner to bind, the interest of Landlord in the Leased Premises or the Shopping Center or to charge the Rent payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs. Each such claim shall affect, and each such lien shall attach to, if at all, only the leasehold interest granted to Tenant by this Lease. Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Leased Premises on which any mechanic's or other lien is or can be validly and legally asserted against its leasehold interest in the Leased Premises or the improvements thereon. Tenant further agrees to save and hold Landlord harmless from any and all loss, cost, or expense based on or arising out of claims or liens asserted by parties by virtue of their dealings with Tenant and encumbering the leasehold estate or the right, title and interest of the Landlord in the Leased Premises or the Shopping Center. Under no circumstances shall Tenant be or hold itself out to be the agent or representative of Landlord with respect to any Alterations of the Leased Premises whether or not consented to or approved by Landlord hereunder. Tenant waives any right to claim any nature of lien or to withhold, abate or deduct from or offset against Rent under Texas Property Code § 91.004 (b) or otherwise.

## 34.    ENTRY BY LANDLORD

Landlord reserves and shall at any and all times have, the right to enter the Leased Premises to inspect the same, to submit said Leased Premises to prospective purchasers or tenants, to post notices of non-responsibility, to repair the Leased Premises and any portion of the Building of which the Leased Premises are a part that Landlord may deem necessary or desirable, without abatement of Rent, and may for that purpose erect scaffolding and other necessary structures where reasonably required by the character of the work to be performed, always providing that the entrance to the Leased Premises shall not be unreasonably blocked thereby, and further providing that the business of Tenant shall not be interfered with unreasonably. Tenant hereby waives any claim for damages or for any injury or inconvenience to or interference with Tenant's business, any loss of occupancy or quiet enjoyment of the Leased Premises, and any other loss occasioned thereby. For each of the aforesaid purposes, Landlord shall at all times have and retain a key with which to unlock all of the doors in, upon and about the Leased Premises, excluding Tenant's vaults, safes, and files, and Landlord shall have the right to use any and all means that Landlord may deem proper to open said doors in an emergency, in order to obtain entry to the Leased Premises without liability to Tenant except for any failure to exercise due care for Tenant's property and any entry to the Leased Premises obtained by Landlord by any of said means, or otherwise, shall not under any circumstance by construed or deemed to be forcible or unlawful entry into, or a detainer of, the Leased Premises, or an eviction of Tenant from the Leased Premises or any portion thereof.

## 35.    ENTIRE AGREEMENT AND LIMITATION OF WARRANTIES

It is expressly agreed by Tenant, as a material consideration for the execution of this Lease, that this Lease is the entire agreement of the parties and that there are and were no verbal representations, warranties, understandings, stipulations, agreements, or promises pertaining to this Lease not incorporated in this Lease. It is likewise agreed that this Lease may not be altered, waived, amended, or extended except by an


INITIAL
TENANT
LANDLORD

instrument in writing signed by both Landlord and Tenant. Not in limitation upon the foregoing, Landlord agrees that to the extent assignable, all warranties, if any shall exist, from contractors or suppliers with respect to the improvements to the Leased Premises hereunder are hereby partially assigned to Tenant to the extent necessary to avail Tenant of the benefits thereof with respect to its leasehold estate and property located at the Leased Premises.

## 36.  FORCE MAJEURE

(a)  Landlord shall not be required to perform any covenant or obligation of this Lease or be liable in damages to Tenant for that time period during which the performance or non-performance of the covenant or obligation is delayed, caused by, or prevented by Tenant or Tenant's Representatives or by an act of God or Force Majeure.

(b)  Except with respect to the payment of Rent or any other sum due hereunder, Tenant shall not be required to perform any covenant or obligation of this Lease or be liable in damages to Landlord for that time period during which the performance or non-performance of the covenant or obligation is delayed, caused by, or prevented by Landlord or Landlord's Representatives or by an act of God or Force Majeure.

(c)  The term "**Force Majeure**" is defined for purposes of this Lease as strikes, lockouts, sit-downs, material or labor restrictions by any governmental authority, riots, floods, washouts, explosions, earthquakes, fire, storms, acts of God, acts of the public enemy, wars, insurrections, terrorism and any other similar cause not reasonably within the control of either party and which by the exercise of due diligence Landlord is unable, wholly or in part, to prevent or overcome.

## 37.  MISCELLANEOUS

(a)  Words of any gender used in this Lease shall be held and construed to include any other gender; and words in the singular number shall be held to include the plural, unless the context otherwise requires.

(b)  The captions inserted in this Lease are for convenience only and in no way define, limit, or otherwise describe the scope or intent of this Lease or any provision hereof, or in any way affect the interpretation of this Lease.

(c)  If any clause or provision of this Lease is illegal, invalid, or unenforceable under present or future laws effective during the Term of this Lease, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby; and it is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid, or unenforceable there be added as a part of this Lease a clause as similar in terms to such illegal, invalid, or unenforceable clause or provision as may be possible and be legal, valid, and enforceable.

(d)  Landlord does not in any way or for any purpose become a partner with Tenant in the conduct of its business or otherwise, nor a member of a joint venture with Tenant.

(e)  Tenant shall not record this Lease without the prior written consent of Landlord. However, upon the request of Landlord, Tenant shall join in the execution of a memorandum or so-called "short form" of this Lease for the purposes of recordation.



(f)      Time is of the essence in the performance of all the covenants, conditions, and agreements contained in this Lease.

(g)      Any duty, obligation, or debt and any right or remedy arising hereunder and not otherwise consummated and/or extinguished by the express terms hereof at or as of the time of termination of this Lease, whether at the end of the Term hereof or otherwise, shall survive such termination as continuing duties, obligations, and debts of the obligated party to the other or continuing rights and remedies of the benefited party against the other.

(h)      This Lease may be executed in one or more counterparts, each of which counterpart shall for all purposes be deemed to be an original; but all such counterparts together shall constitute but one instrument.

(i)      All Exhibits, Addenda and Schedules, if any, attached hereto, are hereby incorporated in this Lease by reference.

(j)      Landlord and Tenant hereby each acknowledge and agree that they are knowledgeable and experienced in commercial transactions and further hereby acknowledge and agree that the provisions of this Lease for determining Operating Expenses, charges, amounts and Additional Rent payable by Tenant are commercially reasonable and valid even though such methods may not state precise mathematical formulae for determining such charges.  ACCORDINGLY, TENANT HEREBY VOLUNTARILY AND KNOWINGLY WAIVES ALL RIGHTS AND BENEFITS TO WHICH TENANT MAY BE ENTITLED UNDER SECTION 93.012 OF THE TEXAS PROPERTY CODE, AS SUCH SECTION NOW EXISTS OR AS SAME MAY BE HEREAFTER AMENDED OR SUCCEEDED.

(k)      Tenant agrees that it will not protest or appeal any appraisal or re-appraisal of the Leased Premises or all or any portion of the Shopping Center before any governmental authority and Tenant hereby waives any right to receive notices of re-appraisal, which waiver includes, without limitation, any rights which may otherwise exist under Sections 41.413 and 42.015 of the Texas Tax Code as the same may be modified or amended from time to time.

## 38.  NOTICE

(a)      All Rent and other payments required to be made by Tenant to Landlord shall be payable to Landlord at the address of Landlord set forth in Section 1 above or such other address that Landlord may specify from time to time by written notice delivered to Tenant.

(b)      All payments, if any, required to be made by Landlord to Tenant shall be payable to Tenant at the address set forth in Section 1, above or at any other address that Tenant may specify from time to time by written notice delivered to Landlord.

(c)      Any notice or document required or permitted to be delivered by this Lease shall be deemed to be delivered (whether or not actually received) if addressed to the parties at the respective addresses set forth in Section 1 and when (i) deposited in the United States Mail, postage prepaid, certified mail return receipt requested, (ii) deposited with any nationally known overnight express carrier or (iii) received at the specified facsimile receiving station of either party provided such facsimile delivery is subsequently also made by one of the methods described in subsections 38(c)(i) or (ii).



**39.     LIMITATION ON DAMAGES**

Tenant agrees that any liability of Landlord under this Lease shall be limited solely to Landlord's interest in the Shopping Center, and no other assets of Landlord shall be subject to levy or execution.

**40.     RELOCATION RIGHT**  Intentionally Omitted.

**41.     DISPLAYS**

Tenant may not display or sell merchandise or allow grocery carts or other similar devises within the control of Tenant to be stored or to remain outside the defined exterior walls or permanent doorways of the Leased Premises. Tenant further agrees not to install any exterior lighting, amplifiers or similar devices or use in or about the Leased Premises any advertising medium which may be heard to seen outside the Leased Premises, such as flashing lights, searchlights, loudspeakers, phonographs or radio broadcasts.

**42.     AUCTIONS**

Tenant shall not conduct or permit to be conducted any sale by auction in, upon or from the Leased Premises whether said auction be voluntary, involuntary, pursuant to any assignment for the payment of creditors or pursuant to any bankruptcy or other insolvency proceeding.

**43.     FINANCIAL STATEMENTS**

Tenant hereby agrees to provide to Landlord financial statements certified by Tenant as true and correct when requested, which will include the current financial status and the most recent year-end financial status of Tenant's operations, and financial statements certified by Guarantor(s) as true and correct when requested, which will include the current financial status and the most recent year-end financial status of Guarantor(s).

**44.     HOURS OF BUSINESS**

Subject to the terms of this Lease, Tenant shall continuously, during the entire term hereof, conduct and carry on Tenant's business in the Leased Premises and shall keep the Leased Premises open for business and cause Tenant's business to be conducted therein during the usual business hours of each and every business day as is customary for business of like character in the city in which the Leased Premises are located to be open for business; provided, however, that this provision shall not apply if the Leased Premises should be closed and the business of Tenant temporarily discontinued therein on account of strikes, lockouts or similar causes beyond the reasonable control of Tenant. Tenant shall keep the Leased Premises adequately stocked with merchandise, and with sufficient sales personnel to care for the patronage, and to conduct said business in accordance with sound business practice.

**45.     CONFIDENTIALITY**

Tenant acknowledges that the terms and conditions of this Lease are to remain confidential for Landlord's benefit, and may not be disclosed by Tenant to anyone, by any manner or means, directly or indirectly, without Landlord's prior written consent.  The consent by Landlord to any disclosures shall not be deemed to be a waiver on the part of Landlord of any prohibition against any future disclosure.

LEASE AGREEMENT – Page 28
348426.2



INITIAL

TENANT
LANDLORD

DocuSign Envelope ID: BE20E58C6-950B-4C57-B1C2-168B13F54C48    Case 21-33989   Document 128-2   Filed in TXSB on 03/18/22   Page 38 of 69

DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

EXECUTED by Landlord and Tenant as of the day and year set forth below.

LANDLORD:

VAQUERO KIRBY PARTNERS, LP

By:   Vaquero Ventures Management, LLC,
     Its General Partner

     By:     _____
           W.A. Landreth, III, Manager

Date:   _____
          6/14/17


TENANT:

MARSHLAND FOODS, LLC

By:   _____
     *Rick ElMogazi*
     —93EEA80627134CA...
Name: Rick ElMogazi

Title: Managing Partner

Date: 6/7/2017


INITIAL
___ TENANT
___ LANDLORD

DocuSign Envelope ID: BE20E8C6-950B-4C57-B1C2-168B13F54C42    Case 21-33989  Document 128-2   Filed in TXSB on 03/18/22   Page 39 of 69

DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

## SCHEDULE 1

### DEFINITIONS

"**Adjacent Land**" shall mean the land located adjacent to the Land and containing approximately 27,603 square feet of area, as shown in the attached Exhibit B-1.

"**Alterations**" shall mean the making or performance of any initial or subsequent Tenant finish work or any alterations, installations, decorations, improvements, additions, or other physical changes in or about the Leased Premises that are structural in nature or that exceed $10,000 in costs.

"**Base Rent**" shall mean the annualized amounts computed for the applicable period using the Monthly Base Rent shown in Section 1, multiplied by twelve (12), and payable as provided in Section 4(a).

"**Building**" shall have the meaning given in Section 1.

"**Common Area(s)**" shall mean the facilities and areas of the Building and Land that are intended and designated by Landlord from time to time for the common, general and non-exclusive use of all tenants and/or their invitees of the Building.

"**Entire Development**" shall mean the Land and Adjacent Land containing a total of approximately 69,359 square feet of area.

"**Land**" shall mean the land upon which the Building is located containing approximately 41,756 square feet of area, as shown in the attached Exhibit B.

"**Landlord**" shall have the meaning given in Section 1.

"**Lease**" shall mean this Standard Shopping Center Lease Agreement.

"**Leased Premises**" shall have the meaning given in Section 1.

"**Purchaser**" shall mean any third party to whom the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any mortgage on the Leased Premises.

"**Rent**" shall mean all of the following: Base Rent; any Additional Rent and any other Lease costs; and any other sums that are or may become due from Tenant to Landlord pursuant to this Lease, including, without limitation, any amount that Landlord may spend or become obligated to spend by reason of any Event of Default by Tenant or to compensate Landlord for any damage, liability or expense caused to Landlord by such Event of Default or breach.

"**Security Deposit**" shall mean the deposit held by Landlord in the amount as set forth in Section 1.

"**Shopping Center**" shall mean the Land and the Building, landscaping, parking and driveway areas, sidewalks and other improvements thereon

"**Tenant**" shall have the meaning given in Section 1.

DocuSign Envelope ID: BE20E58C6-950B-4C57-B4C2-168B13F54C48

DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

"**Tenant's Proportionate Share of the Shopping Center**" shall mean the percentage set forth in Section 1, determined by dividing the Rentable Square Feet of the Leased Premises by the Rentable Square Feet of the Shopping Center.  The Tenant's Proportionate Share of the Shopping Center shall be adjusted if the size of the Leased Premises is modified.

"**Tenant's Proportionate Share of the Entire Development**" shall mean the percentage set forth in Section 1, determined on the basis of the ratio that the Rentable Square Feet of the Leased Premises bears to the overall square footage of the Entire Development.  The Tenant's Proportionate Share of the Entire Development shall be adjusted if the size of the Leased Premises is modified.

"**Termination Date**" shall mean the date set forth in Section 1 unless this Lease shall be earlier terminated as provided for in this Lease.

DocuSign Envelope ID: BE20E8C6-950B-4C57-B1C2-168B13E54C48  Case 21-33989  Document 128-2  Filed in TXSB on 03/18/22  Page 41 of 69

DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

## EXHIBIT A

## LEASED PREMISES



BROADWAY STREET

DocuSign Envelope ID: BE20E8C6-950B-4C57-B4C2-168B13F54C4B

DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

## EXHIBIT B

### LEGAL DESCRIPTION OF LAND

A TRACT OR PARCEL CONTAINING 0.9586 ACRES OR 41,756 SQUARE FEET OF LAND SITUATED IN THE JOHN W. MAXCY SURVEY, ABSTRACT NO. 675, BRAZORIA COUNTY, TEXAS, BEING OUT OF RESTRICTED LOT "B" OF SHADOW CREEK RANCH COMMERCIAL SITE NO. 3, MAP OR PLAT THEREOF RECORDED UNDER PLAT NO. 2006023374 OF THE BRAZORIA COUNTY PLAT RECORDS (B.C.P.R.), CONVEYED TO A GOLDENFASE DEVELOPER, LLC, AS RECORDED UNDER BRAZORIA COUNTY CLERK'S FILE (B.C.C.F.) NO. 2011008361, WITH SAID 0.9586 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS, WITH ALL BEARINGS BASED ON THE TEXAS STATE PLANE COORDINATE SYSTEM, SOUTH CENTRAL ZONE (NAD 83):

BEGINNING AT A CAPPED 5/8 INCH IRON ROD (UNABLE TO READ) FOUND ON THE NORTH RIGHT-OF-WAY (R.O.W.) LINE OF BROADWAY STREET (WIDTH VARIES) MARKING THE SOUTHEAST CORNER OF RESTRICTED LOT "A" OF SAID SHADOW CREEK RANCH COMMERCIAL SITE NO. 3, AND THE SOUTHWEST CORNER OF SAID RESTRICTED LOT "B";

THENCE, NORTH 03 DEG. 14 MIN. 26 SEC. WEST, ALONG THE COMMON LINE OF SAID LOT "A" AND LOT "B", A DISTANCE OF 286.89 FEET TO A CAPPED 5/8 INCH IRON ROD (UNABLE TO READ) FOUND ON THE SOUTHWESTERLY LINE OF A CALLED 1.616 ACRE TRACT OF LAND, CONVEYED TO SHADOW CREEK RANCH DEVELOPMENT COMPANY LIMITED PARTNERSHIP, AS RECORDED UNDER B.C.C.F. NO. 2015038714, MARKING THE NORTHEAST CORNER OF SAID LOT "A" AND THE NORTHWEST CORNER OF SAID LOT "B";

THENCE, SOUTH 62 DEG. 33 MIN. 09 SEC. EAST, ALONG THE COMMON LINE OF SAID LOT "B" AND SAID CALLED 1.616 ACRE TRACT, A DISTANCE OF 207.92 FEET TO THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE, SOUTH 03 DEG. 02 MIN. 41 SEC. EAST, THROUGH AND ACROSS SAID LOT "B", A DISTANCE OF 180.80 FEET TO THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT, BEING OF THE NORTH R.O.W. LINE OF SAID BROADWAY STREET;

THENCE, SOUTH 86 DEG. 46 MIN. 06 SEC. WEST, ALONG THE NORTH R.O.W. LINE OF SAID BROADWAY STREET, A DISTANCE OF 178.19 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.9586 ACRES OR 41,756 SQUARE FEET OF LAND.

## EXHIBIT B-1

### LEGAL DESCRIPTION OF ADJACENT LAND

A TRACT OR PARCEL CONTAINING 0.6337 ACRES OR 27,603 SQUARE FEET OF LAND SITUATED IN THE JOHN W. MAXCY SURVEY, ABSTRACT NO. 675, BRAZORIA COUNTY, TEXAS, BEING OUT OF RESTRICTED LOT "B" OF SHADOW CREEK RANCH COMMERCIAL SITE NO. 3, MAP OR PLAT THEREOF RECORDED UNDER PLAT NO. 2006023374 OF THE BRAZORIA COUNTY PLAT RECORDS (B.C.P.R.), CONVEYED TO A GOLDENFASE DEVELOPER, LLC, AS RECORDED UNDER BRAZORIA COUNTY CLERK'S FILE (B.C.C.F.) NO. 2011008361, WITH SAID 0.6337 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS, WITH ALL BEARINGS BASED ON THE TEXAS STATE PLANE COORDINATE SYSTEM, SOUTH CENTRAL ZONE (NAD 83):

COMMENCING AT A CAPPED 5/8 INCH IRON ROD (UNABLE TO READ) FOUND ON THE NORTH RIGHT-OF-WAY (R.O.W.) LINE OF BROADWAY STREET (WIDTH VARIES) MARKING THE SOUTHEAST CORNER OF RESTRICTED LOT "A" OF SAID SHADOW CREEK RANCH COMMERCIAL SITE NO. 3, AND THE SOUTHWEST CORNER OF SAID RESTRICTED LOT "B";

THENCE, NORTH 86 DEG. 46 MIN. 06 SEC. EAST, ALONG THE NORTH R.O.W. LINE OF SAID BROADWAY STREET, A DISTANCE OF 178.19 FEET TO A CUT "X" IN CONCRETE SET MARKING THE SOUTHWEST CORNER AND POINT OF BEGINNING OF THE HEREIN DESCRIBED TRACT;

THENCE, NORTH 03 DEG. 02 MIN. 41 SEC. WEST, THROUGH AND ACROSS SAID RESTRICTED LOT "B', A DISTANCE OF 180.80 FEET TO THE NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT, BEING ON THE SOUTHWESTERLY LINE OF A CALLED 1.616 ACRE TRACT OF LAND, CONVEYED TO SHADOW CREEK RANCH DEVELOPMENT COMPANY LIMITED PARTNERSHIP, AS RECORDED UNDER B.C.C.F. NO. 2015038714;

THENCE, SOUTH 62 DEG. 33 MIN. 09 SEC. EAST, ALONG THE COMMON LINE OF SAID LOT "6" AND SAID CALLED 1.616 ACRE TRACT, A DISTANCE OF 354.35 FEET TO A CAPPED 5/8 INCH IRON ROD STAMPED "EIC" FOUND MARKING THE INTERSECTION OF THE NORTH R.O.W.. LINE OF SAID BROADWAY STREET AND THE SOUTHWESTERLY LINE OF SAID CALLED 1.616 ACRE TRACT;

THENCE, SOUTH 86 DEG. 46 MIN. 06 SEC. WEST, ALONG THE NORTH R.O.W. LINE OF SAID BROADWAY STREET, A DISTANCE OF 305.34 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.6337 ACRES OR 27,603 SQUARE FEET OF LAND.

## EXHIBIT C

## PROHIBITED USES

Notwithstanding anything to the contrary contained herein, the Leased Premises in no event shall be used for any of the following uses:

1. Uses that causes or create a nuisance;
2. Uses that are obnoxious;
3. Uses that generally distract from the general first-class nature of the surrounding area including, but not limited to, the following:
   a. Funeral establishment;
   b. Used car lot;
   c. Auction or bankruptcy sale;
   d. Pawn shop;
   e. Outdoor circus;
   f. Carnival or amusement park, or other recreation or entertainment facility;
   g. Outdoor meetings;
   h. Bowling alleys or complex;
   i. Shooting gallery;
   j. Off-track betting;
   k. Any bookstore, theater, amusement facility or facility selling or displaying books, magazines, literature, or videotapes containing printed or pictorial work that appeals to a prurient interest in sex, is patently offensive according to contemporary community standards, and has no serious literary, artistic, political or scientific value, and any printed or pictorial work rated X, XX, and XXX;
   l. Any multi-family rental housing;
   m. Theater or movie theater;
   n. Auditorium, meeting hall, ballroom, school, or other place of public assembly;
   o. Unemployment agency, service, or commission;
   p. Dance hall;
   q. Disco, after-hours club or night club;
   r. Bingo or similar games of chance;
   s. Video game or amusement arcade;
   t. Skating or roller rink;
   u. Second-hand store, auction house, or flea market;
   v. Retail auto sales;
   w. Outdoor amusement facility;
   x. Golf driving range, miniature golf course, go-cart course, batting cage or similar facility;
   y. Wholesale and/or distribution operation;
   z. Dry cleaning plant over 3,000 SF;
   aa. Sporting event or other sports facility;
   bb. Massage parlor
4. The storage or accumulation of lumber, metal, bulk materials, refuse, or trash;
5. The burning of trash;
6. The storage of any trailer, trailer-house, recreational vehicle, camper, mobile home, boat, semitruck tractor or trailer, or other truck with a licensed capacity in excess of one ton;
7. The use of chemicals, fertilizers, pesticides, or herbicides on the Property;
8. Any uses other than commercial;

DocuSign Envelope ID: BE20E58C6-950B-4C57-B1C2-168B13F54C42

DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

9.  A business offering automotive maintenance or repair services, or for the sales of automotive parts or supplies;

10. Any use prohibited by Applicable Laws.

## <u>EXHIBIT D</u>

### RULES AND REGULATIONS

1.    Tenant shall not suffer or permit the obstruction of any Common Areas, including driveways, walkways, stairways, lobbies, landings, restrooms and parking areas.

2.    Landlord reserves the right to refuse access to the Shopping Center to any person or persons that Landlord, in good faith, judges to be a threat to the safety, reputation or property of the Shopping Center and its occupants.

3.    Tenant shall not make or permit any noise or odors that annoy or interfere with other tenants or persons having business within the Shopping Center.

4.    Tenant shall not lay linoleum, tile, carpet or other floor covering in the Leased Premises so that the same shall be affixed to the floor of the Leased Premises in any manner or method except that first approved by Landlord. The expense of repairing any damage resulting from a violation of this rule shall be borne by any Tenant by whom, or by whose contractors, employees, or invitees, the damage shall have been caused. No painting shall be done, nor shall any alterations be done on any part of the Shopping Center or Leased Premises by butting up or changing any partition or partitions, door or doors, window or windows, nor shall there be any defacing of the walls, partitions or other surfaces without the written consent of Landlord being first obtained. Tenant shall not permit any contractor or other persons making any alterations, additions or installations within the Leased Premises to use the hallways, lobby, or corridors as storage or work areas without the prior written consent of Landlord. Tenant shall be liable for and shall pay the expense of any additional cleaning or other maintenance required to be performed by Landlord as a result of the transportation or storage of materials or work performed within the Shopping Center by or for Tenant.

5.    Tenant shall not keep animals, pets or birds within the Shopping Center and shall not bring bicycles, motorcycles or other vehicles into areas not specifically designated as authorized for same.

6.    Tenant shall not make, suffer or permit trash or litter except in appropriate receptacles for that purpose.

7.    Tenant shall not alter any lock or install new or additional locks or bolts in Tenant's Leased Premises or in the Shopping Center without first obtaining Landlord's approval.

8.    Tenant shall be responsible for the inappropriate use of any toilets, restrooms, plumbing or other utilities. No foreign substances of any kind are to be inserted therein.

9.    Tenant shall not suffer or permit anything in or around the Leased Premises or Shopping Center that causes excessive noise, vibration or floor loading in any part of the Shopping Center. Landlord reserves the right to prohibit or impose conditions upon the installation in any Leased Premises of furniture, equipment, safe or any heavy objects which might overload the Leased Premises' floor. Tenant shall be responsible for any damage to the Leased Premises and the Shopping Center arising from any such activity.

10.     Tenant shall not employ any service or contractor for services or work to be performed in the Shopping Center, except as approved by Landlord. No Tenant shall engage in the business of paying any persons in the Leased Premises or the Shopping Center except those persons actually and directly employed by or working for Tenant nor shall any Tenant advertise for laborers or servants, giving an address of the Leased Premises.

11.     Tenant shall return all keys at the termination of its tenancy and shall be responsible for the cost of replacing any keys that are lost.

12.     No Tenant, employee, guest or invitee of Tenant shall go upon the roof of the Shopping Center.

13.     No boring, cutting, stringing or installation of wires, telephones, telegraph or other electric apparatus and no exterior placement of telephone boxes, call boxes and similar equipment shall be permitted except as may be set forth in any of Tenant's plans approved by Landlord or with the prior written consent of Landlord, and shall be accomplished only as Landlord may direct.

14.     Tenant shall not suffer or permit smoking or carrying of lighted cigars or cigarettes in areas designated by applicable governmental agencies as non-smoking areas, if such designation is made.

15.     The Leased Premises shall not be used for lodging or manufacturing, or for any illegal, immoral or objectionable purpose.

16.     Tenant shall comply with all safety, fire protection and evacuation regulations reasonably established by Landlord or any applicable governmental agency.

17.     Tenant assumes all risks from theft or vandalism and agrees to keep its Leased Premises locked as may be required.

18.     No flammable, combustible, explosive, caustic or poisonous fluids, chemicals or other substances shall be discarded in trash receptacles or enclosures or dumped in the sewer or drain systems.

19.     Canvassing, soliciting, or peddling products or services to Tenants, Landlord expressly prohibits their employees or visitors and each Tenant shall cooperate with Landlord to prevent such practices.

20.     Parking areas shall be used only for parking by motor vehicles and such parking shall be in conformity with the markings of those areas. Such parking use as a herein provided is intended merely as a license only and no bailment is intended or shall be created hereby. Tenant shall not permit or allow any motor vehicles that belong to or are controlled by Tenant or Tenant's employees, suppliers, shippers, customers or invitees to be loaded, unloaded, or parked in areas that interfere with pedestrian and motor vehicle ingress and egress to and from the Shopping Center and the parking areas. The maintenance, washing, lubrication, oil change, repair, waxing or cleaning of vehicles in the parking area is prohibited. Landlord will not be responsible for any damage to vehicles, injury to persons or loss of property, all of which risks are assumed by the party using the parking area.  Landlord reserves the right to change the entrances, exits, traffic lanes, boundaries, striping, and locations of any and all parking areas servicing the Shopping Center.

DocuSign Envelope ID: BE20E58C6-950B-4CE7-B1C2-168B13F54C48
DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

Landlord reserves the right to waive any one of these Rules or Regulations, and/or as to any particular Tenant, and any such waiver shall not constitute a waiver of any other Rule or Regulation or any subsequent application thereof to such Tenant.

## EXHIBIT E

## CONSTRUCTION RIDER

Section 1.1      The Leased Premises will be tendered to Tenant by Landlord in accordance with the requirements applicable to Landlord set forth in Section 1.6 below.  As soon as completed and available, Landlord will deliver to Tenant one set of CAD files of Landlord's construction drawings for the shell Building, including cover sheet, architectural, site plan, structural, mechanical, plumbing and electrical components.

Section 1.2.     As soon as reasonably practicable, Landlord shall commence performance of the work of Landlord referred to in Section 1.1 of this Exhibit and otherwise necessary to complete the Building and Common Areas as depicted on the Exhibit A attached to this Lease including, without limitation, all site work, lighting, paving, parking areas/spaces (depicted thereon (collectively, "**Landlord's Work**") and thereafter continuously and diligently pursue the completion of Landlord's Work.

Section 1.3.     Landlord's Work shall be deemed to have been substantially completed, notwithstanding that minor adjustments may be required to be made by Landlord in its work and that various items of Landlord's Work have not been fully completed, so long as Tenant would be able to reasonably use the Leased Premises for the purposes provided hereunder upon performance of Tenant's own construction, installation of its fixtures and equipment, stocking of its merchandise and staffing of its personnel. Substantial completion by Landlord shall be evidenced by a certificate of completion or certificate of substantial completion issued by Landlord's architect and any required certificate(s) or other approval instrument(s) issued by applicable governmental and/or quasi-governmental authority(ies). After the substantial completion of Landlord's Work, Landlord will proceed with reasonable diligence to cause the final completion of such work as soon as practicable thereafter.

Section 1.4.     After the Delivery Date, Tenant shall have the right to enter the Leased Premises and begin to diligently pursue the completion of the Tenant's Work, at Tenant's sole cost and expense (subject to Landlord's payment of the Tenant Improvement Allowance), and in accordance with the terms and conditions of the Lease.

Section 1.5.     In connection with any construction of improvements at the Leased Premises by Tenant prior to the Rent Commencement Date, Tenant shall take out and maintain (or cause the contractor under its construction contract(s) to take out and maintain) commercial general liability insurance as required by the Lease and provide Landlord with evidence of the same to the extent required by this Lease.

Section 1.6.     Description of Landlord's Work

- **Storefront**: Minimum 50" opening at front door for smoker access. One single door exit in rear.
- **Walls**: If the Leased Premises is sprinklered, Landlord will provide 1 hour fire rated demising walls with 5/8" Type X gyp board running to the roof deck and all wall penetrations fire caulked. If the Leased Premises is not sprinklered, Landlord will provide 2 hour fire rated walls with 5/8" Type X gyp board running to the roof deck and all wall penetrations fire caulked.
- **Domestic Water Service**: Landlord shall provide a 2" cold waterline stubbed to the rear of the Leased Premises in a located designated by Tenant. All tap fees and meter installation fees shall be at Landlord's cost. Tenant shall make application to the appropriate water utility for metered service.

DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

- **Sewer**: Landlord shall furnish and install a minimum of one (4") four inch sewer line located at the rear of the Leased Premises. Any impact fees shall be at Landlord's expense.
- **Gas**: No longer a requirement, if electric available can be used for hot water heater.
- **Electrical**: Landlord shall provide Tenant, from the Building main electrical service — 400 amp, 208/120 volt, 3 phase, 4 wire electrical system available at the back of the Building.
- **Sprinkler**: Landlord shall provide a fire sprinkler service main, or branch line for the Leased Premises, from which Tenant's fire sprinkler service shall be provided in accordance with governing code requirements for restaurant use, generally one (1) head for each 125 square feet of floor area or as required by code, if required.
- **Grease Trap**: Landlord shall install an exterior grease interceptor for Tenant's use of a type and size required by applicable code for Tenant's use, in a location mutually agreed upon. Landlord shall also stub the grease interceptor to a mutually agreed upon location. Tenant shall extend the grease line to the location it desires in accordance with its approved plans and specifications. Prior to installation of the grease trap, Landlord shall verify all plumbing invert elevations and coordinate with Tenant's fixtures.
- **Internet and Phone**: Landlord shall provide internet and phone to the rear of the Leased Premises.

## EXHIBIT F

### ENCUMBRANCES

1.  All validly existing restrictions, easements, liens, encumbrances, rights-of-way, prescriptive rights, reservations, covenants, conditions, mineral leases, mineral interests, and other instruments that affect the Shopping Center.

2.  All zoning laws, regulations and ordinances of municipal and other governmental authorities.

3.  The following restrictive covenants of record itemized below:

    Clerk's File No. 2006023374, Map Records of Brazoria County, Texas, and under Clerk's File No(s) 2001051825, 2002010779, 2002020479, 2003080263, 2004018022, 2004076439, 2006033399, 2006072217, 2008035927, 2008058725, 2009056174, 2009056181, 2009056519, 2009056520, 2011041716, 2011041717, 2011041718, 2011041719, 2011041721, 2012003005, 2012003007, 2012008063, 2013005615, 2014005144, 2010041821, 2014054900 and 2015046005 Official Records of Brazoria County, Texas.

4.  The following maters and all terms of the documents creating or offering evidence of the matters:

    a.  Easement(s) for the purpose(s) shown below and rights incidental thereto as delineated or as offered for dedication by Clerk's File No. 2006023374, Map Records of Brazoria County, Texas;

        Purpose:      Electrical Easement
        Affects:      2.5 feet along the southerly property line

    b.  Easement(s) for the purpose(s) shown below and rights incidental thereto as delineated or as offered for dedication, on the map of said tract/plat;

        Purpose:      Water and Sewer Easement
        Affects:      10 feet along the southerly property line.
        Recording:    Clerk's File No. 99-043032, Official Records of Brazoria County, Texas.

    c.  A building set-back line, as disclosed by Clerk's File No. 2006023374, Map Records of Brazoria County, Texas.

        Affects:      25 feet along the southerly property line

    d.  Terms, conditions and stipulations for the purpose(s) shown below and rights incidental thereto, as granted in a document:

        Parties:      Shadow Creek Ranch Development Company, L.P., a Nevada limited partnership and Texas Cable Partners, L.P., a Delaware limited partnership d/b/a Time Warner Communications
        Purpose:      Shadow Creek Rach Bundled Services Agreement
        Recording:    Clerk's File No(s) 01-024866 and 01-024867, Official Records of Brazoria County, Texas.

DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

e.  Terms, conditions and stipulations for the purpose(s) shown below and rights incidental thereto, as granted in a document:

Purpose:      Grant of Easements
Recording:    Clerk's File No. 2006033399, Official Records of Brazoria County, Texas.

f.  All oil, gas and other minerals and/or royalties, bonuses, rentals and all other rights relating thereto as set forth in the document:

Recording No.: Volume 796, Page 240, Deed Records of Brazoria County, Texas.

g.  All oil, gas and other minerals and/or royalties, bonuses, rentals and all other rights relating thereto as set forth in the document:

Recording No.: Volume (88) 580, Page 422, Official Records of Brazoria County, Texas.

h.  All oil, gas and other minerals and/or royalties, bonuses, rentals and all other rights relating thereto as set forth in the document:

Recording No.: Clerk's File No(s) 02-063452 and 04-076440, Official Records of Brazoria County, Texas.

i.  Assessments, charges and liens as set forth in the document:

Recording No:  Clerk's File No(s) 2001042985, 2001051825, 2003080263, 2006072217, 2008035927, 2008058725, 2009056174, 2009056181, 2009056519, 2009056520, 2012008063, 2013005615, and 2014005144 Official Records of Brazoria County, Texas.

## EXHIBIT G

### TENANT ACCEPTANCE LETTER

**VAQUERO KIRBY PARTNERS, LP**
**3211 WEST 4TH STREET**
**FORT WORTH, TX 76107**

_____, 20__

_____

Attn: _____

_____

_____

Re:    Standard Shopping Center Lease Agreement between Vaquero Kirby Partners, LP, as Landlord, and Marshland Foods, LLC, as Tenant, for _____, dated on or about _____ ___, 2017 (the "Lease")

Dear _____:

Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Lease. Tenant acknowledges that:

1. Tenant has taken possession of the Leased Premises.

2. Tenant has inspected the Leased Premises.

3. The Leased Premises are satisfactory to Tenant in the present condition and for the purpose for which they were leased.

4. Tenant has ratified the Lease.

5. Landlord has completed all improvements required by the terms of the Lease to the satisfaction of Tenant.

6. Tenant has completed the Tenant's Work in compliance with the Lease, has obtained a certificate of occupancy and is now entitled to the Tenant Improvement Allowance.

7. The Rent Commencement Date is established as _____, 20__ and the Termination Date of the initial Lease Term is established as _____, 20__.

8. The date upon which Tenant opened for business is established as _____, 20__.

If you are in agreement with the foregoing, please acknowledge your agreement by signing where indicated below.

CONFIRMED AND AGREED:

DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

LANDLORD:

VAQUERO KIRBY PARTNERS, LP

By:     Vaquero Ventures Management, LLC,
        Its General Partner

        By:    _____
               W.A. Landreth, III, Manager

TENANT:

MARSHLAND FOODS, LLC

By:     _____

Name:   _____

Title:  _____

## EXHIBIT H

## LEASE GUARANTY

In order to induce **VAQUERO KIRBY PARTNERS, LP** ("**Landlord**") to execute the foregoing Lease Agreement (the "**Lease**") with **MARSHLAND FOODS, LLC** ("**Tenant**") for a certain Leased Premises located at in the **City of Pearland, Brazoria County, Texas**, the undersigned (whether one or more than one) has guaranteed, and by this instrument does hereby guarantee, the payment and performance of all liabilities, obligations and duties (including, but not limited to, payment of rent) imposed upon Tenant under the terms of the Lease, as if the undersigned has executed the Lease as Tenant hereunder.

The undersigned hereby waives notice of acceptance of this Guaranty and all other notices in connection herewith or in connection with the liabilities, obligations and duties guaranteed hereby, including notices of default by Tenant under the Lease, and waives diligence, presentment and suit on the part of Landlord in the enforcement of any liability, obligation or duty guaranteed hereby. The undersigned hereby agrees that its obligation shall be absolute and unconditional, irrespective of any claim, counterclaim, set off, credit, or other right that may exist. The undersigned's obligations hereunder shall not be reduced, discharged, or released because of or by reason of any existing or future offset, set off, claim, or defense of Tenant, or any other person, against Landlord or against payment or performance of the undersigned's obligations hereunder, whether such offset, claim, or defense arises in connection with the Lease or otherwise.

The undersigned further agrees that Landlord shall not be first required to enforce against Tenant or any other person any liability, obligation or duty guaranteed hereby before seeking enforcement thereof against the undersigned. Suit may be brought and maintained against the undersigned by Landlord to enforce any liability, obligation or duty guaranteed hereby without joinder of Tenant or any other person. The liability of the undersigned shall not be affected by any indulgence, compromise, settlement or variation of terms which may be extended to Tenant by Landlord or agreed upon by Landlord and Tenant, and shall not be impaired, modified, changed, released or limited in any manner whatsoever by any impairment, modification, change, release, or limitation of the liability of Tenant or its estate in bankruptcy, or if any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the federal Bankruptcy Act, or any similar law or statute of the United States or any state thereof. Landlord and Tenant, without notice to or consent by the undersigned, may at any time or times enter into such extensions, amendments, assignments, subleases, or other covenants with respect to the Lease as they may deem appropriate, and the undersigned shall not be released thereby, but shall continue to be fully liable for the payment and performance of all liabilities, obligations and duties of Tenant under the Lease as so extended, amended, assigned or otherwise modified.

It is understood that other agreements similar to this guaranty may, at Landlord's sole option and discretion, be executed by other persons with respect to the Lease. This guaranty shall be cumulative of any such agreements and the liabilities and obligations of the undersigned hereunder shall in no event be affected or diminished by reason of such other agreements. Moreover, in the event Landlord obtains another signature of more than one guarantor on this page or by obtaining additional guarantee agreements, or both, the undersigned agrees that Landlord, in Landlord's sole discretion, may (i) bring suit against all guarantors of the Lease jointly and severally or against any one or more of them, (ii) compound or settle with any one or more of the guarantors for such consideration as Landlord may deem proper, and (iii) release one or more of the guarantors from liability. The undersigned further agrees that

no such action shall impair the rights of Landlord to enforce the Lease against any remaining guarantor or guarantors, including the undersigned.

If the party executing this guaranty is a corporation, then the undersigned officer personally represents and warrants that Board of Directors of such corporation, in a duty held meeting, has determined that his guaranty may reasonably be expected to benefit the corporation.

The undersigned agree(s) that if Landlord shall employ an attorney to present, enforce or defend all of Landlord's rights or remedies hereunder, the undersigned shall pay any reasonable attorney's fees incurred by Landlord in such connection.

This agreement shall be binding upon the undersigned and the successors, heirs, executors and administrators of the undersigned, and shall inure to the benefit of Landlord and Landlord's heirs, executors, administrators and assigns.

Notwithstanding anything to the contrary contained in this Guaranty, if and only if (1) no Event of Default has occurred within the immediately preceding twelve (12) month and (2) Tenant has fully paid all sums due to Landlord hereunder, including without limitation Base Rent and Additional Rent, then after Lease Year 5, this full Guaranty shall expire and be of no further force and effect; however, for the remainder of the Initial Term, Guarantor shall remain liable for the sum of one year of Rent, as well as the unamortized portions of the Tenant Improvement Allowance and any leasing commissions paid hereunder, such amortization to be calculated on a straight line basis over the Term.

EXECUTED this _____ day of _____, 2017, to be effective the same day as the effective day of the Lease.

GUARANTORS:

_____

RICK EL MOGAZI

Address:

_____

_____

_____

KRIS HICKINGBOTTOM

Address:

_____

_____

DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

_____

ROBERT RAY

Address:

_____

_____

DocuSign Envelope ID: BE20E8C6-950B-4C57-B1C2-168B13F54C4B Case 21-33989 Document 128-2 Filed in TXSB on 03/18/22 Page 58 of 69

DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

**EXHIBIT I**

**TENANT'S APPROVED SIGNAGE**



DocuSign Envelope ID: BE20E86C-950B-4C57-B4C2-168B13F54C48 Case 21-33989 Document 128-2 Filed in TXSB on 03/18/22 Page 59 of 69

DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3



**FIRST AMENDMENT**
**TO**
**STANDARD SHOPPING CENTER LEASE AGREEMENT**

This FIRST AMENDMENT TO STANDARD SHOPPING CENTER LEASE AGREEMENT (this "**Amendment**") is made effective as of April 17, 2018 by and between VAQUERO KIRBY PARTNERS, LP ("**Landlord**"), and MARSHLAND FOODS, LLC ("**Tenant**").

**Recitals**

WHEREAS, Landlord and Tenant are parties to a certain Standard Shopping Center Lease Agreement, dated on or about June 14, 2017 (the "**Lease**"), for the lease by Landlord to Tenant of that certain tract of land situated in Pearland, Texas and more particularly described in the Lease;

WHEREAS, Landlord and Tenant now desire to amend and modify the Lease as more particularly set forth in this Amendment;

NOW, THEREFORE, for and in consideration of the mutual covenants between the parties hereto and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and confessed by the parties, and for the benefit which will inure to each party from the execution of this Amendment, Landlord and Tenant hereby agree to amend and modify the Lease as follows, with each amendment and modification to be effective as of the date set forth above:

1.      The first sentence of the "Leased Premises" paragraph in Section 1 of the Lease is hereby deleted in its entirety and replaced with the following: "Suite TBD (approximately 2,001 Rentable Square Feet) of the Shopping Center situated in Pearland, Brazoria County, Texas (the "**Leased Premises**"), as shown in Exhibit A attached hereto and incorporated by reference herein."

2.      Exhibit A to the Lease is hereby deleted in its entirety and replaced by the Exhibit A attached hereto and incorporated herein by reference.

3.      The "Rent Commencement Date" paragraph in Section 1 of the Lease is hereby deleted in its entirety and replaced with the following:

"Rent Commencement Date:        Payments of Base Rent and Additional Rent under this Lease shall commence on the date that is the earlier of (a) the date Tenant opens for business or (b) September 14, 2018 (the "**Rent Commencement Date**")."

4.      The chart in the "Monthly Base Rent" paragraph in Section 1 of the Lease is hereby deleted in its entirety and replaced with the following:

| Year | Rent Per Square Foot | Monthly Base Rent |
|------|------|------|
| 1 – 5 | $36.00 | $6,003.00 |
| 6 – 10 | $39.60 | $6,603.30 |
| Extension Term(s) (if applicable) | | |
| 11 – 15 | Prevailing Market | Prevailing Market |
| 16 – 20 | Prevailing Market | Prevailing Market |

5.    The first sentence of the "Additional Rent" paragraph in Section 1 of the Lease is hereby deleted in its entirety and replaced with the following: "To be determined as set forth in the Lease, initially estimated to be $6.50 per Rentable Square Foot of the Leased Premises ($1,083.88 per month).  Tenant acknowledges and agrees that the foregoing amount is solely based on Landlord's estimate of Additional Rent with respect to the Leased Premises."

6.    The "Land and Building" paragraph in Section 1 of the Lease is hereby deleted in its entirety and replaced with the following:

"Land and Building:    Lying and being situated in the City of Pearland, Brazoria County, Texas located at the northeast corner of Broadway (FM 518) and Kirby Drive, Pearland, Brazoria County, Texas, consisting of improvements with a total of approximately 7,036 Rentable Square Feet (the "**Building**") and located on that certain real property legally described on Exhibit B (the "**Land**") (collectively, the "**Shopping Center**")."

7.    The "Tenant's Proportionate Share of the Shopping Center" paragraph in Section 1 of the Lease is hereby deleted in its entirety and replaced with the following:

"Tenant's Proportionate
Share of the Shopping Center:    28.44%"

8.    The "Tenant's Proportionate Share of the Entire Development" paragraph in Section 1 of the Lease is hereby deleted in its entirety and replaced with the following:

"Tenant's Proportionate Share
of the Entire Development:    17.12%"

9.    Defined Terms.  Capitalized terms that are not otherwise defined in this Amendment shall have the same meanings ascribed to such terms in the Lease.

10.    Counterparts.  This Amendment may be executed in multiple counterparts, and all such executed counterparts shall constitute the same agreement.  It shall be necessary to account for only one such counterpart in proving this Amendment.  To facilitate the execution and delivery of this Amendment, the parties may execute and exchange counterparts of the signature pages by facsimile or email, and the signature page of either party to any counterpart may be appended to any other counterpart.

11.    Ratification and Confirmation.  Except as expressly modified and amended hereby, all terms, conditions, and provisions of the Lease remain unamended and unmodified and the Lease, as amended and modified hereby, is hereby ratified and confirmed by Landlord and Tenant.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK
SIGNATURE PAGE FOLLOWS

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment effective as of the date set forth above.

**LANDLORD:**

VAQUERO KIRBY PARTNERS, LP

By: Vaquero Ventures Management, LLC,
   Its General Partner

By: _____
   W.A. Landreth, III, Manager

**TENANT:**

MARSHLAND FOODS, LLC

By: _____

Name: _____

Title: _____

## EXHIBIT A



# SECOND AMENDMENT
## TO
## STANDARD SHOPPING CENTER LEASE AGREEMENT

This SECOND AMENDMENT TO STANDARD SHOPPING CENTER LEASE AGREEMENT (this "**Amendment**") is made effective as of January 28, 2019 by and between VAQUERO KIRBY PARTNERS, LP ("**Landlord**"), and MARSHLAND FOODS, LLC ("**Tenant**").

### Recitals

WHEREAS, Landlord and Tenant are parties to a certain Standard Shopping Center Lease Agreement, dated on or about June 14, 2017 (the "**Original Lease**"), as amended by that certain First Amendment to Standard Shopping Center Lease Agreement dated on or about April 17, 2018 (the "**First Amendment**") (the Original Lease as amended by the First Amendment being collectively referred to herein as the "**Lease**") for the Leased Premises located in Pearland, Texas and more particularly described in the Lease;

WHEREAS, Landlord and Tenant now desire to amend and modify the Lease as more particularly set forth in this Amendment;

NOW, THEREFORE, for and in consideration of the mutual covenants between the parties hereto and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and confessed by the parties, and for the benefit which will inure to each party from the execution of this Amendment, Landlord and Tenant hereby agree to amend and modify the Lease as follows, with each amendment and modification to be effective as of the date set forth above:

1.     <u>Legal Description of Land</u>. <u>Exhibit B</u> of the Lease is hereby deleted in its entirety and replaced with <u>Exhibit B</u> attached hereto and incorporated herein by reference.

2.     <u>Defined Terms</u>. Capitalized terms that are not otherwise defined in this Amendment shall have the same meanings ascribed to such terms in the Lease.

3.     <u>Counterparts</u>. This Amendment may be executed in multiple counterparts, and all such executed counterparts shall constitute the same agreement. It shall be necessary to account for only one such counterpart in proving this Amendment.   To facilitate the execution and delivery of this Amendment, the parties may execute and exchange counterparts of the signature pages by facsimile or email, and the signature page of either party to any counterpart may be appended to any other counterpart.

4.     <u>Ratification and Confirmation</u>. Except as expressly modified and amended hereby, all terms, conditions, and provisions of the Lease remain unamended and unmodified and the Lease, as amended and modified hereby, is hereby ratified and confirmed by Landlord and Tenant.

### REMAINDER OF PAGE INTENTIONALLY LEFT BLANK
### SIGNATURE PAGE FOLLOWS

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment effective as of the date set forth above.

**LANDLORD:**

VAQUERO KIRBY PARTNERS, LP,

By:     Vaquero Ventures Management, LLC,
        Its General Partner

By:     _____
        W.A. Landreth, III, Manager

**TENANT:**

MARSHLAND FOODS, LLC

By:     _____

Name:   Rick ElMogazi

Title:  Partner

**EXHIBIT B**

**LEGAL DESCRIPTION OF LAND**

All of UNRESTRICTED LOT 1, FINAL PLAT OF SHADOW CREEK RANCH COMMERCIAL SITE NO. 3, REPLAT NO. 1, a subdivision in Brazoria County, Texas according to the map or plat thereof recorded in Document #2018058329 Official Public Records of Brazoria County, Texas.

DocuSign Envelope ID: BE20E86C-950B-4C57-B4C2-168B13F54C48

DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

# LEASE GUARANTY

In order to induce **VAQUERO KIRBY PARTNERS, LP** ("**Landlord**") to execute the foregoing Lease Agreement (the "**Lease**") with **MARSHLAND FOODS, LLC** ("**Tenant**") for a certain Leased Premises located at in the **City of Pearland, Brazoria County, Texas**, the undersigned (whether one or more than one) has guaranteed, and by this instrument does hereby guarantee, the payment and performance of all liabilities, obligations and duties (including, but not limited to, payment of rent) imposed upon Tenant under the terms of the Lease, as if the undersigned has executed the Lease as Tenant hereunder.

The undersigned hereby waives notice of acceptance of this Guaranty and all other notices in connection herewith or in connection with the liabilities, obligations and duties guaranteed hereby, including notices of default by Tenant under the Lease, and waives diligence, presentment and suit on the part of Landlord in the enforcement of any liability, obligation or duty guaranteed hereby. The undersigned hereby agrees that its obligation shall be absolute and unconditional, irrespective of any claim, counterclaim, set off, credit, or other right that may exist. The undersigned's obligations hereunder shall not be reduced, discharged, or released because of or by reason of any existing or future offset, set off, claim, or defense of Tenant, or any other person, against Landlord or against payment or performance of the undersigned's obligations hereunder, whether such offset, claim, or defense arises in connection with the Lease or otherwise.

The undersigned further agrees that Landlord shall not be first required to enforce against Tenant or any other person any liability, obligation or duty guaranteed hereby before seeking enforcement thereof against the undersigned. Suit may be brought and maintained against the undersigned by Landlord to enforce any liability, obligation or duty guaranteed hereby without joinder of Tenant or any other person. The liability of the undersigned shall not be affected by any indulgence, compromise, settlement or variation of terms which may be extended to Tenant by Landlord or agreed upon by Landlord and Tenant, and shall not be impaired, modified, changed, released or limited in any manner whatsoever by any impairment, modification, change, release, or limitation of the liability of Tenant or its estate in bankruptcy, or if any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the federal Bankruptcy Act, or any similar law or statute of the United States or any state thereof. Landlord and Tenant, without notice to or consent by the undersigned, may at any time or times enter into such extensions, amendments, assignments, subleases, or other covenants with respect to the Lease as they may deem appropriate, and the undersigned shall not be released thereby, but shall continue to be fully liable for the payment and performance of all liabilities, obligations and duties of Tenant under the Lease as so extended, amended, assigned or otherwise modified.

It is understood that other agreements similar to this guaranty may, at Landlord's sole option and discretion, be executed by other persons with respect to the Lease. This guaranty shall be cumulative of any such agreements and the liabilities and obligations of the undersigned hereunder shall in no event be affected or diminished by reason of such other agreements. Moreover, in the event Landlord obtains another signature of more than one guarantor on this page or by obtaining additional guarantee agreements, or both, the undersigned agrees that Landlord, in Landlord's sole discretion, may (i) bring suit against all guarantors of the Lease jointly and severally or against any one or more of them, (ii) compound or settle with any one or more of the guarantors for such consideration as Landlord may deem proper, and (iii) release one or more of the guarantors from liability. The undersigned further agrees that no such action shall impair the rights of Landlord to enforce the Lease against any remaining guarantor or guarantors, including the undersigned.

DocuSign Envelope ID: BE20E58C6-950B-4C57-B1C2-168B13F54C48
DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

If the party executing this guaranty is a corporation, then the undersigned officer personally represents and warrants that Board of Directors of such corporation, in a duty held meeting, has determined that his guaranty may reasonably be expected to benefit the corporation.

The undersigned agree(s) that if Landlord shall employ an attorney to present, enforce or defend all of Landlord's rights or remedies hereunder, the undersigned shall pay any reasonable attorney's fees incurred by Landlord in such connection.

This agreement shall be binding upon the undersigned and the successors, heirs, executors and administrators of the undersigned, and shall inure to the benefit of Landlord and Landlord's heirs, executors, administrators and assigns.

Notwithstanding anything to the contrary contained in this Guaranty, if and only if (1) no Event of Default has occurred within the immediately preceding twelve (12) month and (2) Tenant has fully paid all sums due to Landlord hereunder, including without limitation Base Rent and Additional Rent, then after Lease Year 5, this full Guaranty shall expire and be of no further force and effect; however, for the remainder of the Initial Term, Guarantor shall remain liable for the sum of one year of Rent, as well as the unamortized portions of the Tenant Improvement Allowance and any leasing commissions paid hereunder, such amortization to be calculated on a straight line basis over the Term.

EXECUTED this ___7th___ day of ___June___, 2017, to be effective the same day as the effective day of the Lease.

GUARANTORS:

*Rick ElMogazi*

RICK EL MOGAZI

Address:

3237 Portrush Dr. Lake Charles, LA 70605
3237 Portrush Dr. Lake Charles, LA 70605

KRIS HICKINGBOTTOM

Address:

1469 Hickory Ridge Dr. Lake Charles, LA 70611
1469 Hickory Ridge Dr. Lake Charles, LA 70611

*Robert Ray*

ROBERT RAY

Address:

DocuSign Envelope ID: BE20E58C6-950B-4C57-B1C2-168B13F54C48

DocuSign Envelope ID: ECB65410-3BF8-4470-ADAD-59C9D45913A3

Robert Ray
Robert Ray